**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-02992-STV

DETROIT STREET PARTNERS INC. AND
BIRCHWOOD RESOURCES INC.,

Plaintiffs,

v.

JAMES A. LUSTIG, JAL VENTURES CORPORATION, CLFS EQUITIES, LLLP, UNITED
CAPITAL MANAGEMENT, INC., GLOBAL CAP LIMITED, INC., BRANDON PERRY,
ULTIMATE VENTURES, INC., JONATHAN MARSICO, HAVEN CAPITAL VENTURES
INC., BRETT PERRY, PINEHURST CAPITAL, INC., WILLIAM SANDLER, RANCHO
HOLDINGS, LLC,  ANDREW HARRISON, JZ CAPITAL, LLC, SAMUEL ZAITZ, SMM
INVESTMENTS, INC., STEWART "SKIP" MILLER, ARROWHEAD INVESTMENTS, INC.,
STEVE SHOFLICK, ALTERMAN HARRISON INVESTMENTS, INC., BENNETT PAUL
"BUZZ" ALTERMAN, ALLIED FUNDING, INC., RIO NORTE CAPITAL, INC., KEN
LANDE, MESA INVESTMENT PARTNERS, LLC, TODD J. EBERSTEIN, JMC CAPITAL,
INC., JORDAN COHEN, PEAK CAPITAL PARTNERS INC., RICKI REST, JAF HOLDINGS
INC., JAN FALBER, PREAKNESS CAPITAL MANAGEMENT INC., WILLIAM HALL,
ROCK SPRINGS INVESTMENTS, LLC, and JONATHAN VINNIK,

Defendants.

---

## AMENDED COMPLAINT AND JURY DEMAND

---

COMES NOW the Plaintiffs, by and through counsel, and for their Complaint against the

Defendants named herein, state and allege as follows:[1]

## <u>PRELIMINARY STATEMENT</u>

Plaintiffs Birchwood Resources Inc. ("<u>Birchwood</u>") and Detroit Street Partners Inc.

("<u>Detroit Street</u>") are securities traders that opened accounts at a prominent private bank with a

---

[1] All allegations as to Plaintiffs are based upon personal knowledge and all allegations as to Defendants and other
persons are based upon information and belief.

branch office in Denver, Colorado (the "Bank") in 2005 and 2013, respectively, for the purpose

of engaging in securities transactions. Both Plaintiffs are owned and controlled by Mr. David

Berlin, who conducted securities trades through Birchwood's account at the Bank between 2005

and 2013 and through Detroit Street's account at the Bank between 2013 and the present.

1. Defendant James A. Lustig ("Lustig"), who is domiciled in Colorado and maintains his

principal place of business at 410 17th Street, Suite 1705, Denver, CO 80202, is the

mastermind behind the development and operation of a massive racketeering enterprise

through which he and the other Defendants have for years engaged – and continue to

engage – in countless instances of market manipulation, wire fraud, mail fraud, securities

fraud, and other racketeering activities that have directly injured – and continue to

directly injure – Plaintiffs to the tune of tens of millions of dollars.

2. In support of his massive racketeering enterprice, Lustig directly controls and manages:

Defendant JAL Ventures Corporation ("JAL"), a Colorado corporation, (ii) CLFS

Equities, LLLP ("CLFS"), a Colorado limited liability partnership, and (iii) United

Capital Management, Inc. ("United"), a Colorado corporation.

3. As clients of the Bank, Plaintiffs and Defendant JAL were eligible to compete for

valuable and highly sought-after shares issued in initial public offerings that were

underwritten by the Bank's affiliate ("IPO Shares"). When Birchwood first opened its

account with the Bank sometime in 2005, the prerequisite for receiving such IPO Shares

was that Birchwood (directly or through its affiliates) have at least $10 million in assets

on deposit with the Bank. Later, around 2007 or 2008, the Bank changed its policy such

that clients who did not have at least $10 million on deposit would still become eligible to

receive IPO Shares if they generated and paid trading commissions for the Bank equal to

at least $600,000. After this policy change, those clients that had $10 million on deposit and/or had generated at least $600,000 in commissions would compete with each other to become top tier clients of the Bank, *i.e.*, the highest commission-generating accounts, as those clients in the top tier received the vast majority of the IPO Shares allocated by the Bank.

4.     Because of the way the Bank's rules were structured, multiple Bank clients generating trading commissions for the Bank would collectively be allocated a larger number of IPO Shares than an individual client generating the same total amount of commissions. For example, if Companies A, B, C, D and E each separately generated $600,000 in commissions for the Bank in one year, for a total of $3 million, the total number of IPO Shares that were allocated to them, collectively, would be larger than the number of IPO Shares allocated to Company F, which had itself generated $3 million in commissions for the Bank that same year.

5.     This revised structure for the allocation of IPO Shares in effect created an auction-like scenario, where the true price of purchasing IPO Shares included not only the initial offering price of the IPO Shares themselves that a Bank client pays, but also the hundreds of thousands of dollars in commissions that each client had to generate for and pay to the Bank in order to be allowed to purchase such IPO Shares.

6.     Plaintiffs Birchwood (between 2005 and 2013) and Detroit Street (between 2013 and the present) purchased every single IPO Share allocation offered to them by the Bank and, over the first several years of its relationship with the Bank, Birchwood earned profits ranging between $3 and $5 million per year from the sale of such IPO Shares.

7.      In or before 2011, Lustig began unlawfully manipulating this structure by working with

        JAL, CLFS, United, and dozens of his friends, family members, and associates to create

        <u>nearly twenty</u> straw man entities that, on paper, are purportedly controlled by those

        individuals but that, in reality, are financed, operated, and controlled by Lustig himself.

        These entities opened accounts with the Bank by providing false information to the Bank

        and then, through those accounts, they engaged (and continue to engage) in illegal

        churning – *i.e.*, repeatedly consummating securities transactions lacking any economic

        substance such as "wash sales"– for the sole purpose of generating enough commissions

        to become top tier clients of the Bank and thereby receive the valuable IPO Share

        allocations at the expense of Plaintiffs and other innocent Bank customers.[2]  The entities

        then purchase and quickly sell the IPO Shares that they are allocated, resulting in millions

        of dollars of ill-gotten profit per year that is shared among Lustig and his affiliates.

8.      Lustig's vast and unlawful scheme to manipulate the market for IPO Shares in this way

        (the "<u>IPO Market Manipulation Scheme</u>") has directly caused (and continues to cause)

        millions of dollars of damages per year to Plaintiffs and other law-abiding clients of the

        Bank who are not participants in the IPO Market Manipulation Scheme.

9.      In order to facilitate the execution of the IPO Market Manipulation Scheme and to

        conceal the Scheme from regulators and the investing public, the law firm Brownstein

        Hyatt Farber Schreck ("<u>Brownstein Farber</u>") drafted contractual provisions that were

        executed among Lustig, JAL, CLFS, United and others that would purport to keep the

---

[2] "Wash sales involve the use of techniques designed to give the appearance of submitting trades to the open market, while negating the risk or price competition incident to the market.  Wash trading produces a virtual financial nullity because the resulting net financial position is near or equal to zero."  *Wilson v. CFTC*, 322 F.3d 555, 559 (8th Cir. 2003).  *See also Edward J. Mawod & Co. v. S.E.C.*, 591 F.2d 588, 591-92, 595 (10th Cir. 1979) (holding certain wash sales to be "per se manipulative").

IPO Market Manipulation Scheme confidential. Such contractual provisions are against public policy and not enforceable. Brownstein Farber should have known that the contractual provisions that it drafted and that were executed among Lustig, JAL, CLFS, United and others were intended to be used in, and were used in, "racketeering activity" as defined by C.R.S. 18-17-103(5). Brownstein Farber should have known that its actions could be construed as having participated in the racketeering enterprise under C.R.S. 18-17-103(3). In fact, upon information and belief, name partner Steven W. Farber is the "F" in CLFS.

10.     The IPO Market Manipulation Scheme has enabled Lustig to profit from a far greater number of IPO Shares than he would have had he simply generated commissions for the Bank in his own account through legitimate trading. Indeed, but for the IPO Market Manipulation Scheme, the majority of the IPO Shares that Lustig has received and/or profited from would, under the policies of the Bank, instead have been allocated to Plaintiffs and other innocent clients of the Bank. As a result of the IPO Market Manipulation Scheme, Plaintiffs have seen a steady decrease in the amount of IPO Shares allocated to them, and thus a steady decrease in the profits that they have earned on the sale of such IPO Shares.

11.     Moreover, by creating more than twenty illegal sham entities and engaging in churning to artificially generate commissions, Lustig and the other Defendants have caused (and continue to cause) an artificial increase in the number of accounts with which Plaintiffs must compete in order to become top tier clients, which has required Plaintiffs to increase their – legitimate and lawful – trading activity in order to generate up to five times higher commissions just to stay on the list. Thus, Lustig has artificially increased (and continues

to artificially increase) the true price of the IPO Shares – *i.e.*, the amount of commissions that Plaintiffs and other innocent clients of the Bank must generate in order to be considered top tier clients and allocated IPO Shares.

## PARTIES, JURISDICTION AND VENUE

12. Plaintiff Birchwood is a Colorado corporation which, at all times relevant to the claims herein, maintained its principal place of business in Colorado.

13. Plaintiff Detroit Street is a Colorado corporation which, at all times relevant to the claims herein, maintained its principal place of business in Colorado.

14. At all times relevant to the claims asserted herein, Defendant Lustig resided in California and Colorado but was domiciled in Colorado. Lustig maintains his principal place of business at 410 17th Street, Suite 1705, Denver, CO 80202.

15. Defendant JAL is a corporation registered to transact business in Colorado. JAL at all times relevant to the claims herein, maintained its principal place of business at 410 17th Street, Suite 1705, Denver, CO 80202. JAL has two accounts with the Bank that receive IPO Share allocations: one doing business as Greenwich Asset Management ("Greenwich") and one doing business as Hampden Place Associates ("Hampden Place" and, together with Greenwich, the "JAL DBAs").

16. Defendant CLFS is a limited liability limited partnership registered to transact business in Colorado. CLFS at all times relevant to the claims herein, maintained its principal place of business at 410 17th Street, Suite 1705, Denver, CO 80202.

17. Defendant United is a corporation registered to transact business in Colorado.  United at all times relevant to the claims herein, maintained its principal place of business at 410 17th Street, Suite 1705, Denver, CO 80202.

18. Defendant Global Cap Limited, Inc. ("Global") is a Delaware Corporation registered to transact business in Colorado. Global and its manager, Defendant Brandon Perry, individually ("Brandon"), at all times relevant to the claims herein, maintained their principal place of business at 22 Foxtail Circle, Cherry Hills Village, Colorado 80113. Defendant Brandon is a close friend of Defendant Lustig's.  He is also the son of Defendant Rest (defined below) and the brother of Defendant Brett (defined below).

19. Defendant Ultimate Ventures, Inc. ("Ultimate") is a corporation registered to transact business in Colorado.  Ultimate and its manager, Defendant Jonathan Marsico, individually ("Marsico"), at all times relevant to the claims herein, maintained their principal place of business at 5251 DTC Parkway, Suite 410, Englewood, Colorado 80111.  Defendant Marsico is a close friend of Lustig's.  He is also the step-son of Defendant Sandler (defined below).

20. Defendant Haven Capital Ventures Inc. ("Haven") is a California limited liability company registered to transact business in Colorado.  Its manager(s) are Defendant(s) Brett Perry ("Brett") and/or Andrew Harrison ("Harrison").  At all times relevant to the claims herein, Haven maintained its principal place of business at 4660 La Jolla Village, Suite 500, San Diego, California 92122.  Brett is a full-time resident of Colorado. Through phone calls, emails, and/or in person visits, Haven, Brett and Harrison regularly transacted, and continue to transact, business related to the IPO Market Manipulation Scheme in Colorado.  Additionally, pursuant to C.R.S. 11-51-706(4), Haven's, Brett's,

and Harrison's violations of C.R.S. 11-51-501, as described more fully below, constitute the transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124. Defendants Brett and Harrison are close friends of Defendant Lustig's. Defendant Brett is also the brother of Defendant Brandon and the son of Defendant Rest (defined below). Defendant Harrison is also the former brother-in-law of Defendant Alterman (defined below).

21. Defendant Pinehurst Capital, Inc. ("Pinehurst") is a corporation registered to transact business in Colorado. Pinehurst and its manager, Defendant William Sandler, individually ("Sandler"), at all times relevant to the claims herein, maintained their principal place of business at 4 Buell Mansion Parkway, Cherry Hills Village, Englewood, Colorado 80113. Defendant Sandler is a close friend of Lustig's. He is also the step-father of Defendant Marsico.

22. Defendant Rancho Holdings, LLC ("Rancho") is a limited liability company registered to transact business in Colorado. Rancho and its manager(s), Defendant(s) Harrison and/or Brett, individually, at all times relevant to the claims herein, maintained their principal place of business at 4950 S Yosemite St, F2#349, Greenwood Village, CO 80111.

23. Defendant JZ Capital, LLC ("JZ") is a limited liability company registered to transact business in Colorado. JZ and its manager, Defendant Samuel Zaitz, individually ("Zaitz"), at all times relevant to the claims herein, maintained their principal place of business at 55 Cherry Lane Drive, Englewood, Colorado 80113. Defendant Zaitz is a friend of Defendant Lustig's.

24. Defendant SMM Investments, Inc. ("SMM") is a corporation registered to transact business in Colorado. SMM and its manager, Defendant Stewart "Skip" Miller,

individually ("Miller"), at all times relevant to the claims herein, maintained their principal place of business at 999 18th Street, Suite 3000, Denver, Colorado 80202. Defendant Miller is Defendant Lustig's brother-in-law.

25. Defendant Arrowhead Investments, Inc. ("Arrowhead") is a corporation registered to transact business in Colorado. Arrowhead and its manager, Defendant Steve Shoflick, individually ("Shoflick"), at all times relevant to the claims herein, maintained their principal place of business at 4200 East Perry Parkway, Greenwood Village, Colorado 80121. Defendant Shoflick is Defendant Lustig's nephew-in-law. He is also Defendant Miller's son-in-law.

26. Defendant Alterman Harrison Investments, Inc. ("AHI") is a corporation registered to transact business in Colorado. AHI and its manager, Defendant Bennett Paul "Buzz" Alterman, individually ("Alterman"), at all times relevant to the claims herein, maintained their principal place of business at 7877 East Mississippi Ave., #107, Denver, Colorado 80247. Defendant Alterman is a friend of Defendant Lustig's. He is also Defendant Harrison's former brother-in-law.

27. Defendant Allied Funding, Inc. ("Allied") is a Delaware corporation registered to transact business in Colorado. Allied and its manager, Defendant Brandon, individually, at all times relevant to the claims herein, maintained their principal place of business at 4950 South Yosemite Street, #F2411, Greenwood Village, Colorado 80111.

28. Defendant Rio Norte Capital, Inc. ("Rio Norte") is a corporation registered to transact business in California. Rio Norte and its manager, Defendant Ken Lande, individually ("Lande"), at all times relevant to the claims herein, maintained their principal place of business at 2851 Haddington Drive, Los Angeles, California 90064. Through phone calls,

emails, and/or in person visits, Rio Norte and Lande regularly transacted, and continue to transact, business related to the IPO Market Manipulation Scheme in Colorado. Additionally, pursuant to C.R.S. 11-51-706(4), Lande's and Rio Norte's violations of C.R.S. 11-51-501, as described more fully below, constitute the transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124. Defendant Lande is Defendant Lustig's son-in-law.

29.     Defendant Mesa Investment Partners, LLC ("Mesa") is a limited liability company registered to transact business in California. Mesa and its manager, Defendant Todd J. Eberstein, individually ("Eberstein"), at all times relevant to the claims herein, maintained their principal place of business at 465 Mesa Road, Santa Monica, California 90402. Through phone calls, emails, and/or in person visits, Mesa and Eberstein regularly transacted, and continue to transact, business related to the IPO Market Manipulation Scheme in Colorado. Additionally, pursuant to C.R.S. 11-51-706(4), Eberstein's and Mesa's violations of C.R.S. 11-51-501, as described more fully below, constitute the transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124. Defendant Eberstein is related to a close friend of Defendant Lustig's.

30.     Defendant JMC Capital, Inc. ("JMC") is a corporation registered to transact business in California. JMC and its manager, Defendant Jordan Cohen, individually ("Cohen"), at all times relevant to the claims herein, maintained their principal place of business at 9595 Wilshire Boulevard, Suite 410, Beverly Hills, California 90212. Through phone calls, emails, and/or in person visits, JMC and Cohen regularly transacted, and continue to transact, business related to the IPO Market Manipulation Scheme in Colorado.

Additionally, pursuant to C.R.S. 11-51-706(4), Cohen's and JMC's violations of C.R.S. 11-51-501, as described more fully below, constitute the transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124. Defendant Cohen is a friend of Defendant Lustig's.

31. Defendant Peak Capital Partners, Inc. ("Peak") is a corporation registered to transact business in Colorado. Peak and its manager, Defendant Ricki Rest, individually ("Rest"), at all times relevant to the claims herein, maintained their principal place of business at 5 Cherry Hills Farm Drive, Englewood, CO 80113. Defendant Rest is a close friend of Defendant Lustig's. She is also Defendants Brandon and Brett's mother.

32. Defendant JAF Holdings, Inc. ("JAF") is a New Jersey corporation registered to transact business in New York. JAF and its manager, Defendant Jan Falber, individually ("Falber"), at all times relevant to the claims herein, maintained their principal place of business at 250 E. 63rd St., Apt. 19C, New York, NY 10065. Through phone calls, emails, and/or in person visits, JAF and Falber regularly transacted, and continue to transact, business related to the IPO Market Manipulation Scheme in Colorado. Additionally, pursuant to C.R.S. 11-51-706(4), Falber's and JAF's violations of C.R.S. 11-51-501, as described more fully below, constitute the transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124.

33. Defendant Preakness Capital Management Inc. ("Preakness") is a corporation registered to transact business in Colorado. Preakness and its manager, William Hall, individually ("Hall"), at all times relevant to the claims herein, maintained their principal place of business in Denver, Colorado. Defendant Hall is a business associate of Defendant Lustig's.

34.    Defendant Rock Springs Investments LLC ("Rock Springs") is a limited liability company registered to transact business in Colorado.  Rock Springs and its manager, Defendant Jonathan Vinnik, individually ("Vinnik"), at all times relevant to the claims herein, maintained their principal place of business at 360 South Garfield Street, Suite 600, Denver, CO 80209.  Defendant Vinnik is a friend and business associate of Defendant Lustig's.

35.    Defendants Global, Ultimate, Haven, Pinehurst, Rancho Holdings, JZ, SMM, Arrowhead, AHI, Allied, Rio Norte, Mesa, JMC, Peak, JAF, Preakness, and Rock Springs shall be collectively referred to herein as the "Affiliated Entities."

36.    Defendants Brandon, Marsico, Brett, Sandler, Harrison, Zaitz, Miller, Shoflick, Alterman, Lande, Eberstein, Cohen, Rest, Falber, Hall, and Vinnik shall be collectively referred to herein as the "Affiliated Individuals."

37.    The Affiliated Entities and the Affiliated Individuals shall collectively be referred to herein as the "Affiliates."

38.    The acts and omissions complained of herein, which directly caused injury to Plaintiffs, occurred in Denver County, State of Colorado.

39.    This Court has jurisdiction over the parties for the reasons set forth in paragraphs 13-35.

40.    This Court has original subject matter jurisdiction over the Tenth, Eleventh, Twelfth, and Thirteenth Claims to Relief set forth herein pursuant to 28 U.S. Code § 1331 because such claims arise under the laws of the United States.

41.    This Court has supplemental subject matter jurisdiction over the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Fourteenth and Fifteenth Claims to Relief set forth herein pursuant to 28 U.S.C. § 1367 because such claims are so related to claims

within the Court's original jurisdiction as set forth in paragraph 41 that they form part of the same case or controversy under Article III of the United States Constitution.

42. This civil action is properly brought in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because this judicial district is the locus in which a substantial part of the events and omissions giving rise to the claims occurred.

## GENERAL ALLEGATIONS

43. In order to raise new capital, a company may decide to sell ownership of its shares to the public by issuing stock in an initial public offering, or "IPO". As an integral step in this process, the company will retain one or more investment banks that will agree to underwrite the IPO. When a company goes public, the initial offering price (the price paid by the initial buyers of the stock) is established by the company and underwriters based on their best estimation of the market. Once issued, the stock price is determined by market forces. It has been documented that shares issued in IPOs generally trade on the open market at a price significantly higher than the initial offering price. Thus, investors who can purchase the stock at the initial offering price can often make an immediate and substantial profit by selling their stock in the aftermarket at the higher post-IPO price. As a result, investors vie for the right to purchase stock at the initial IPO price.

44. One of the Bank's affiliates is among the world's leading underwriters, and as part of its work for companies going public, the Bank typically receives allotments of IPO stock at the initial attractive IPO price. Plaintiffs Birchwood and Detroit Street are securities traders that opened accounts at the Bank in 2005 and 2013, respectively, for the purpose of engaging in securities transactions. At the time of opening its account, Plaintiff

Birchwood was informed that, under then-prevailing Bank policies, if Birchwood (directly or through its affiliates) deposited in excess of $10 million with the Bank, the Bank would provide Birchwood with preferential access to valuable allocations of IPO Shares from an exclusive Bank trading desk in New York City, and that the IPO Share allocations were exclusive benefits reserved for the Bank's private clients – clients whose deposits at the Bank were above a certain threshold.

45.    In accordance with the Bank's policies, and in part in order to receive preferential access to IPO Share allocations, Birchwood, through its affiliates, deposited in excess of $10 million with the Bank when its securities account was opened in or around 2005, and began receiving and trading valuable IPO Share allocations.  Plaintiffs opted to purchase every IPO Share allocation offered to them by the Bank and earned profits of approximately $3 to $5 million per year from the sale of such IPO Shares over the first several years their accounts were open.

46.    In or around 2008, without notifying Birchwood, the Bank changed its policy such that it would allocate IPO Shares to its private banking clients based on the amount of commission revenue each account generated for the Bank through trading in securities, rather than the amount each account had on deposit.  Pursuant to this Bank policy change, clients were not required to have deposited in excess of $10 million with the Bank in order to be eligible to receive IPO Share allocations provided that they generated at least $600,000 in commission revenue for the Bank.

47.    After this policy change (which Birchwood was at first unaware of), those clients with at least $10 million on deposit <u>and</u> those that had generated at least $600,000 in commissions would compete with each other to become top tier clients of the Bank, *i.e.*,

to be among the highest commission-generating accounts, as those top tier clients would receive the vast majority of the Bank's IPO Share allocations. To remain top tier clients, and thereby to receive the most IPO Share allocations, a Bank customer would have to generate <u>as much as $100,000 in commissions every month</u>.

48.     Birchwood continued the banking relationship with the Bank after this policy change regarding how IPO Shares are allocated, and substantially increased its trading activity in an effort to remain a top tier client of the Bank. In 2013, as a result of an internal restructuring of Mr. Berlin's family office, Birchwood closed its account with the Bank and Detroit Street opened an account with the Bank through which Mr. Berlin began conducting securities trading. From that point on, Detroit Street continually increased its trading activity in an effort to remain a top tier client of the Bank. At all times, Mr. Berlin had only one account with the Bank through which he conducted securities trading and received IPO Share allocations. Moreover, both Plaintiffs Birchwood and Detroit Street only engaged in securities transactions that had economic substance and only paid commissions to the Bank based on legitimate trading activity.

49.     Defendants, on the other hand, unscrupulously exploited the Bank's new allocation policy regarding IPO Shares. Through a series of fraudulent schemes to open accounts in violation of Bank and FINRA rules and policies, and then to engage in collusive sham trading, the Defendants unlawfully obtained the opportunity to purchase a greater portion of the IPO Shares available for purchase, thus reducing the number of IPO Shares that Birchwood and (later) Detroit Street were able to buy and costing Birchwood and (later) Detroit Street the financial benefits flowing from those purchases.

50.     Specifically, Lustig, United, JAL, and CLFS (the "Lustig Defendants") associated in fact with the Affiliates to create an enterprise (the "Enterprise") which they operated for the purpose of: (i) generating commissions for the Bank through churning, that is, consummating transactions that lack economic substance, and thereby (ii) obtaining greater numbers of IPO Shares and profits for the Lustig Defendants and the Affiliates (collectively, the "Defendants") than they would have obtained had they not engaged in the unlawful conduct.

51.     The Defendants knowingly conducted, and participated in conducting, the Enterprise through the repeated commission of acts constituting "racketeering activity" under C.R.S. 18-17-103(5), including, without limitation:

a.      conduct indictable under 18 U.S.C. §1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud) and/or 18 U.S.C. § 1956 (laundering of monetary instruments);

b.      violations of Colorado state securities statutes:

   i.      C.R.S. 11-51-401 (acting as an unlicensed Broker/Dealer and/or investment adviser and/or failing to file the notice and fee required in sections 11-51-403 and 11-51-404 with the Colorado securities commissioner);

   ii.      C.R.S. 11-51-501(a) (knowing participation in a device, scheme or artifice to defraud in connection with the offer, sale, or purchase of securities);

   iii.      C.R.S. 11-51-501(1)(b) (knowing participation in the making of untrue statements of material fact, or the omission of necessary statements of material fact in connection with the offer, sale, or purchase of securities); and

iv.      C.R.S. 11-51-501(1)(c) (knowing participation in acts, practices, and a course of business which operated as a fraud or deceit upon other persons in connection with the offer, sale, or purchase of securities); and

c.      violations of federal securities statutes:

i.      subsections (a) and (c) of Rule 10b-5 promulgated by the Securities and Exchange Commission pursuant to 15 U.S.C. §78j(b) ("Rule 10b-5"); and

ii.      subsection (b) of Rule 10b-5.

52.      This conduct has directly caused (and continues to directly cause) millions of dollars of damages per year to Plaintiffs and other innocent clients of the Bank who are not associated with the Enterprise ("Innocent Bank Clients").

53.      Specifically, the Defendants' commission of these acts constituting of racketeering activity, *i.e.*, the IPO Market Manipulation Scheme, directly caused (and continues to cause) an artificial increase in the number of accounts with which Birchwood and (later) Detroit Street were required to compete in order to remain top tier clients of the Bank, and thus an artificial increase in the amount of commissions that Birchwood and (later) Detroit Street were required to generate in order to remain top tier clients. Indeed, Birchwood and (later) Detroit Street had to generate up to five times higher commissions just to remain top tier clients and continue to receive IPO Share allocations. Thus, Lustig and the other Defendants have artificially increased (and continue to artificially increase) the true price of the IPO Shares – *i.e.*, the amount of commissions that Plaintiffs and other Innocent Bank Clients were (and are) required to generate in order to be considered top tier clients and allocated IPO Shares.

54.     The IPO Market Manipulation Scheme has also directly caused (and continues to cause) the Affiliated Entities to receive substantial numbers of IPO Shares that otherwise would have been allocated to Plaintiffs and other Innocent Bank Clients.  The sale of such IPO Shares by the Affiliated Entities generated (and continues to generate) substantial profits that were and are shared by Lustig and the Affiliated Individuals but that, in the absence of the the misconduct described herein, would have been shared by Innocent Bank Clients.  Indeed, Birchwood and (later) Detroit Street have seen their profits from the sale of IPO Shares allocated to them decrease steadily over the past seven years, notwithstanding that the amounts they have paid in commissions to the Bank have skyrocketed over that same period.

55.     The IPO Market Manipulation Scheme operated (and continues to operate) as follows:

   a.     At the direction of the Lustig Defendants and its respective Affiliated Individual, each Affiliated Entity opened a securities account with the Bank.

   b.     The Lustig Defendants provided approximately $600,000 to each of the Affiliated Entities, and directed which securities the Affiliated Entities would purchase and sell on an ongoing basis.  In so doing, Lustig and JAL acted (and continue to act) as unlicensed broker-dealers and/or investment advisers in violation of C.R.S. 11-51-401, and/or have failed to file the notice and pay the fee required in sections 11-51-403 and 11-51-404 with the Colorado securities commissioner.

   c.     At the direction of the Lustig Defendants and its respective Affiliated Individual, each Affiliated Entity used (and continues to use) the money fronted by the Lustig Defendants to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating

enough commissions for the Bank to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations. Through such deceptive and manipulative conduct, the Lustig Defendants and Affiliates knowingly controlled and artificially affected (and continue to control and artificially affect) the market for IPO Share allocations by the Bank in violation of C.R.S. 11-51-501(1)(a) and (c), as well as subsections (a) and (c) of Rule 10b-5.

d.   When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, each of the Affiliated Entities, at the direction of the Lustig Defendants and its respective Affiliated Individual, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds it uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

e.   Each Affiliated Entity generated (and continues to generate) substantial commissions for the Bank each year and thus received (and continues to receive) many millions of dollars' worth of IPO Share allocations, which they purchased and then quickly sold (and continue to purchase and quickly sell) at a substantial profit.

f.   The Affiliated Entities repaid (and continue to repay) funds advanced by the Lustig Defendants, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of each Affiliated Entity's profits from the sale of IPO Shares are paid to the Lustig Defendants.

g.     The Lustig Defendants and the Affiliates used (and continue to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for the Affiliated Entities.

h.     Each of the Lustig Defendants and the Affiliates used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the activities described in paragraphs a-g above, in violation of 18 USC §§ 1341 (mail fraud) and 1343 (wire fraud). Specifically, Defendants used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by authorizing the churning transactions. In addition, Defendants mailed or caused to be mailed bank account opening documents containing materially false and fraudulent information in violation of 18 U.S.C. § 1341.

i.     In violation of 18 U.S.C. § 1956, each of the Lustig Defendants and the Affiliates knowingly engaged in money laundering by conducting financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such mail fraud, wire fraud, and fraud in the sale of securities, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud, wire fraud, and fraud in the sale of securities.

56. An internal database controlled by the Lustig Defendants, to which Plaintiffs have previously had access, contains the following information:

   a. account numbers for the Affiliated Entities' accounts;

   b. information regarding the "wash sales" in which the Affiliated Entities' participated;

   c. dates of transactions;

   d. amount of stock traded and dollar amount of transactions;

   e. sources of funds used to conduct transactions;

   f. commissions paid on transactions;

   g. profits and losses from transactions;

   h. IPO Share allocations received;

   i. dates of IPO Share allocations;

   j. price of allocated IPO Shares;

   k. number of allocated IPO Shares purchased;

   l. profits made on sale of purchased IPO Shares; and

   m. division of profits from sale of purchased IPO Shares.

57. The Lustig Defendants and their employees have the user names and passwords necessary to access this information. Defendants are under a legal duty to preserve this information and requests to preserve this information have been sent to Defendant Lustig.

58. Similar information is also contained on the Triad Securities website https://secure.triadsecurities.com/login.

59.     The internal databases controlled by the Lustig Defendants and the information contained on the Triad Securities website https://secure.triadsecurities.com/login are incorporated by reference as if fully set forth herein.

## FIRST CLAIM FOR RELIEF

### Colorado Organized Crime Control Act (COCCA)

### C.R.S. 18-17-104(3) and 18-17-106

60.     All allegations previously stated herein are incorporated by reference.

61.     Each Defendant violated, and continues to violate, C.R.S. 18-17-104(3) because each Defendant was (and continues to be) associated with the Enterprise and has knowingly participated (and continues to knowingly participate) in the Enterprise through an ongoing pattern of racketeering activity.

62.     The Enterprise is an association in fact among the Lustig Defendants, the Affiliated Entities, and the Affiliated Individuals, the purpose of which is to generate trading commissions for the Bank through churning and to obtain IPO Share allocations for the Affiliated Entities, which IPO Share allocations are purchased and then quickly sold for profits that are shared among Lustig and the Affiliated Individuals.

63.     The pattern of racketeering activity consists of the Defendants' repeated and ongoing violations of 18 USC §§ 1341, 1343, and 1956; C.R.S. 11-51-501(1)(a), (b), and (c); and Rule 10b-5(a), (b), and (c), through the IPO Market Manipulation Scheme.  The IPO Market Manipulation Scheme constitutes:

a.      a device, scheme or artifice to defraud that Defendants knowingly employed in connection with the offer, sale, and purchase of IPO Shares allocated by the Bank to its clients;

b.    a course of business knowingly engaged in by Defendants which operated as a fraud or deceit upon Plaintiffs and other Innocent Bank Clients in connection with the offer, sale, and purchase of IPO Shares allocated by the Bank to its clients; and

c.    manipulative and deceptive conduct knowingly engaged in by Defendants that controlled and artificially affected the market for IPO Shares allocated by the Bank to its clients, which market was relied upon by Plaintiffs and other Innocent Bank Clients who were injured by reason thereof.

Moreover, in connection with implementing the IPO Market Manipulation Scheme, Lustig, JAL, and the Affiliates have: (i) violated (and continue to violate) C.R.S. 11-51-501(b) by making untrue statements of material fact on account opening documents and FINRA Form 5130/5131 IPO Disclosure Forms; (ii) used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of such activities in violation of 18 U.S.C. §§ 1341 and 1343; and (iii) violated (and continue to violate) the anti-money laundering provisions set forth in 18 U.S.C. § 1956 by conducting financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (A) with the intent to promte the carrying on of such mail fraud, wire fraud, and fraud in the sale of securities, and (B) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud, wire fraud, and fraud in the sale of securities.

64.    Defendant Lustig knowingly participated, and continues to participate in conducting the Enterprise and the IPO Market Manipulation Scheme as follows:

a.   Lustig leads, orchestrates, manages, and is the mastermind behind, the IPO Market Manipulation Scheme.

b.   Lustig directed the opening of separate Bank accounts for United, CLFS, and the JAL DBAs, which Lustig controlled and managed (and continues to control and manage).

c.   Lustig directed the opening of separate Bank accounts for the Affiliated Entities, which Lustig controlled and managed (and continues to control and manage) through a form of joint venture agreement with such Affiliated Entities.

d.   Lustig provided funds in the amount of approximately $600,000 to United, the JAL DBAs, and the Affiliated Entities so that they could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

e.   Lustig provided (and continues to provide) advice and analysis to the Affiliated Entities regarding the purchase and sale of securities, and directed (and continues to direct) which securities should be purchased and sold.  In so doing, Lustig acted (and continues to act) as an unlicensed broker-dealer and/or investment adviser in violation of C.R.S. 11-51-401 and/or has failed to file the notice and pay the fee required in sections 11-51-403 and 11-51-404 with the Colorado securities commissioner.

f.   Lustig monitored (and continues to monitor) United's, the JAL DBAs' and the Affiliated Entities' accounts and moved (and continues to move) money between them as needed in order to ensure that sufficient commissions were (and are)

being generated.  No Affiliated Entity or Affiliated Individual was (or is) permitted or able to move money into or out of the Affiliated Entities' accounts without Lustig signing off.

g.    Lustig directed (and continues to direct) the JAL DBAs and the Affiliated Entities to violate C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing on account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, that: (i) the funds they use to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

h.    Lustig used (and continues to use) the U.S. mail and interstate telephone and electronic communications in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

i.    Lustig received (and continues to receive) repayment of the funds advanced by him to the Affiliated Entities, plus interest. Additionally, in the guise of compensation for accounting and administrative services, Lustig received (and continues to receive) as much as one third of the Affiliated Entity's profits from the sale of IPO Shares.

j.    Lustig used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for Affiliated Entities.

k.      Lustig knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

65.    Defendant JAL knowingly participated, and continues to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.      JAL opened a Bank account in the name of each of the JAL DBAs, and controlled and managed (and continues to control and manage) such accounts.

b.      JAL also directed the opening of separate Bank accounts for Affiliated Entities, which JAL controlled and managed (and continues to control and manage) through a form of joint venture agreement with such Affiliated Entities.

c.      JAL provided funds in the amount of approximately $600,000 to the JAL DBAs and Affiliated Entities so that they could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.      JAL provided (and continues to provide) advice and analysis to Affiliated Entities regarding the purchase and sale of securities, and directed (and continues to direct) which securities should be purchased and sold. In so doing, JAL acted (and continues to act) as an unlicensed broker-dealer and/or investment adviser in

violation of C.R.S. 11-51-401 and/or has failed to file the notice and pay the fee required in sections 11-51-403 and 11-51-404 with the Colorado securities commissioner.

e. JAL monitored (and continues to monitor) the JAL DBAs and Affiliated Entities' accounts and moved (and continues to move) money between them as needed in order to ensure that sufficient commissions were (and are) being generated.

f. JAL violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing on account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, that: (i) the funds the JAL DBAs use to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

g. JAL directed (and continues to direct) the Affiliated Entities to violate C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing on account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, that (i) the funds they use to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

h. JAL used (and continues to use) the U.S. mail and interstate telephone and electronic communications in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

i. JAL received (and continues to receive) repayment of the funds advanced by it to the Affiliated Entities, plus interest. Additionally, in the guise of compensation for accounting and administrative services, JAL received (and continues to receive) as much as one third of the Affiliated Entity's profits from the sale of IPO Shares.

j. JAL used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for Affiliated Entities.

k. JAL knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

66. Defendant CLFS knowingly participated, and continues to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a. CLFS held (and continues to hold) funds used in effectuating the IPO Market Manipulation Scheme.

b. CLFS functioned (and continues to function) as a holding "bank" through which Lustig and JAL cause funds to be transferred to United, the JAL DBAs, and the Affiliated Entities in order to ensure that sufficient commissions are being generated.

c.      CLFS provided funds in the amount of approximately $600,000 to United, the JAL DBAs, and the Affiliated Entities so that they could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c).

d.      CLFS monitored (and continues to monitor) United, the JAL DBAs, and the Affiliated Entities' accounts and moved (and continues to move) money between them as needed in order to ensure that sufficient commissions were (and are) being generated.

e.      CLFS used (and continues to use) the U.S. mail and interstate telephone and electronic communications in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

f.      CLFS received (and continues to receive) repayment of the funds advanced by it to the Affiliated Entities, plus interest. Additionally, in the guise of compensation for accounting and administrative services, CLFS received (and continues to receive) as much as one third of the Affiliated Entity's profits from the sale of IPO Shares.

g.      CLFS used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for Affiliated Entities.

h.      CLFS knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§

1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

67. Defendant United knowingly participated, and continues to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

    a.    United opened an account with the Bank. United's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

    b.    United received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

    c.    United used (and continues to use) the money fronted by the Lustig Defendants to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.     United has generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.     United used (and continues to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

f.     United used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

g.     United knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

68.    Defendant Global, and its manager, Brandon, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.     Brandon opened an account for Global with the Bank.  Global's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.     Global received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating

transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.    Global used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.    Global generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.    When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Brandon, on behalf of Global, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds Global uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Brandon's personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.    Brandon and Global used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.    Global repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of Global's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.    Global used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.    Global knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

69.    Defendant Ultimate, and its manager, Marsico, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.    Marsico opened an account for Ultimate with the Bank. Ultimate's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.    Ultimate received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole

purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.  Ultimate used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.  Ultimate generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and quickly sells at a substantial profit.

e.  When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Marsico, on behalf of Ultimate, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds Ultimate uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Marsico's personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.  Marsico and Ultimate used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.  Ultimate repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative

services, as much as one third of Ultimate's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.     Ultimate used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.     Ultimate knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

70.     Defendant Haven, and its manager, Brett, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.     Brett opened an account for Haven with the Bank. Haven's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.     Haven received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.  Haven used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.  Haven generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.  When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Brett, on behalf of Haven, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds Haven uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Brett's personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.  Brett and Haven used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.  Haven repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of Haven's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.    Haven used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.    Haven knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

71.    Defendant Pinehurst, and its manager, Sandler, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.    Sandler opened an account for Pinehurst with the Bank.  Pinehurst's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.    Pinehurst received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.    Pinehurst used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to

remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.  Pinehurst generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.  When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Sandler, on behalf of Pinehurst, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds Pinehurst uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as Sandler's personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.  Sandler and Pinehurst used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.  Pinehurst repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of Pinehurst's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.  Pinehurst used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating

more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.     Pinehurst knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

72.    Defendant Rancho, and its manager, Harrison, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.     Harrison opened an account for Rancho with the Bank. Rancho's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.     Rancho received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.     Rancho used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO

Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.      Rancho generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.      When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Harrison, on behalf of Rancho, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds Rancho uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as Harrison's personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.      Harrison and Rancho used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.      Rancho repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of Rancho's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.      Rancho used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i. Rancho knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

73. Defendant JZ, and its manager, Zaitz, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a. Zaitz opened an account for JZ with the Bank. JZ's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b. JZ received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c. JZ used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.      JZ generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.      When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Zaitz, on behalf of JZ, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds JZ uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Zaitz's personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.      Zaitz and JZ used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.      JZ repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of JZ's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.      JZ used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.      JZ knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the

intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

74. Defendant SMM, and its manager, Miller, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a. Miller opened an account for SMM with the Bank. SMM's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b. SMM received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c. SMM used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d. SMM generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.   When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Miller, on behalf of SMM, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds SMM uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as Miller's personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.   Miller and SMM used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.   SMM repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of SMM's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.   SMM used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.   SMM knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the

source, the ownership, or the control of the proceeds of such mail fraud and wire

fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

75. Defendant Arrowhead, and its manager, Shoflick, knowingly participated, and continue

to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a. Shoflick opened an account for Arrowhead with the Bank. Arrowhead's account

was (and continues to be) controlled and managed by Lustig and/or JAL through a

form of joint venture agreement.

b. Arrowhead received approximately $600,000 from Lustig, individually or through

JAL and/or CLFS, so that it could engage in illegal churning by consummating

transactions lacking any economic substance, *e.g.*, "wash sales," for the sole

purpose of generating commissions for the Bank in violation of C.R.S. 11-51-

501(1)(a) and (c) and Rule 10b-5(a) and (c).

c. Arrowhead used (and continues to use) the money fronted by Lustig to engage in

illegal churning by consummating transactions lacking any economic substance,

*e.g.*, "wash sales," for the sole purpose of generating enough commissions to

remain among the Bank's top tier clients and continue receiving the valuable IPO

Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-

5(a) and (c).

d. Arrowhead generated (and continues to generate) enough commissions to receive

many millions of dollars' worth of IPO Share allocations, which it purchases and

then quickly sells at a substantial profit.

e. When required to complete account opening documents, as well as FINRA Rule

5130/5131 IPO Disclosure Forms, Shoflick, on behalf of Arrowhead, violated

C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds Arrowhead uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Shoflick's personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.    Shoflick and Arrowhead used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.    Arrowhead repaid (and continues to repay) funds advanced by Lustig, plus interest.  Additionally, in the guise of compensation for accounting and administrative services, as much as one third of Arrowhead's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.    Arrowhead used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.    Arrowhead knowingly conducted (and continues to conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail

fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

76.     Defendant AHI, and its manager, Alterman, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

    a.      Alterman opened an account for AHI with the Bank. AHI's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

    b.      AHI received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

    c.      AHI used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

    d.      AHI generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

    e.      When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Alterman, on behalf of AHI, violated C.R.S.

11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds AHI uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Alterman's personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.  Alterman and AHI used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.  AHI repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of AHI's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.  AHI used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.  AHI knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

77.     Defendant Allied, and its manager, Brandon, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.      Brandon opened an account for Allied with the Bank. Allied's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.      Allied received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.      Allied used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.      Allied generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.      When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Brandon, on behalf of Allied, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds Allied uses to conduct trades, pay commissions, and purchase IPO Shares

come from sources <u>other than the Lustig Defendants</u>, such as Brandon's personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.  Brandon and Allied used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.  Allied repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of Allied's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.  Allied used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.  Allied knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

78.  Defendant Rio Norte, and its manager, Lande, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a. Lande opened an account for Rio Norte with the Bank. Rio Norte's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b. Rio Norte received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c. Rio Norte used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) Rule 10b-5(a) and (c).

d. Rio Norte generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e. When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Lande, on behalf of Rio Norte, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds Rio Norte uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Lande's

personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.    Lande and Rio Norte used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.    Rio Norte repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of Rio Norte's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.    Rio Norte used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.    Rio Norte knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

79.    Defendant Mesa, and its manager, Eberstein, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a. Ebertsein opened an account for Mesa with the Bank. Mesa's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b. Mesa received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c. Mesa used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d. Mesa generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e. When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Eberstein, on behalf of Mesa, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds Mesa uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Eberstein's personal

or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.     Eberstein and Mesa used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.     Mesa repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of Mesa's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.     Mesa used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.     Mesa knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

80.   Defendant JMC, and its manager, Cohen, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a. Cohen opened an account for JMC with the Bank.  JMC's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b. JMC received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c. JMC used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d. JMC generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e. When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Cohen, on behalf of JMC, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds JMC uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Cohen's personal or

family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.     Cohen and JMC used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.     JMC repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of JMC's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.     JMC used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.     JMC knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

81.     Defendant Peak, and its manager, Rest, knowingly participated, and continues to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.  Rest opened an account for Peak with the Bank. Peak's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.  Peak received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.  Peak used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.  Peak generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.  When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Rest, on behalf of Peak, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds Peak uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Rest's personal or family

wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.      Rest and Peak used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.      Peak repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of Peak's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.      Peak used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.      Peak knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

82.     Defendant JAF, and its manager, Falber, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a. Falber opened an account for JAF with the Bank. JAF's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b. JAF received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c. JAF used (and continues to use) the money fronted by the Lustig Defendants to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d. JAF generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e. When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Falber, on behalf of JAF, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds JAF uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Falber's personal or

family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.  Falber and JAF used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.  JAF repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of JAF's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.  JAF used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.  JAF knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

83. Defendant Preakness, and its manager, Hall, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a. Hall opened an account for Preakness with the Bank. Preakness's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b. Preakness received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c. Preakness used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d. Preakness generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e. When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Hall, on behalf of Preakness, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds Preakness uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as Hall's

personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.    Preakness and Hall used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.    Preakness repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as one third of Preakness's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.    Preakness used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.    Preakness knowingly conducted (and continues to conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

84.    Defendant Rock Springs, and its manager, Vinnik, knowingly participated, and continue to participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.     Vinnik opened accounts for Rock Springs with the Bank. Rock Spring's account was (and continues to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.     Rock Springs received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, e.g., "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.     Rock Springs used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, e.g., "wash sales," for the sole purpose of generating enough commissions to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1) (a) and (c) and Rule 10b-5(a) and (c).

d.     Rock Springs generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.     When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Vinnik, on behalf of Rock Springs, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds Rock Springs uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as Vinnik's

personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations.

f.      Vinnik and Rock Springs used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

g.      Rock Springs repaid (and continues to repay) funds advanced by Lustig, plus interest.  Additionally, in the guise of compensation for accounting and administrative services, as much as one third of Rock Springs's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.      Rock Springs used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Bank and obtaining more IPO Share allocations for itself.

i.      Rock Springs knowingly conducted (and continues to conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

85. Each of the aforementioned acts relates directly to the conduct of the Enterprise, and was carried out in the conduct of the Enterprise's affairs. Accordingly, the aforementioned acts constitute a pattern of racketeering activity as that term is defined in C.R.S. 18-17-103(3).

86. The Enterprise and the IPO Market Manipulation Scheme are ongoing.

87. Plaintiffs Birchwood and Detroit Street are entities that have been (and, in the case of Detroit Street, continue to be) injured by reason of Defendants' violations of the provisions of C.R.S. 18-17-104(3), including:

   a.  Engaging in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Banks in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c), which artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

   b.  Violating C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds each Affiliated Entity uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as the Affiliated Entity's personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations, which caused the Bank to open accounts for the Affiliated Entities which then artificially increased the price of the IPO Shares by artificially

increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

c.  Using the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme in violation of 18 U.S.C. §§1341 and 1343, which caused the Bank to open accounts for the Affiliated Entities which then artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

d.  Knowingly conducting financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such mail fraud, wire fraud, and fraud in the sale of securities, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud, wire fraud, and fraud in the sale of securities, which caused the Bank to open accounts for the Affiliated Entities which then artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused

millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

As a result, Plaintiffs' injuries flow directly from the IPO Market Manipulation Scheme, including the violations set forth in paragraphs a-d above.

88. Under C.R.S. 18-17-106(7), Plaintiffs have a cause of action for threefold the actual damages they have sustained, attorneys fees, and a claim to forfeited property or the proceeds derived therefrom.

89. Defendants have received millions of dollars of proceeds derived from their violations of C.R.S. 18-17-104(3) which is subject to forfeiture under C.R.S. 18-17-106(10). Under C.R.S. 18-17-106(7)(b), Plaintiffs are injured persons who have a right or claim to the forfeited property or the proceeds derived therefrom superior to any right or claim the state has in the same property or proceeds.

## SECOND CLAIM FOR RELIEF

## Colorado Organized Crime Control Act (COCCA)

## C.R.S. 18-17-104(1) and 18-17-106

90. All allegations previously stated herein are incorporated by reference.

91. Each Defendant violated, and continues to violate, C.R.S. 18-17-104(1) because each Defendant has knowingly received proceeds derived directly from the pattern of racketeering activity described herein, and has used such proceeds in the ongoing operation of the Enterprise.

92. Plaintiffs Birchwood and Detroit Street are persons who have been (and, in the case of Detroit Street, continue to be) injured by reason of the Defendants' use of the proceeds from the pattern of racketeering activity described herein to continue operating the

Enterprise and carrying out the IPO Market Manipulation Scheme, which has artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations. The IPO Market Manipulation Scheme has also directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead.

93. Under C.R.S. 18-17-106(7), Plaintiffs have a cause of action for threefold the actual damages they have sustained, attorneys fees, and a claim to forfeited property or the proceeds derived therefrom.

94. Defendants have received millions of dollars of proceeds derived from their violations of C.R.S. 18-17-104(1) which are subject to forfeiture under C.R.S. 18-17-106(10). Under C.R.S. 18-17-106(7)(b), Plaintiffs are injured persons who have a right or claim to the forfeited property or the proceeds derived therefrom superior to any right or claim the state has in the same property or proceeds.

### THIRD CLAIM FOR RELIEF

### Colorado Organized Crime Control Act (COCCA)

### C.R.S. 18-17-104(2) and 18-17-106

95. All allegations previously stated herein are incorporated by reference.

96. Each Defendant has violated C.R.S. 18-17-104(2) because each Defendant has knowingly maintained a direct interest in and control of the Enterprise through the pattern of racketeering activity described herein.

97. Plaintiffs Birchwood and Detroit Street are persons who have been (and, in the case of Detroit Street, continue to be) injured by reason of the Defendants' maintenance of a

direct interest in, and control of, the Enterprise, through the IPO Market Manipulation Scheme, which has artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations. The IPO Market Manipulation Scheme has also directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead.

98. Under C.R.S. 18-17-106(7), Plaintiffs have a cause of action for threefold the actual damages they have sustained, attorneys fees, and a claim to forfeited property or the proceeds derived therefrom.

99. Defendants have received millions of dollars of proceeds derived from their violations of C.R.S. 18-17-104(2) which are subject to forfeiture under C.R.S. 18-17-106(10). Under C.R.S. 18-17-106(7)(b), Plaintiffs are injured persons who have a right or claim to the forfeited property or the proceeds derived therefrom superior to any right or claim the state has in the same property or proceeds.

## FOURTH CLAIM FOR RELIEF

## Colorado Organized Crime Control Act (COCCA)

## C.R.S. 18-17-104(4) and 18-17-106

100. All allegations previously stated herein are incorporated by reference.

101. Each Defendant violated, and continues to violate, C.R.S. 18-17-104(4) because each Defendant conspired and endeavored (and continues to conspire and endeavor) to associate with the Enterprise and to knowingly participate in the Enterprise through the ongoing pattern of racketeering activity described herein.

102. The overt acts committed by each Defendant in furtherance of the conspiracy are set forth in paragraphs 65-85, which paragraphs are incorporated by reference herein.

103. Plaintiffs Birchwood and Detroit Street are persons who have been (and, in the case of Detroit Street, continue to be) injured by reason of the Defendants' commissions of overt acts in furtherance of the above-referenced conspiracy, including:

   a. Engaging in illegal churning by consummating transactions lacking any economic substance, e.g., "wash sales," for the sole purpose of generating commissions for the Bank in violation of C.R.S.; 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c), which artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

   b. Violating C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the funds each Affiliated Entity uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as the Affiliated Entity's personal or family wealth, and (ii) the Lustig Defendants do not have a beneficial interest in the profits from the IPO Share allocations, which caused the Bank to open accounts for the Affiliated Entities which then artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused millions of

dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

c.  Using the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343, which caused the Bank to open accounts for the Affiliated Entities which then artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

d.  Knowingly conducting financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such mail fraud, wire fraud, and fraud in the sale of securities, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud, wire fraud, and fraud in the sale of securities, which caused the Bank to open accounts for the Affiliated Entities which then artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to  be allocated to the Affiliated Entities instead;

As a result, Plaintiffs' injuries flow directly from the commission of overt acts in furtherance of the Defendants' conspiring and endeavoring to engage in the IPO Market Manipulation Scheme, including the violations set forth in paragraphs a-d above.

104. Under C.R.S. 18-17-106(7), Plaintiffs have a cause of action for threefold the actual damages they have sustained, attorneys fees, and a claim to forfeited property or the proceeds derived therefrom.

105. Defendants have received millions of dollars of proceeds derived from their violations of C.R.S. 18-17-104(4) which are subject to forfeiture under C.R.S. 18-17-106(10). Under C.R.S. 18-17-106(7)(b), Plaintiffs are injured persons who have a right or claim to the forfeited property or the proceeds derived therefrom superior to any right or claim the state has in the same property or proceeds.

## FIFTH CLAIM FOR RELIEF

### Colorado Securities Act

### C.R.S. 11-51-501(1)(a) and 11-51-604(3)

106. All allegations previously stated herein are incorporated by reference.

107. The IPO Market Manipulation Scheme is a device, scheme, or artifice to defraud.

108. Defendants knowingly committed (and continue to commit) manipulative and deceptive acts in furtherance of the IPO Market Manipulation Scheme.

109. The specific manipulative and deceptive acts committed by each Defendant in furtherance of the IPO Market Manipulation Scheme are set forth in paragraphs 65-85, which paragraphs are incorporated by reference herein.

110. Defendants' manipulative and deceptive acts controlled and artificially affected the market for IPO Shares allocated by the Bank.

111. Plaintiffs relied on the integrity of the IPO Share allocation market and were injured by having to pay a higher price for the IPO Shares than they would have paid but for the IPO Market Manipulation Scheme. Plaintiffs were also injured by receiving fewer IPO Shares than they would have received but for the IPO Market Manipulation Scheme.

112. Plaintiffs are entitled to damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Colorado Securities Act

### C.R.S. 11-51-501(1)(b) and 11-51-604(3)

113. All allegations previously stated herein are incorporated by reference.

114. Defendants knowingly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the offer, sale, and purchase of IPO Shares.

115. The specific misstatements and fraudulent omissions made by each Defendant in furtherance of the IPO Market Manipulation Scheme are set forth in paragraphs 65-85, which paragraphs are incorporated by reference herein.

116. Defendants' misstatements and fraudulent omissions artificially affected the market for IPO Shares allocated by the Bank.

117. Plaintiffs relied on the integrity of the IPO Share allocation market and were injured by having to pay a higher price for the IPO Shares than they would have paid but for the IPO Market Manipulation Scheme. Plaintiffs were also injured by receiving fewer IPO Shares than they would have received but for the IPO Market Manipulation Scheme.

## SEVENTH CLAIM FOR RELIEF

## Colorado Securities Act

## C.R.S. 11-51-501(1)(c) and 11-51-604(3)

118. All allegations previously stated herein are incorporated by reference.

119. Defendants engaged (and continue to engage) in acts, practices, and a course of business which operated (and continues to operate) as a fraud and deceit upon Plaintiffs.

120. The IPO Market Manipulation Scheme operated as a fraud and deceit upon Plaintiffs (and continues to operate as a fraud and deceit upon Detroit Street).

121. The fraudulent and deceptive acts, practices, and course of business in which Defendants engaged (and continue to engage) is described in paragraphs 65-85, which paragraphs are incorporated by reference herein.

122. Defendants' manipulative and deceptive acts controlled and artificially affected the market for IPO Shares allocated by the Bank.

123. Plaintiffs relied on the integrity of the IPO Share allocation market and were injured by having to pay a higher price for the IPO Shares than they would have paid but for the IPO Market Manipulation Scheme. Plaintiffs were also injured by receiving fewer IPO Shares than they would have received but for the IPO Market Manipulation Scheme.

124. Plaintiffs are entitled to damages in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

## Control Person Liability

## (Against Lustig, JAL and the Affiliated Individuals Only)

## C.R.S. 11-51-501(1) and 11-51-604(5)(a) and (b)

125. All allegations previously stated herein are incorporated by reference.

126. The Affiliated Entities are liable for violations of C.R.S. 11-51-501(1) pursuant to C.R.S. 11-51-604(3). Detailed allegations regarding the Affiliated Entities' liability for such violations are contained in paragraphs 65-85 and 107-125, which paragraphs are incorporated by reference herein.

127. Lustig and JAL controlled (and continue to control) the Affiliated Entities, and thus are liable for the Affiliated Entities' violations of C.R.S. 11-51-501(1) pursuant to C.R.S. 11-51-604(5)(a) and (b).

128. Each Affiliated Individual controlled its respective Affiliated Entity and thus each Affiliated Individual is liable for its respective Affiliated Entity's violations of C.R.S. 11-51-501(1) pursuant to C.R.S. 11-51-604(5).

129. Plaintiffs were injured by Lustig, JAL, and the Affiliated Entities' violations of C.R.S. 11-51-501(1) and are entitled to damages in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF

### Aiding and Abetting Liability

### (Against CLFS Only)

### C.R.S. 11-51-501(1) and 11-51-604(5)(c)

130. All allegations previously stated herein are incorporated by reference.

131. Lustig, JAL, and the Affiliates are liable for violations of C.R.S. 11-51-501(1) pursuant to C.R.S. 11-51-604(3). Detailed allegations regarding Lustig, JAL, and the Affiliates' liability for such violations are contained in paragraphs 65-85 and 107-125, which paragraphs are incorporated by reference herein.

132. CLFS knew (and continues to know) that Lustig, JAL, and the Affiliates were (and continue to be) engaged in conduct which constitutes violations of C.R.S. 11-51-501(1),

and gave (and continues to give) substantial assistance to such conduct. Accordingly, CLFS is liable for Lustig, JAL, and the Affiliates' violations of C.R.S. 11-51-501(1) pursuant to C.R.S. 11-51-604(5)(c).

## TENTH CLAIM FOR RELIEF

### Securities Exchange Act

### Section 10(b) and Rule 10b-5(a)

133. All allegations previously stated herein are incorporated by reference.

134. The IPO Market Manipulation Scheme is a device, scheme, or artifice to defraud.

135. Defendants knowingly committed (and continue to commit) manipulative and deceptive acts in furtherance of the IPO Market Manipulation Scheme.

136. The specific manipulative and deceptive acts committed by each Defendant in furtherance of the IPO Market Manipulation Scheme are set forth in paragraphs 65-85, which paragraphs are incorporated by reference herein.

137. Defendants' manipulative and deceptive acts controlled and artificially affected the market for IPO Shares allocated by the Bank.

138. Plaintiffs relied on the integrity of the IPO Share allocation market and were injured by having to pay a higher price for the IPO Shares than they would have paid but for the IPO Market Manipulation Scheme. Plaintiffs were also injured by receiving fewer IPO Shares than they would have received but for the IPO Market Manipulation Scheme.

139. Plaintiffs are entitled to damages in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF

### Securities Exchange Act

### Section 10(b) and Rule 10b-5(b)

140.    All allegations previously stated herein are incorporated by reference.

141.    Defendants knowingly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the offer, sale, and purchase of IPO Shares.

142.    The specific misstatements and fraudulent omissions made by each Defendant in furtherance of the IPO Market Manipulation Scheme are set forth in paragraphs 65-85, which paragraphs are incorporated by reference herein.

143.    Defendants' misstatements and fraudulent omissions artificially affected the market for IPO Shares allocated by the Bank.

144.    Plaintiffs relied on the integrity of the IPO Share allocation market and were injured by having to pay a higher price for the IPO Shares than they would have paid but for the IPO Market Manipulation Scheme.  Plaintiffs were also injured by receiving fewer IPO Shares than they would have received but for the IPO Market Manipulation Scheme.

## TWELFTH CLAIM FOR RELIEF

### Securities Exchange Act

### Section 10(b) and Rule 10b-5(c)

145.    All allegations previously stated herein are incorporated by reference.

146.    Defendants engaged (and continue to engage) in acts, practices, and a course of business which operated (and continues to operate) as a fraud and deceit upon Plaintiffs.

147.   The IPO Market Manipulation Scheme operated as a fraud and deceit upon Plaintiffs (and continues to operate as a fraud and deceit upon Detroit Street).

148.   The fraudulent and deceptive acts, practices, and course of business in which Defendants engaged (and continue to engage) is described in paragraphs 65-85, which paragraphs are incorporated by reference herein.

149.   Defendants' manipulative and deceptive acts controlled and artificially affected the market for IPO Shares allocated by the Bank.

150.   Plaintiffs relied on the integrity of the IPO Share allocation market and were injured by having to pay a higher price for the IPO Shares than they would have paid but for the IPO Market Manipulation Scheme.  Plaintiffs were also injured by receiving fewer IPO Shares than they would have received but for the IPO Market Manipulation Scheme.

151.   Plaintiffs are entitled to damages in an amount to be determined at trial.

<u>**THIRTEENTH CLAIM FOR RELIEF**</u>

<u>**Securities Exchange Act**</u>

<u>**Section 20(a) Control Person Liability**</u>

<u>**(Against Lustig, JAL and the Affiliated Individuals)**</u>

152.   All allegations previously stated herein are incorporated by reference.

153.   The Affiliated Entities are liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5.  Detailed allegations regarding the Affiliated Entities' liability for such violations are contained in paragraphs 65-85 and 134-152, which paragraphs are incorporated by reference herein.

154. Lustig and JAL controlled (and continue to control) the Affiliated Entities, and thus are liable for the Affiliated Entities' violations of Section 10(b) of the Exchange Act and Rule 10b-5.

155. Each Affiliated Individual controlled its respective Affiliated Entity and thus each Affiliated Individual is liable for its respective Affiliated Entity's violations of Section 10(b) of the Exchange Act and Rule 10b-5.

156. Plaintiffs were injured by the Affiliated Entities' violations of Section 10(b) of the Exchange Act and Rule 10b-5 and are entitled to damages in an amount to be determined at trial.

## FOURTEENTH CLAIM FOR RELIEF

### Tortious Interference with Prospective Business Relations

157. All allegations previously stated herein are incorporated by reference.

158. As indicated in detail above, at the direction of Lustig (either individually or through JAL and/or CLFS) and the relevant Affiliated Individual, and using funds fronted by Lustig (either individually or through JAL and/or CLFS), each Affiliated Entity opened a securities account with the Bank by supplying false information to the Bank. After an account was opened, again at the direction of Lustig (either individually or through JAL and/or CLFS) and the relevant Affiliated Individual, each Affiliated Entity used (and continues to use) the money fronted by Lustig (either individually or through JAL and/or CLFS) to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions for the Bank to remain among the Bank's top tier clients and continue receiving the valuable IPO Share allocations.

159. Plaintiff Detroit Street is and, until closing its account with the Bank in 2013, Plaintiff Birchwood was, a legitimate customer of the Bank, and each has generated substantial commissions for the Bank through legitimate and lawful securities transactions.

160. Plaintiffs had, under the prevailing policies established by the Bank, a reasonable expectation of entering into valid business relationships with the Bank to purchase the IPO Shares as a top tier client of the Bank.

161. Defendants knew or should have known of Plaintiffs' reasonable expectancies for the allocations of IPO Shares.

162. Nevertheless, Defendants purposefully interfered in the process by which the IPO Shares were allocated by fraudulently opening accounts at the Bank and then engaging in securities transactions through the accounts that lack economic substance for the sole purpose of generating commissions to qualify for the IPO Shares. Through this fraudulent scheme, Defendants usurped Plaintiffs' opportunity to obtain a much larger number of IPO shares and prevented Plaintiffs' legitimate and reasonable expectancies from ripening into valid business relationships with the Bank.

163. Absent the respective frauds and collusive sham churning by Defendants, Plaintiffs would have had an opportunity to obtain a much larger number of the IPO Shares and would have enjoyed the financial benefits flowing from those purchases.

## FIFTEENTH CLAIM FOR RELIEF

### Civil Conspiracy

164. All allegations previously stated herein are incorporated by reference.

165. Defendants, in the course of their business, occupation, and/or vocation, had agreed among themselves and conspired with each other to accomplish goals through unlawful

means. The goals included, without limitation, to: (a) manipulate the established procedures by which the Bank would allocate the valuable right to purchase IPO Shares, (b) obtain the opportunity to purchase a greater number of IPO Shares than Defendants would have otherwise been entitled to under the established policies of the Bank, and (c) unlawfully deprive Plaintiffs of the opportunity to purchase their legitimate portion of the IPO Shares under the established rules of the Bank.

166.    One or more overt act acts were performed to accomplish these goals. The overt acts committed by each Defendant in furtherance of the conspiracy are set forth in paragraphs 65-85, which paragraphs are incorporated by reference herein.

167.    As a direct and proximate result of the conspiracy alleged in this Complaint, Plaintiffs have been injured as described above in an amount to be determined at trial.

## DAMAGES

Plaintiffs are entitled to, and hereby request, damages in an amount to be determined at trial. Additionally, pursuant to C.R.S. 18-17-106, Plaintiffs are entitled to, and hereby request:

a.    A money judgment award against all Defendants herein for threefold (triple) the actual damages sustained by Plaintiffs from 2011 through present;

b.    A money judgment of forfeiture for the total amount of all gains realized by Defendants on the sale of IPO Shares obtained by the Defendants as a result of the IPO Market Manipulation Scheme from 2011 to the present;

c.    A judgment of forfeiture awarding to Plaintiffs all property, real or personal, including without limitation, money, airplanes, boats, cars, houses, jewelry, stocks, bonds, real estate, etc., obtained by Defendants using gains realized on the sale of the IPO Shares received as a result of the IPO Market Manipulation

Scheme from 2011 to the present, or in the alternative a money judgment of forfeiture for the cash value of these items;

d.    A money judgment of forfeiture for all proceeds from the sale of any and all assets referred to in paragraph c. above;

e.    For the costs and expenses of this action;

f.    For reasonable Attorneys' fees;

g.    For such other and further relief ordered by the Court.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury on all issues herein.

## PRAYER

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants for damages as set out above, along with costs and reasonable attorneys' fees.

Dated: January 30, 2018.

SANDERS LAW FIRM

_s/ David W. Hannum_____
David W. Hannum
Perry R. Sanders, Jr.
Robert J. Frank
Justin T. Bailey
31 N. Tejon Street, Suite 400
Colorado Springs, CO 80903
Email: Perry@scclaw.net
       Rob@rjflaw.com
       Justin@PerrySandersLaw.com
       David@PerrySandersLaw.com
Telephone: 719/630-1556
Fascmile: 719/630-7004

Of counsel:

ROBINS KAPLAN LLP
Craig Weiner
Ronald J. Schutz

Lisa M. Coyle
Minyao Wang
399 Park Avenue, Suite 3600
New York, NY 10022
Email: CWeiner@RobinsKaplan.com
RSchutz@RobinsKaplan.com
LCoyle@RobinsKaplan.com
MWang@RobinsKaplan.com
Telephone: 212/980-7400
Fascimile: 212/980-7499

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of January 2018, a true and correct copy of the foregoing **AMENDED COMPLAINT AND JURY DEMAND** was served via ECF to the following addresses:

Haddon, Morgan and foreman, P.C.
Harold A. Haddon
Saskia A. Jordan
Pamela Robillard Mackey
150 East 10th Avenue
Denver, CO 80203
Email: hhaddon@hmflaw.com
      sjordan@hmflaw.com
      pmackey@hmflaw.com

Christopher J. Clark
Latham & Watkins, LLP
885 Third Avenue
New York, NY 10022
Email: christopher.clark2@lw.com

Springer & Steinberg, P.C.
Michael P. Zwiebel
Jeffrey A. Springer
1600 Broadway, Suite 1200
Denver, CO 80202
Email: mzwiebel@springersteinberg.com
      jspringer@springersteinberg.com

David A. Zisser
Jones & Keller, P.C.
1999 Broadway, Suite 3150
Denver, CO 80202

*/s/ Heather Jacobson*
*Original Signature on File per Rules*
Heather Jacobson, Paralegal