## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-2992-WJM-STV
*Consolidated with Civil Action No. 18-cv-0190-WJM-STV*

DETROIT STREET PARTNERS, INC. and
BIRCHWOOD RESOURCES INC.

       Plaintiffs,

v.

JAMES A. LUSTIG, *et al.*

       Defendants.

       and

DETROIT STREET PARTNERS, INC. and
BIRCHWOOD RESOURCES INC.,

       Plaintiffs,

v.

JAMES A. LUSTIG, *et al.*

       Defendants.

---

## AMENDED CONSOLIDATED COMPLAINT AND JURY DEMAND

---

COMES NOW the Plaintiffs, by and through counsel, and for their Amended Consolidated Complaint against the Defendants named herein, state and allege as follows:[1]

## PRELIMINARY STATEMENT

1.      This case concerns a massive racketeering enterprise orchestrated by James A. Lustig through which he and dozens of other individuals and straw man entities, including the other Defendants in this case, for years repeatedly and knowingly engaged (and continue to knowingly engage) in various racketeering activities, including mail and wire fraud, market manipulation, securities fraud, and money laundering, in order to improperly obtain allocations of valuable initial public offering shares from several banks to the detriment of individuals competing for such shares legally.  Specifically, among other illicit conduct, Lustig and the other scheme participants executed high volumes of illegal "wash" trades lacking any economic substance solely for the purpose of generating commissions at the banks which would result in greater allocations of initial public offering shares.  Lustig not only masterminded the enterprise but also, in recognition of the highly unlawful nature and purpose of his scheme, had his attorneys prepare, and his affiliates sign, non-disclosure agreements which were designed solely to conceal their racketeering activity, so that their enterprise could continue indefinitely, shrouded by a cloak of impenetrable secrecy.  As a result of this scheme, innocent clients of the banks who were entitled to initial public offering shares by virtue of their *legal* trading activity,

---

[1] All allegations as to Plaintiffs are based upon personal knowledge and all allegations as to Defendants and other persons are based upon information and belief.  Where an allegation is made upon information and belief, the basis for Plaintiffs' belief regarding the allegation is described herein.

including Plaintiffs, were deprived of their proper allocation of such shares and consequently lost tens of millions of dollars.

2.    Plaintiffs Birchwood Resources Inc. ("Birchwood") and Detroit Street Partners, Inc. ("Detroit Street" and, together with Birchwood, "Plaintiffs") are securities traders that opened accounts at eight of the world's most prominent and recognized banks—J.P. Morgan Securities LLC ("J.P. Morgan"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Citigroup Global Markets Inc. ("Citigroup"), Goldman Sachs & Co. ("Goldman Sachs"), Morgan Stanley & Co. Incorporated ("Morgan Stanley"), Jefferies LLC ("Jefferies"), Barclays Capital Inc. ("Barclays"), and Credit Suisse Securities (USA) LLC ("Credit Suisse" and, collectively, the "Banks")—for the purpose of engaging in securities transactions.  Both Plaintiffs are owned and controlled by Mr. David Berlin, who conducted securities trades through Plaintiffs over various time periods at the different Banks.  Specifically, at J.P. Morgan, Mr. Berlin conducted securities trades through Birchwood between 2005 and 2013, and through Detroit Street between 2013 and the present.  At the other Banks (*i.e.*, Deutsche Bank, Citigroup, Goldman Sachs, Morgan Stanley, Jefferies, Barclays, and Credit Suisse), Mr. Berlin conducted trades through Birchwood between 2005 and 2013 and through Detroit Street between 2006 and the present.

3.    Defendant James A. Lustig ("Lustig"), who is domiciled in Colorado and maintains his principal place of business at 410 17th Street, Suite 1705, Denver, CO 80202, is the mastermind behind the development and operation of a massive racketeering enterprise across multiple banks, including the Banks, through which he and the other Defendants

(and other co-conspirators) have for years knowingly engaged – and continue to knowingly engage – in countless instances of mail and wire fraud, market manipulation, securities fraud, money laundering, and other racketeering activities that have directly injured – and continue to directly injure – Plaintiffs to the tune of tens of millions of dollars.

4.   In support of his massive racketeering enterprise, Lustig directly controls and manages: (i) Defendant JAL Ventures Corporation ("JAL"), a Colorado corporation; (ii) Defendant CLFS Equities, LLLP ("CLFS"), a Colorado limited liability limited partnership; and (iii) Defendant United Capital Management, Inc., ("United"), a Colorado corporation.

5.   As top tier clients of the Banks, Plaintiffs are eligible to compete for valuable and highly sought-after shares issued in initial public offerings ("IPOs") that are underwritten by the Banks' investment banking affiliates ("IPO Shares").  While the particulars of allocation eligibility requirements vary from Bank to Bank, in general, the amount of IPO Shares a client of a Bank receives is directly tied to the amount of commissions the Bank earns in a given year from that client's securities account.  The more securities transactions a client engages in through a Bank, the higher the amount of commissions that Bank can earn.  As a result, a higher volume of trading activity will translate into a larger allocation of IPO Shares.

6.   Because of the way the Banks' rules were structured, multiple clients generating trading commissions for any one Bank would collectively be allocated a larger number of IPO Shares by that Bank than an individual client generating the same total amount of commissions.  For example, if Companies A, B, C, D, and E each separately generated

$600,000 in commissions for J.P. Morgan in one year, for a total of $3 million, the total number of IPO Shares that were allocated to them, collectively, would be larger than the number of IPO Shares allocated to Company F, which had itself generated $3 million in commissions for J.P. Morgan that same year.

7.      The allocation process for IPO Shares across the Banks in effect created an auction-like scenario, where the true price of purchasing IPO Shares included not only the initial offering price of the IPO Shares themselves, but also the hundreds of thousands of dollars in commissions that each client had to generate for, and pay to, the Banks in order to be allowed to purchase such IPO Shares.

8.      Plaintiffs Birchwood (between 2005 and 2013) and Detroit Street (between 2013 and the present for J.P. Morgan and between 2006 and the present for the other Banks) purchased almost every IPO Share allocation offered to them by the Banks.  Over the first several years of its relationship with the Banks, Birchwood and Detroit Street earned combined profits ranging on average between $4 and $7 million per year from the sale of IPO Shares allocated to them by the Banks.  From the sale of IPO Shares allocated to them by J.P. Morgan alone, Plaintiffs earned profits ranging between $3 and $5 million per year during that time period.

9.      In or before 2011, Lustig began unlawfully manipulating the structure for IPO Share allocations put in place by the Banks by working with JAL, CLFS, United, and dozens of his friends, family members, and associates to create nearly thirty straw man entities that, on paper, are purportedly controlled by those individuals but that, in reality, are financed, operated, and controlled by Lustig himself.  These entities opened accounts with the

Banks by providing false information to the Banks and then, through those accounts, knowingly engaged (and continue to knowingly engage) in illegal churning – *i.e.*, repeatedly consummating securities transactions lacking any economic substance such as "wash sales"– for the sole purpose of generating enough commissions to become top tier clients of the Banks and thereby receive the valuable IPO Share allocations at the expense of Plaintiffs and other innocent customers of the Banks.[2]

10.     For example, as several Defendants have admitted to Mr. Berlin, Lustig trained and instructed the straw man entities, and the individuals purportedly controlling them, to purchase a particular quantity of a particular stock at one Bank and then simultaneously sell the same quantity of the same stock at another Bank, thereby generating commissions at both Banks without incurring any market risk.  Based on the commissions they generate for the Banks through this trading activity, the entities are then allocated IPO Shares by the Banks, which they purchase and quickly sell, resulting in tens of millions of dollars of ill-gotten profit per year that is shared among Lustig and his affiliates.

11.     By artificially inflating the amount of commissions paid to the Banks through constant wash trading by dozens of straw-man entities, Lustig and his co-conspirators managed to earn greater IPO Share allocations, to the detriment of clients of the Banks who were engaged in only lawful trading activity, including Plaintiffs.

---

[2] "Wash sales involve the use of techniques designed to give the appearance of submitting trades to the open market, while negating the risk or price competition incident to the market.  Wash trading produces a virtual financial nullity because the resulting net financial position is near or equal to zero." *Wilson v. CFTC*, 322 F.3d 555, 559 (8th Cir. 2003).  *See also Edward J. Mawod & Co. v. S.E.C.*, 591 F.2d 588, 591-92, 595 (10th Cir. 1979) (holding certain wash sales to be "per se manipulative").

12.  Lustig's vast and unlawful scheme to manipulate the market for IPO Shares in this way (the "IPO Market Manipulation Scheme") has directly caused (and continues to cause) millions of dollars of damages per year to Plaintiffs and other law-abiding clients of the Banks who are not participants in the IPO Market Manipulation Scheme.

13.  In order to facilitate the execution of the IPO Market Manipulation Scheme and to conceal the Scheme from regulators and the investing public, the law firm Brownstein Hyatt Farber Schreck ("Brownstein Farber") drafted non-disclosure agreements ("NDAs") that were executed among Lustig, JAL, CLFS, United and each of the straw man entities that would purport to keep the IPO Market Manipulation Scheme confidential.  These NDAs contained the following clause:

> Confidentiality.  Each of the Company, the Member, JAL and CLFS acknowledges that, in and as a result of its relationship with each other, it has been and will be making use of, acquiring or adding to confidential information of a special and unique nature and value, including, without limitation, the Company, the Member, JAL, CLFS and their affiliates' identities, trade secrets, systems, programs, procedures, confidential reports and communications (including, without limitation, account information, technical information on the performance of the Company, JAL, CLFS and their affiliates' business) and lists of accounts, *as well as the nature and type of the activities engaged in by the Company, the Member, JAL, CLFS and their affiliates* (collectively, "Confidential Information"). Each of the Parties further acknowledges that any information and materials received by itself or the Company from third parties in confidence shall be deemed to be and shall be confidential information within the meaning of this Section. As partial consideration for each Party's agreement to enter into this Agreement, each of the Company, the Member, JAL and CLFS covenants and agrees that it shall not, except with the prior written consent of JAL, in the case of the Company or the Member, or the Company, in the case of JAL or CLFS, or as required by law or as necessary to enforce this Agreement, at any time during or following the term of this Agreement, directly or indirectly, use, divulge, reveal, report, publish, transfer or disclose, for any purposes

whatsoever, any of the terms or conditions of the Transaction Documents or such confidential information which has been obtained by or disclosed to it as a result of its affiliation with JAL or the Company, as the case may be. Notwithstanding the foregoing, "Confidential Information" shall not include any information that: (i) is or becomes generally available to and known by the public (other than as a result of an unpermitted disclosure directly or indirectly by the receiving Party or its affiliates, advisors or representatives), (ii) is or becomes available to the receiving Party on a nonconfidential basis from a source other than the furnishing Party or its affiliates, advisors or representatives, provided that such source is not and was not bound by confidentiality agreement with or other obligation of secrecy to the furnishing Party of which the receiving Party has knowledge; or (iii) has already been or is hereafter independently acquired or developed by the receiving Party without violating any confidentiality agreement with or other obligation of secrecy to the furnishing Party.  In the event any Party determines that it is required by applicable law to make any such disclosure, such Party shall so advise the other Parties immediately and shall consult and cooperate to the greatest extent feasible with respect to the timing, manner and contents of such disclosure.

14.    Such contractual provisions are specifically designed to conceal racketeering activity and are therefore against public policy and not enforceable.  As a highly sophisticated law firm, Brownstein Farber knew or should have known that the contractual provisions that it drafted and that were included in NDAs executed among Lustig, JAL, CLFS, United and others were intended to be used in, and were used in, "racketeering activity" as defined by C.R.S. 18-17-103(5).  Brownstein Farber knew or should have known that its actions could be construed as having participated in the racketeering enterprise under C.R.S. 18-17-103(3).  In fact, upon information and belief, name partner Steven W. Farber is the "F" in CLFS.

15.    However, Brownstein Farber and Lustig have used these unenforceable confidentiality provisions to coerce silence among the IPO Market Manipulation Scheme's participants.

For example, just days ago, Rob Kaufmann, a partner at Brownstein Farber, called Confidential Co-conspirator No. 2, who was in settlement discussions with Plaintiffs, and threatened that Lustig would "wreck him" if he disclosed any information about the IPO Market Manipulation Scheme to Plaintiffs, warning specifically that "Jimmy [Lustig] will sue you for millions if you give out any info."[3]

16. Moreover, to further the conspiracy, Lustig has not only threatened the other participants of the IPO Market Manipulation Scheme, including as described in paragraph 15 above, but also, according to statements made to Mr. Berlin, has been paying *all* of the other Defendants' legal fees in this action.

17. The IPO Market Manipulation Scheme has enabled Lustig to profit from a far greater number of IPO Shares than he would have had he simply generated commissions for the Banks in his own account with each Bank through legitimate trading.  Indeed, but for the IPO Market Manipulation Scheme, the majority of the IPO Shares that Lustig has received and/or profited from would, under the policies of the Banks, instead have been allocated to Plaintiffs and other innocent clients of the Banks.  As a result of the IPO Market Manipulation Scheme, Plaintiffs have seen a steady decrease in the amount of IPO Shares allocated to them, and thus a steady decrease in the profits that they have earned on the sale of such IPO Shares.

18. Moreover, by creating nearly thirty illegal sham entities and engaging in wash trading to artificially generate commissions, Lustig and the other Defendants have caused (and

---

[3] Referenced throughout this Complaint are eight Confidential Coconspirators who have provided information to Plaintiff.

continue to cause) an artificial increase in the number of accounts with which Plaintiffs

must compete in order to become top tier clients of each Bank, which has required

Plaintiffs to increase their—legitimate and lawful—trading activity in order to generate

up to five times higher commissions. Thus, Lustig has knowingly and intentionally

artificially increased (and continues to knowingly and intentionally artificially increase)

the true price of the IPO Shares – *i.e.*, the amount of commissions that Plaintiffs and

other innocent clients of the Banks must generate in order to be considered top tier clients

and allocated IPO Shares.

19.    Since in or about December 2017, several participants in the IPO Market Manipulation

Scheme have revealed to Mr. Berlin the nature and scope of the IPO Market

Manipulation Scheme.  Redacted declarations by three of these Confidential Co-

conspirators are attached to this Complaint as Exhibit 1 (Declaration of Confidential Co-

conspirator No. 1), Exhibit 2 (Declaration of Confidential Co-conspirator No. 2), and

Exhibit 3 (Declaration of Confidential Co-conspirator No. 3), and are hereby

incorporated by reference herein.

20.    On December 13, 2017, Plaintiffs filed a complaint in this Court against Lustig, JAL,

CLFS, United and several other affiliated defendants in connection with their

racketeering activity, including their illegal manipulation of the allocation of IPO Shares,

at J.P. Morgan (the "First Action").  That case is numbered 1:17-CV-02992-STV.

21.    On January 24, 2018, Plaintiffs filed a complaint in this Court against Lustig, JAL,

CLFS, United and several other affiliated defendants in connection with their

racketeering activity, including their illegal manipulation of the allocation of IPO Shares

9

at the other Banks (*i.e.*, Deutsche Bank, Citigroup, Goldman Sachs, Morgan Stanley, Jefferies, Barclays, and Credit Suisse) (the "Second Action"). That case is numbered 1:18-CV-00190-STV.

22.     Both cases seek to hold those Defendants accountable for their racketeering activity, including illegal manipulation of the allocation of IPO Shares at the Banks, which has resulted (and continues to result) in significant losses to Plaintiffs and others.

23.     On August 8, 2018, upon joint motion of the parties, this Court consolidated the First Action and the Second Action under the case number 1:17-CV-02992-STV and permitted Plaintiffs to file this Amended Consolidated Complaint.

## PARTIES, JURISDICTION AND VENUE

24.     Plaintiff Birchwood is a Colorado corporation which, at all times relevant to the claims herein, maintained its principal place of business in Colorado.

25.     Plaintiff Detroit Street is a Colorado corporation which, at all times relevant to the claims herein, maintained its principal place of business in Colorado.

26.     At all times relevant to the claims asserted herein, Defendant Lustig resided in California and Colorado but was domiciled in Colorado. Lustig maintains his principal place of business at 410 17th Street, Suite 1705, Denver, CO 80202.

27.     Defendant JAL is a corporation registered to transact business in Colorado. JAL, at all times relevant to the claims herein, maintained its principal place of business at 410 17th Street, Suite 1705, Denver, CO 80202. JAL has two accounts with each of the Banks that receive IPO Share allocations: one doing business as Greenwich Asset Management

("Greenwich") and one doing business as Hampden Place Associates ("Hampden Place" and, together with Greenwich, the "JAL DBAs").   "JAL" stands for James Altman Lustig and is controlled by Lustig.

28.   Defendant CLFS is a limited liability limited partnership registered to transact business in Colorado.   CLFS, at all times relevant to the claims herein, maintained its principal place of business at 410 17th Street, Suite 1705, Denver, CO 80202.   "CLFS" stands for Cook, Lustig, Farber, and Sapkin.   "Farber" refers to Steven W. Farber, of the law firm Brownstein Farber, and "Sapkin" refers to Richard Sapkin.   "Cook" refers to Herbert Cook, who was Lustig, Farber, and Sapkin's father-in-law.   Lustig controls CLFS.

29.   Defendant United is a corporation registered to transact business in Colorado.   United, at all times relevant to the claims herein, maintained its principal place of business at 410 17th Street, Suite 1705, Denver, CO 80202.   United is controlled by Lustig.

30.   Defendant Global Cap Limited, Inc. ("Global") is a Delaware Corporation registered to transact business in Colorado. Global and its manager, Defendant Brandon Perry, individually ("Brandon"), at all times relevant to the claims herein, maintained their principal place of business at 22 Foxtail Circle, Cherry Hills Village, Colorado 80113. Defendant Brandon is a close friend of Defendant Lustig's.   He is also the son of Defendant Rest (defined below) and the brother of Defendant Brett (defined below).

31.   Defendant Ultimate Ventures, Inc. ("Ultimate") is a corporation registered to transact business in Colorado.   Ultimate and its manager, Defendant Jonathan Marsico, individually ("Marsico"), at all times relevant to the claims herein, maintained their principal place of business at 5251 DTC Parkway, Suite 410, Englewood, Colorado

80111.  Defendant Marsico is a close friend of Lustig's.  He is also the step-son of Defendant Sandler (defined below).

32.   Defendant Haven Capital Ventures Inc. ("Haven") is a California limited liability company registered to transact business in Colorado.  Its manager(s) are Defendant(s) Brett Perry ("Brett") and/or Andrew Harrison ("Harrison").  At all times relevant to the claims herein, Haven maintained its principal place of business at 4660 La Jolla Village, Suite 500, San Diego, California 92122.  Brett is a full-time resident of Colorado. Through phone calls, emails, and/or in person visits, Haven, Brett and Harrison regularly transacted, and continue to transact, business related to the IPO Market Manipulation Scheme in Colorado.  Additionally, pursuant to C.R.S. 11-51-706(4), Haven's, Brett's, and Harrison's violations of C.R.S. 11-51-501, as described more fully below, constitute the transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124.  Defendants Brett and Harrison are close friends of Defendant Lustig's.  Defendant Brett is also the brother of Defendant Brandon and the son of Defendant Rest (defined below). Defendant Harrison is also the ex-brother-in-law of Defendant Alterman (defined below).

33.   Defendant Pinehurst Capital, Inc. ("Pinehurst") is a corporation registered to transact business in Colorado.  Pinehurst and its manager, Defendant William Sandler, individually ("Sandler"), at all times relevant to the claims herein, maintained their principal place of business at 4 Buell Mansion Parkway, Cherry Hills Village, Englewood, Colorado 80113.  Defendant Sandler is a close friend of Defendant Lustig's. He is also the step-father of Defendant Marsico.

34.     Defendant Rancho Holdings, LLC ("Rancho") is a limited liability company registered to transact business in Colorado.  Rancho and its manager(s), Defendant(s) Harrison and/or Brett, individually, at all times relevant to the claims herein, maintained their principal place of business at 4950 S. Yosemite St., F2#349, Greenwood Village, CO 80111.

35.     Defendant JZ Capital, LLC ("JZ") is a limited liability company registered to transact business in Colorado.  JZ and its manager, Defendant Samuel Zaitz, individually ("Zaitz"), at all times relevant to the claims herein, maintained their principal place of business at 55 Cherry Lane Drive, Englewood, Colorado 80113.  Defendant Zaitz is a friend of Defendant Lustig's.

36.     Defendant SMM Investments, Inc. ("SMM") is a corporation registered to transact business in Colorado. SMM and its manager, Defendant Stewart "Skip" Miller, individually ("Miller"), at all times relevant to the claims herein, maintained their principal place of business at 999 18th Street, Suite 3000, Denver, Colorado 80202. Defendant Miller is Defendant Lustig's brother-in-law.

37.     Defendant Arrowhead Investments, Inc. ("Arrowhead") is a corporation registered to transact business in Colorado.  Arrowhead and its manager, Defendant Steve Shoflick, individually ("Shoflick"), at all times relevant to the claims herein, maintained their principal place of business at 4200 East Perry Parkway, Greenwood Village, Colorado 80121.  Defendant Shoflick is Defendant Lustig's nephew-in-law.  He is also Defendant Miller's son-in-law.

38.     Defendant Alterman Harrison Investments, Inc. ("AHI") is a corporation registered to transact business in Colorado.  AHI and its manager, Defendant Bennett Paul "Buzz"

Alterman, individually ("Alterman"), at all times relevant to the claims herein, maintained their principal place of business at 7877 East Mississippi Ave., #107, Denver, Colorado 80247. Defendant Alterman is a friend of Defendant Lustig's. He is also Defendant Harrison's former brother-in-law.

39.     Defendant Allied Funding, Inc. ("Allied") is a Delaware corporation registered to transact business in Colorado. Allied and its manager, Defendant Brandon, individually, at all times relevant to the claims herein, maintained their principal place of business at 4950 South Yosemite Street, #F2411, Greenwood Village, Colorado 80111.

40.     Defendant Rio Norte Capital, Inc. ("Rio Norte") is a corporation registered to transact business in California. Rio Norte and its manager, Defendant Ken Lande, individually ("Lande"), at all times relevant to the claims herein, maintained their principal place of business at 2851 Haddington Drive, Los Angeles, California 90064. Through phone calls, emails, and/or in person visits, Rio Norte and Lande regularly transacted, and continue to transact, business related to the IPO Market Manipulation Scheme in Colorado. Additionally, pursuant to C.R.S. 11-51-706(4), Lande's and Rio Norte's violations of C.R.S. 11-51-501, as described more fully below, constitute the transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124. Defendant Lande is Defendant Lustig's son-in-law.

41.     Defendant Mesa Investment Partners, LLC ("Mesa") is a limited liability company registered to transact business in California. Mesa and its manager, Defendant Todd J. Eberstein, individually ("Eberstein"), at all times relevant to the claims herein, maintained their principal place of business at 465 Mesa Road, Santa Monica, California

90402.  Through phone calls, emails, and/or in person visits, Mesa and Eberstein regularly transacted, and continue to transact, business related to the IPO Market Manipulation Scheme in Colorado.  Additionally, pursuant to C.R.S. 11-51-706(4), Eberstein's and Mesa's violations of C.R.S. 11-51-501, as described more fully below, constitute the transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124.  Defendant Eberstein is related to a close friend of Defendant Lustig's.

42.     Defendant JMC Capital, Inc. ("JMC") is a corporation registered to transact business in California.  JMC and its manager, Defendant Jordan Cohen, individually ("Cohen"), at all times relevant to the claims herein, maintained their principal place of business at 9595 Wilshire Boulevard, Suite 410, Beverly Hills, California 90212. Through phone calls, emails, and/or in person visits, JMC and Cohen regularly transacted, and continue to transact, business related to the IPO Market Manipulation Scheme in Colorado. Additionally, pursuant to C.R.S. 11-51-706(4), Cohen's and JMC's violations of C.R.S. 11-51-501, as described more fully below, constitute the transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124.  Defendant Cohen is a friend of Defendant Lustig's.

43.     Defendant Peak Capital Partners, Inc. ("Peak") is a corporation registered to transact business in Colorado.  Peak and its manager, Defendant Ricki Rest, individually ("Rest"), at all times relevant to the claims herein, maintained their principal place of business at 5 Cherry Hills Farm Drive, Englewood, CO 80113.  Defendant Rest is a close friend of Defendant Lustig's.  She is also Defendants Brandon and Brett's mother.

44.     Defendant JAF Holdings, Inc. ("JAF") is a New Jersey corporation registered to transact

business in New York.  JAF and its manager, Defendant Jeremy Fraenkel, individually

("Fraenkel"), at all times relevant to the claims herein, maintained their principal place of

business at 250 E. 63rd St., Apt. 19C, New York, NY 10065.[4]  Through phone calls,

emails, and/or in person visits, JAF and Fraenkel regularly transacted, and continue to

transact, business related to the IPO Market Manipulation Scheme in Colorado.

Additionally, pursuant to C.R.S. 11-51-706(4), Fraenkel's and JAF's violations of C.R.S.

11-51-501, as described more fully below, constitute the transaction of business in

Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-

1-124.

45.     Defendant Preakness Capital Management Inc. ("Preakness") is a corporation registered

to transact business in Colorado.  Preakness and its manager, William Hall, individually

("Hall"), at all times relevant to the claims herein, maintained their principal place of

business in Denver, Colorado.  Defendant Hall is a business associate of Defendant

Lustig's.

46.     Defendant Davis Family Office, Inc. ("DFO") is a corporation registered to transact

business in California.  DFO and its manager, Defendant Nancy Davis, individually

("Davis"), at all times relevant to the claims herein, maintained their principal place of

business at 14023 Aubrey Road, Beverly Hills CA 90210.  Through phone calls, emails,

---

[4] Defendant Fraenkel is being substituted for former Defendant Jan Falber, who was named in error in lieu of Fraenkel, an error which Plaintiffs recently discovered.  Fraenkel, who is the manager of JAF, has been on notice of this action, and his potential liability as JAF's manager, since at least January 10, 2018, when JAF was served with the complaint in the First Action.

and/or in person visits, DFO and Davis regularly transacted, and continue to transact, business related to the IPO Market Manipulation Scheme in Colorado. Additionally, pursuant to C.R.S. 11-51-706(4), DFO's and Davis' violations of C.R.S. 11-51-501, as described more fully below, constitute the transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124. Defendant Davis is a close personal friend of Defendant Lustig's and the wife of Defendant Rickel (defined below).

47.    Defendant DTA Capital Inc. ("DTA") is a corporation registered to transact business in Colorado. DTA and its manager, Defendant Ronald Stephen Vlosich, individually ("Vlosich"), at all times relevant to the claims herein, maintained their principal place of business at 11274 W. Asbury Avenue, Lakewood, CO 80227. Defendant Vlosich is an acquaintance of Lustig's.

48.    Defendant Flamingo Group, Inc. ("Flamingo") is a corporation registered to transact business in Colorado. Flamingo and its manager, Defendant Danny Pepper ("Pepper"), at all times relevant to the claims herein, maintained their principal place of business at 2025 East Alameda Avenue, Denver, CO 80209. Defendant Pepper is Defendant Lustig's brother-in-law.

49.    Defendant Irving Investors Income Fund LLC ("Irving Income") is a limited liability company registered to transact business in Colorado. At all times relevant to the claims herein, Irving Income maintained its principal place of business at 100 Fillmore St., 5th Floor, Denver, CO 80206. Defendant Jeremy Abelson ("Jeremy") is the manager of Irving Income.

50.     Defendant Irving Investors Privates, LLC ("Irving Privates") is a limited liability

company registered to transact business in Colorado.  At all times relevant to the claims

herein, Irving Privates maintained its principal place of business at 3777 South Dahlia

Street, Cherry Hills Village, CO 80113.  Defendant Jeremy is the manager of Irving

Privates.

51.     Defendant Irving Investors Real Estate Fund I, LLC ("Irving Real Estate") is a limited

liability company registered to transact business in Colorado.  At all times relevant to the

claims herein, Irving Real Estate maintained its principal place of business at 100

Fillmore St., 5th Floor, Denver, CO 80206.  Defendant Jeremy is the manager of Irving

Real Estate.

52.     At all times relevant to the claims herein, Defendant Jeremy maintained his domicile at

3777 South Dahlia Street, Englewood, CO 80113.  Defendant Jeremy is Defendant

Lustig's nephew-in-law.  He is also the son-in-law of Defendant Miller, brother-in-law of

Defendant Shoflick, and husband of Defendant Mia (defined below).

53.     Defendant Lion Gate Capital, Inc. ("Lion Gate") is a corporation registered to transact

business in California.  Lion Gate and its manager, Defendant Kenneth Rickel,

individually ("Rickel"), at all times relevant to the claims herein, maintained their

principal place of business at 9595 Wilshire Blvd, Suite 410, Beverly Hills, CA 90212.

Through phone calls, emails, and/or in person visits, Lion Gate and Rickel regularly

transacted, and continue to transact, business related to the IPO Market Manipulation

Scheme in Colorado.  Additionally, pursuant to C.R.S. 11-51-706(4), Lion Gate's and

Rickel's violations of C.R.S. 11-51-501, as described more fully below, constitute the

Case 1:17-cv-02992-WJM-STV   Document 83   Filed 08/31/18   USDC Colorado   Page 20 of 163

transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124. Defendant Rickel is a close personal friend of Defendant Lustig's. He is also married to Defendant Davis.

54. Defendant Mack Investor Group, Inc. ("Mack") is a corporation registered to transact business in New York. Mack and its manager, Defendant Aaron Wolk, individually ("Wolk"), at all times relevant to the claims herein, maintained their principal place of business at 111 East 14th Street, Suite 306, New York, NY 10003. Through phone calls, emails, and/or in person visits, Mack and Wolk regularly transacted, and continue to transact, business related to the IPO Market Manipulation Scheme in Colorado. Additionally, pursuant to C.R.S. 11-51-706(4), Mack's and Wolk's violations of C.R.S. 11-51-501, as described more fully below, constitute the transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124. Defendant Wolk is a business associate of Defendant Lustig's.

55. Defendant MSM Capital Management, Inc. ("MSM") is a corporation registered to transact business in Colorado. MSM and its manager, Defendant Mia Abelson ("Mia"), at all times relevant to the claims herein, maintained their principal place of business at 1400 16th Street, Suite 400, Denver, CO 80202. Mia is Lustig's niece. She is also the daughter of Defendant Miller and the wife of Defendant Jeremy.

56. Defendant Prudent Capital, LLC ("Prudent") is a limited liability company registered to transact business in Delaware. Prudent and its manager, Defendant John Goldenberg, individually ("Goldenberg"), at all times relevant to the claims herein, maintained their principal place of business at 5 Cottage Road, Mount Kisco, NY 10549. Through phone

calls, emails, and/or in person visits, Prudent and Goldenberg regularly transacted, and continue to transact, business related to the IPO Market Manipulation Scheme in Colorado.  Additionally, pursuant to C.R.S. 11-51-706(4), Prudent and Goldenberg's violations of C.R.S. 11-51-501, as described more fully below, constitute the transaction of business in Colorado for the purpose of establishing personal jurisdiction over them under C.R.S. 13-1-124.  Defendant Goldenberg is a business associate of Defendant Lustig's.

57.   Defendant Quandary Capital Inc. ("Quandary") is a corporation registered to transact business in Colorado.  Quandary and its manager, Defendant Melissa Mackiernan, individually ("Mackiernan") at all times relevant to the claims herein, maintained their principal place of business at 100 Filmore Street, 5th Floor, Denver, CO 80206. Defendant Mackiernan is Defendant Lustig's niece. She is also the sister of Defendant Mia and the daughter of Defendant Miller.

58.   Defendants Global, Ultimate, Haven, Pinehurst, Rancho Holdings, JZ, SMM, Arrowhead, AHI, Allied, Rio Norte, Mesa, JMC, Peak, JAF, Preakness, DFA, DTA, Flamingo, Irving Income, Irving Privates, Irving Real Estate, Lion Gate, Mack, MSM, Prudent, and Quandary shall be collectively referred to herein as the "Affiliated Entities."

59.   Defendants Brandon, Marsico, Brett, Sandler, Harrison, Zaitz, Miller, Shoflick, Alterman, Lande, Eberstein, Cohen, Rest, Fraenkel, Hall, Davis, Vlosich, Pepper, Jeremy, Rickel, Wolk, Mia, Goldenberg, and Mackiernan shall be collectively referred to herein as the "Affiliated Individuals."

60.     The Affiliated Entities and the Affiliated Individuals shall be collectively referred to herein as the "Affiliates."

61.     The acts and omissions complained of herein, which directly caused injury to Plaintiffs, occurred in Denver County, State of Colorado.

62.     This Court has jurisdiction over the parties for the reasons set forth in paragraphs 26-57.

63.     This Court has original subject matter jurisdiction over the Tenth, Eleventh, Twelfth and Thirteenth Claims to Relief set forth herein pursuant to 28 U.S. Code § 1331 because such claims arise under the laws of the United States.

64.     This Court has supplemental subject matter jurisdiction over the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Fourteenth and Fifteenth Claims to Relief set forth herein pursuant to 28 U.S.C. § 1367 because such claims are so related to claims within the Court's original jurisdiction as set forth in paragraph 63 that they form part of the same case or controversy under Article III of the United States Constitution.

65.     This civil action is properly brought in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because this judicial district is the locus in which a substantial part of the events and omissions giving rise to the claims occurred.

## GENERAL ALLEGATIONS

66.     In order to raise new capital, a company may decide to sell ownership of its shares to the public by issuing stock in an initial public offering, or "IPO."  As an integral step in this process, the company will retain one or more investment banks that will agree to underwrite the IPO.  When a company goes public, the initial offering price (the price

paid by the initial buyers of the stock) is established by the company and underwriters based on their best estimation of the market.  Once issued, the stock price is determined by market forces.  It has been documented that shares issued in IPOs generally trade on the open market at a price significantly higher than the initial offering price.  Thus, investors who can purchase the stock at the initial offering price can often make an immediate and substantial profit by selling their stock in the aftermarket at the higher post-IPO price.  As a result, investors vie for the right to purchase stock at the initial IPO price.

67.     The affiliates of the Banks are among the world's leading underwriters, and as part of their work for companies going public, the Banks typically receive allotments of IPO stock at the attractive initial IPO price.

### *J.P. Morgan's IPO Allocation Policies*

68.     Plaintiffs Birchwood and Detroit Street are securities traders that opened accounts at J.P. Morgan in 2005 and 2013, respectively, for the purpose of engaging in securities transactions.  At the time of opening its account, Plaintiff Birchwood was informed that, under then-prevailing J.P. Morgan policies, if Birchwood (directly or through its affiliates) deposited in excess of $10 million with J.P. Morgan, it would provide Birchwood with preferential access to valuable allocations of IPO Shares from an exclusive J.P. Morgan trading desk in New York City, and that the IPO Share allocations were exclusive benefits reserved for J.P. Morgan's private clients – clients whose deposits at J.P. Morgan were above a certain threshold.

69.     In accordance with J.P. Morgan's policies, and in part in order to receive preferential access to IPO Share allocations, Birchwood, through its affiliates, deposited in excess of $10 million with J.P. Morgan (or its affiliates) when its securities account was opened in or around 2005, and began receiving and trading valuable IPO Share allocations. Birchwood (and, later, Detroit Street) opted to purchase every IPO Share allocation offered to them by J.P. Morgan and earned profits of approximately $3 to $5 million per year from the sale of such IPO Shares over the first several years their accounts with J.P. Morgan were open.

70.     In or around 2008, without notifying Birchwood, J.P. Morgan changed its policy such that it would allocate IPO Shares to its private banking clients based on the amount of commission revenue each account generated for J.P. Morgan through trading in securities, rather than the amount each account had on deposit. Pursuant to this policy change, clients were not required to have deposited in excess of $10 million with J.P. Morgan in order to be eligible to receive IPO Share allocations provided that they generated at least $600,000 in commission revenue for J.P. Morgan before receiving IPO Share allocations.

71.     After this policy change (of which Birchwood was at first unaware), those clients with at least $10 million on deposit *and* those that had generated at least $600,000 in commissions (but did not have at least $10 million on deposit) would compete with each other to become top tier clients of J.P. Morgan, *i.e.* to be among the highest commission-generating accounts, as those top tier clients would receive the vast majority of J.P. Morgan's IPO Share allocations. To remain top tier clients, and

thereby to receive the most IPO Share allocations, a J.P. Morgan customer would have to generate *as much as $100,000 in commissions every month*.

72. Because of the way J.P. Morgan's rules were structured, multiple clients generating trading commissions for it would collectively be allocated a larger number of IPO Shares by J.P. Morgan than an individual client generating the same total amount of commission. For example, if Companies A, B, C, D, and E each separately generated $600,000 in commissions for J.P. Morgan in one year, for a total of $3 million, the total number of IPO Shares that were allocated to them, collectively, would be larger than the number of IPO Shares allocated to Company F, which had itself generated $3 million in commissions for J.P. Morgan that same year.

73. Birchwood continued the banking relationship with J.P. Morgan after this policy change regarding how IPO Shares are allocated, and substantially increased its trading activity in an effort to remain a top tier client of the Bank.  In 2013, as a result of an internal restructuring of Mr. Berlin's family office, Birchwood closed its account with J.P. Morgan and Detroit Street opened an account with J.P. Morgan through which Mr. Berlin began conducting securities trading. From that point on, Detroit Street continually increased its legitimate trading activity in an effort to remain a top tier client of J.P. Morgan.

74. Defendants have been unscrupulously exploiting J.P. Morgan's new allocation policy regarding IPO Shares since at least 2011. Through a series of fraudulent schemes to open multiple accounts in violation of J.P. Morgan and FINRA rules and policies, and then to engage in collusive sham trading, Defendants unlawfully obtained the

opportunity to purchase a greater portion of the IPO Shares allocated by J.P. Morgan, thus: (i) reducing the number of IPO Shares that Birchwood and (later) Detroit Street were able to buy and costing Birchwood and (later) Detroit Street the financial benefits flowing from those purchases; and (ii) artificially driving up the true cost of those IPO Shares that Plaintiffs were able to purchase by artificially inflating the amount of commissions that Plaintiffs had to generate in order to receive such IPO Share allocations from J. P. Morgan.

### IPO Allocation Policies of the Other Banks

75.    Plaintiffs Birchwood and Detroit Street also opened accounts at each of the other seven Banks (*i.e.*, Deutsche Bank, Citigroup, Goldman Sachs, Morgan Stanley, Jefferies, Barclays, and Credit Suisse (collectively, the "Other Banks")) for the purpose of engaging in securities transactions.  At the time of opening their accounts in 2006, and at various times thereafter, Plaintiffs were informed that, as top tier clients of the respective Other Banks, they would be eligible to compete for IPO Shares based on the amount of commission revenue each account generated for the Other Banks through trading in securities.  To remain top tier clients, and thereby to receive the most IPO Share allocations, customers of the Other Banks would have to generate *as much as $100,000 in commissions every month per Bank*.

76.    Like with J.P. Morgan, the Other Banks' rules were structured such that multiple clients generating trading commissions for any one Bank would collectively be allocated a larger number of IPO Shares by that Bank than an individual client generating the same total amount of commission.  For example, if Companies A, B, C, D, and E each separately

generated $600,000 in commissions for Deutsche Bank in one year, for a total of $3 million, the total number of IPO Shares that were allocated to them, collectively, would be larger than the number of IPO Shares allocated to Company F, which had itself generated $3 million in commissions for Deutsche Bank that same year.

77.    Initially, either Plaintiff Birchwood or Detroit Street opened an account with each of the Other Banks.  In 2013, as a result of an internal restructuring of Mr. Berlin's family office, Birchwood closed its accounts with the Banks and Mr. Berlin continued conducting securities trading through Detroit Street's accounts only, with Detroit Street opening accounts at those Banks at which it did not previously have one.

78.    Defendants have been unscrupulously exploiting the Banks' allocation policies regarding IPO Shares since at least 2011.  Through a series of fraudulent schemes to open accounts in violation of Bank and FINRA rules and policies, and then to engage in collusive sham trading, Defendants unlawfully obtained the opportunity to purchase a greater portion of the IPO Shares allocated by the Other Banks, thus: (i) reducing the number of IPO Shares that Birchwood and (later) Detroit Street were able to buy and costing Birchwood and (later) Detroit Street the financial benefits flowing from those purchases; and (ii) artificially driving up the true cost of those IPO Shares that Plaintiffs were able to purchase by artificially inflating the amount of commissions that Plaintiffs had to generate in order to receive such IPO Share allocations from the Other Banks.

***Lustig's Scheme to Manipulate the IPO Allocation Market***

79. To carry out their scheme to exploit the Banks' rules and conduct their multi-billion dollar fraud on the market with the express purpose of illegally acquiring a disproportionate amount of IPO Shares, Lustig, United, JAL, and CLFS (the "Lustig Defendants") trained the Affiliates and other co-conspirators on how to do wash trades and directed them in selecting which securities to trade, met with them once a week to coordinate trading, and provided daily, weekly, monthly, quarterly and annual statements.  Moreover, each participant had access to databases openly revealing the other participants' identities and trading activity.  Furthermore, non-defendant co-conspirator Zach Pashel ("Pashel") informed Mr. Berlin that David Rest, husband of Defendant Rest created an order entry system for Lustig and the Affiliates so that Lustig could monitor each Affiliated Entity's trading positions in real time.

80. Secrecy, however, was also a critical feature of the IPO Market Manipulation Scheme.  Lustig and the law firm Brownstein Farber ensured that each of the co-conspirators, including the Affiliates, executed NDAs purporting to keep confidential, among other things: (i) the "nature and type of the activities engaged in" by the co-conspirators; (ii) the "Transaction Documents"; and (iii) the Lustig Defendants' and other co-conspirators' identities.

81. Since in or around December 2017, several co-conspirators in the IPO Market Manipulation Scheme, including Confidential Co-conspirators No. 1 and No. 2, have

disclosed to Mr. Berlin the nature and scope of Mr. Lustig's IPO Market Manipulation Scheme.  (*See* Exhibits 1, 2, and 3.)

82.   Specifically, the Lustig Defendants associated in fact with the Affiliates to create an enterprise (the "Enterprise") which they operated for the purpose of: (i) generating commissions for the Banks through wash trading, that is, consummating transactions that lack economic substance, and thereby (ii) obtaining greater numbers of IPO Shares and profits for the Lustig Defendants and the Affiliates (collectively, the "Defendants") than they would have obtained had they not engaged in the unlawful conduct.

83.   The Defendants knowingly conducted, and participated in conducting, the Enterprise through the repeated commission of acts constituting "racketeering activity" under C.R.S. 18-17-103(5), including, without limitation:

  a.   conduct indictable under 18 U.S.C. §1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud) and/or 18 U.S.C. § 1956 (laundering of monetary instruments);

  b.   violations of Colorado state securities statutes:

    i.   C.R.S. 11-51-401 (knowingly acting as an unlicensed Broker/Dealer and/or investment adviser and/or failing to file the notice and fee required in sections 11-51-403 and 11-51-404 with the Colorado securities commissioner);

    ii.   C.R.S. 11-51-501(a) (knowing participation in a device, scheme or artifice to defraud in connection with the offer, sale, or purchase of securities);

      iii.  C.R.S. 11-51-501(1)(b) (knowing participation in the making of untrue statements of material fact, or the omission of necessary statements of material fact in connection with the offer, sale, or purchase of securities); and

      iv.  C.R.S. 11-51-501(1)(c) (knowing participation in acts, practices, and a course of business which operated as a fraud or deceit upon other persons in connection with the offer, sale, or purchase of securities); and

c.    violations of federal securities statutes:

      i.  subsections (a) and (c) of Rule 10b-5 promulgated by the Securities and Exchange Commission pursuant to 15 U.S.C. §78j(b) ("Rule 10b-5"); and

      ii.  subsection (b) of Rule 10b-5.

84.    This conduct has directly caused (and continues to directly cause) millions of dollars of damages per year to Plaintiffs and other innocent clients of the Banks who are not associated with the Enterprise ("Innocent Bank Clients").

85.    Specifically, the Defendants' commission of these acts constituting racketeering activity, *i.e.*, the IPO Market Manipulation Scheme, directly caused (and continues to cause) an artificial increase in the number of accounts with which Birchwood and Detroit Street (and other Innocent Bank Clients) were (and are) required to compete in order to remain top tier clients at each of the Banks, and thus an artificial increase in the amount of commissions that Birchwood and Detroit Street (and other Innocent Bank Clients) were (and are) required to generate in order to remain top tier clients at each of the Banks which were eligible for the IPO Shares.  Indeed, at J.P. Morgan alone, Birchwood and (later) Detroit Street had to generate up to ***five times higher commissions*** just to remain

top tier clients and continue to receive IPO Share allocations.  Thus, the Defendants have knowingly and intentionally artificially increased (and continue to knowingly and intentionally artificially increase) the true price of the IPO Shares – *i.e.*, the amount of commissions that Plaintiffs and other Innocent Bank Clients were (and are) required to generate in order to be considered top tier clients and allocated IPO Shares.

86.    The IPO Market Manipulation Scheme has also directly caused (and continues to cause) the Affiliated Entities to receive substantial numbers of IPO Shares that otherwise would have been allocated to Plaintiffs and other Innocent Bank Clients.  The sale of such IPO Shares by the Affiliated Entities generated (and continues to generate) substantial profits that were (and are) shared by Lustig and the Affiliated Individuals but that, in the absence of the misconduct described herein, would have been shared by Plaintiffs and the other Innocent Bank Clients.  Indeed, Birchwood and Detroit Street have seen their profits from the sale of IPO Shares allocated to them decrease steadily over the past seven years, notwithstanding that the amounts they have paid in commissions to the Banks have skyrocketed over that same period.

87.    The IPO Market Manipulation Scheme operated (and continues to operate) as follows:

a.    At the direction of Lustig and its respective Affiliated Individual, each Affiliated Entity opened a brokerage account with one or more of the Banks.  Many of these entities were straw men entities.  For example, Confidential Co-conspirator No. 3 admitted that, despite the fact that he is the President of one of the entities involved in the IPO Market Manipulation Scheme, he has no management role other than to occasionally execute documents, no knowledge of or involvement

in the purchase or sale of securities, and no knowledge of what persons in fact trade securities for that entity.  (*See* Exhibit 3.)

b.      One or more of the Lustig Defendants provided approximately $600,000 to each of the Affiliated Entities as well as other co-conspirators, and Lustig directed which securities the Affiliated Entities would purchase and sell on an ongoing basis.  For example, the Lustig Defendants provided Confidential Co-conspirator No. 1 and his company with $650,000 and funded Confidential Co-conspirator No. 2 and his entity's account with approximately $680,000, funds which were to be repaid over time to the Lustig Defendants.

c.      Confidential Co-conspirator No. 1 also stated to Mr. Berlin that Lustig conducted "primers" for scheme participants to teach them how to conduct wash trades, *i.e.*, trades close in time that are designed to cancel each other which are conducted solely for the purpose of generating commissions for the Banks.  For example, Confidential Co-conspirator No. 1 was instructed to buy a specific quantity of a specific stock at one of the Banks and simultaneously sell that same quantity of the same stock at another Bank.  Lustig explained to the Affiliated Individuals during these "primers" that wash trades should be conducted using stocks that were inexpensive and liquid, such as Sirius Satellite, United States Oil Fund, LP ("USO"), Bank of America, and Citigroup.  Moreover, Lustig trained the participants on how to conceal their wash trading, including, for example, by holding back some of the purchased stock and selling it at a slightly later interval.  For example, he would recommend buying 50,000 shares of one stock

31

and then selling only 40,000 shares simultaneously.  By waiting a few minutes to sell the remaining 10,000 shares, the co-conspirators would be able to trade at a slightly different price on those shares, which would inhibit the market from detecting pure wash trading while continuing to limit market risk.  In so doing, Lustig and JAL knowingly acted (and continue to knowingly act) as unlicensed broker-dealers and/or investment advisers in violation of C.R.S. 11-51-401, and/or have failed to file the notice and pay the fee required in sections 11-51-403 and 11-51-404 with the Colorado securities commissioner.  Along with Lustig, Defendant Brandon conducted similar primers for other co-conspirators, including Confidential Co-conspirator No. 2, instructing them on how Mr. Lustig's business worked and how to conduct wash trades and directing them to trade in stocks that did not move much in price so as to minimize risk while generating commissions for the Banks in order to become eligible to purchase IPO Shares.  Brandon also regularly had in-person and telephonic meetings with these individuals—daily when they first joined the IPO Market Manipulation Scheme and later weekly—during which meetings and phone calls Brandon would advise which stocks to trade, how and when to do wash trades, and which IPO Shares to purchase.

d.  At the direction of Lustig and its respective Affiliated Individual, each Affiliated Entity used (and continues to use) the money fronted by the Lustig Defendants to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough

commissions for the Bank where the account is maintained to remain among that Bank's top tier clients and continue receiving the valuable IPO Share allocations. For example, Confidential Co-conspirator No. 1 has advised that ***all*** trades made by his company between 2011 and 2017 were wash trades executed for the sole purpose of generating commissions for the Banks.  Similarly, Confidential Co-conspirator No. 2 confessed to Mr. Berlin that all of his entity's trades between 2011 until 2018 were wash trades.

e.   Confidential Co-conspirator No. 8 (a friend and business associate of Defendant Lustig's) also regularly conducted wash trades through the entity he managed. Indeed, as reflected on trading records (*see* Restricted Exhibit A) prepared for Confidential Co-conspirator No. 8 by CLFS., the following transactions constitute wash trades designed to mislead the market as to the nature and extent of the trading and to generate commissions for the Banks in order to obtain IPO Share allocations:

i.   On February 1, 2017, Confidential Co-conspirator No. 8, through his entity, purchased and sold 100,000 shares of Univar Inc. ("Univar") at approximately the same price per share, resulting in a loss (including trading commissions) of $6,353, or approximately $.06 per share.  The industry standard for trading commissions in brokerage accounts is approximately $.03-$.10 per share per trade.  Thus, a strong inference can be drawn that the $6,353 loss that Confidential Co-conspirator No. 8's entity incurred on this same-day purchase and sale of Univar is made up

almost entirely – if not entirely – of the commissions paid to the Banks through which the purchase and sale were executed (*i.e.,* approximately $.03 per share to the Bank through which the purchase was executed and approximately $.03 per share to the Bank through which the sale was executed), and thus that the trades were entered into for the sole purpose of generating such commissions in exchange for future IPO Share allocations or to pay the Banks back for past IPO Share allocations, rather than for legitimate trading purposes.

ii.   On March 1, 2017, one day before Snapchat's IPO, Confidential Co-conspirator No. 8, through his entity, purchased and sold 50,000 shares of Whiting Petroleum Corp. ("Whiting") at approximately the same price per share, resulting in a loss (including trading commissions) of $6,607, or approximately $.13 per share.  The industry standard for trading commissions in brokerage accounts is approximately $.03-$.10 per share per trade.  Thus, a strong inference can be drawn that the $6,607 loss that Confidential Co-conspirator No. 8's entity incurred on this same-day purchase and sale of Whiting is made up almost entirely – if not entirely – of the commissions paid to the Banks through which the purchase and sale were executed (*i.e.,* approximately $.06 per share to the Bank through which the purchase was executed and approximately $.06 per share to the Bank through which the sale was executed), and thus that the trades were entered into for the sole purpose of generating such commissions in

exchange for future IPO Share allocations, such as allocations of shares of the Snapchat IPO on March 2, 2017, or to pay the Banks back for past IPO Share allocations, rather than for legitimate trading purposes.

iii.  On March 3, 2017, Confidential Co-conspirator No. 8, through his entity, purchased and sold 50,000 shares of Conduent Inc. Com ("Conduent") at approximately the same price per share, resulting in a loss (including trading commissions) of $10,690, or approximately $.21 per share.  The industry standard for trading commissions in brokerage accounts is approximately $.03-$.10 per share per trade.  Thus, a strong inference can be drawn that the $10,690 loss that Confidential Co-conspirator No. 8's entity incurred on this same-day purchase and sale of Conduent is made up almost entirely – if not entirely – of the commissions paid to the Banks through which the purchase and sale were executed (*i.e.,* approximately $.10 per share to the Bank through which the purchase was executed and approximately $.10 per share to the Bank through which the sale was executed), and thus that the trades were entered into for the sole purpose of generating such commissions in exchange for future IPO Share allocations or to pay the Banks back for past IPO Share allocations, such as the Snapchat IPO on March 2, 2017, rather than for legitimate trading purposes.

iv.  The trading records prepared for Confidential Co-conspirator No. 8 by CLFS, filed as Restricted Exhibit A, reflect numerous additional wash

35

trades, including, but not limited to, those trades that have been
highlighted.

f.   Similarly, the trading records prepared by CLFS for Confidential Co-conspirator
No. 4 and his entity, which are attached to this Complaint as Exhibit 4 and
incorporated by reference herein, contain numerous instances of wash trades,
including, but not limited to, those trades that have been highlighted on the
document.

i.   For example, on February 23, 2017, Confidential Co-conspirator No. 4
purchased and sold 16,500 shares of Cloud Peak Energy Inc. ("Cloud
Peak") at approximately the same price per share, resulting in a loss
(including trading commissions) of $1,482, or approximately $.09 per
share.  The industry standard for trading commissions in brokerage
accounts is approximately $.03-$.10 per share per trade.  Thus, a strong
inference can be drawn that the $1,482 loss that Confidential Co-
conspirator No. 4 incurred on this same-day purchase and sale of Cloud
Peak is made up almost entirely – if not entirely – of the commissions paid
to the Banks through which the purchase and sale were executed (*i.e.*,
approximately $.04 per share to the Bank through which the purchase was
executed and approximately $.04 per share to the Bank through which the
sale was executed), and thus that the trades were entered into for the sole
purpose of generating such commissions in exchange for future IPO Share
allocations, such as the Snapchat IPO on March 2, 2017, or to pay the

Banks back for past IPO Share allocations, rather than for legitimate trading purposes.

ii. Additionally, on February 27, 2017 Confidential Co-conspirator No. 4 purchased and sold 7,500 shares of Hi-Crush Partners LP ("Hi-Crush") at approximately the same price per share, resulting in a loss (including trading commissions) of $1,513, or approximately $.20 per share.  The industry standard for trading commissions in brokerage accounts is approximately $.03-$.10 per share per trade.  Thus, a strong inference can be drawn that the $1,513 loss that Confidential Co-conspirator No. 4 incurred on this same-day purchase and sale of Hi-Crush is made up almost entirely – if not entirely – of the commissions paid to the Banks through which the purchase and sale were executed (*i.e.*, approximately $.10 per share to the Bank through which the purchase was executed and approximately $.10 per share to the Bank through which the sale was executed), and thus that the trades were entered into for the sole purpose of generating such commissions in exchange for future IPO Share allocations, such as the Snapchat IPO on March 2, 2017, or to pay the Banks back for past IPO Share allocations, rather than for legitimate trading purposes.

g. Moreover, the trading records prepared by CLFS for Confidential Co-conspirator No. 6, which are attached to this Complaint as Exhibit 7, and incorporated by

37

reference herein, contain numerous instances of wash trades, including, but not limited to, those trades that have been highlighted on the document.

   i.  For example, on February 23, 2017, Confidential Co-conspirator No. 6 purchased and sold 10,000 shares of Cloud Peak at approximately the same price per share, resulting in a loss (including trading commissions) of $1,673, or approximately $.17 per share.  The industry standard for trading commissions in brokerage accounts is approximately $.03-$.10 per share per trade.  Thus, a strong inference can be drawn that the $1,673 loss that Confidential Co-conspirator No. 6 incurred on this same-day purchase and sale of Cloud Peak is made up almost entirely – if not entirely – of the commissions paid to the Banks through which the purchase and sale were executed (*i.e.*, approximately $.08 per share to the Bank through which the purchase was executed and approximately $.08 per share to the Bank through which the sale was executed), and thus that the trades were entered into for the sole purpose of generating such commissions in exchange for future IPO Share allocations, such as the Snapchat IPO on March 2, 2017, or to pay the Banks back for past IPO Share allocations, rather than for legitimate trading purposes.

   ii.  Similarly, on March 10, 2017, Confidential Co-conspirator No. 6 purchased and sold 10,334 shares of Cachet Financial ("Cachet") at approximately the same price per share, resulting in a loss (including trading commissions) $2,299, or approximately $.22 per share.  The

industry standard for trading commissions in brokerage accounts is approximately $.03-$.10 per share per trade.  Thus, a strong inference can be drawn that the $2,299 loss that Confidential Co-conspirator No. 6 incurred on this same-day purchase and sale of Cachet is made up almost entirely – if not entirely – of the commissions paid to the Banks through which the purchase and sale were executed (*i.e.*, approximately $.11 per share to the Bank through which the purchase was executed and approximately $.11 per share to the Bank through which the sale was executed), and thus that the trades were entered into for the sole purpose of generating such commissions in exchange for future IPO Share allocations, or to pay the Banks back for past IPO Share allocations, such as the Snapchat IPO on March 2, 2017, rather than for legitimate trading purposes.

h.    Finally, the trading records prepared by CLFS for Confidential Co-conspirator No. 7, which are attached to this Complaint, contain numerous instances of wash trades, including, but not limited to, those highlighted on Exhibit 12.

   i.    For example, on February 24, 2017, Confidential Co-conspirator No. 7 purchased and sold 50,000 shares of Ishares Gold Trust ("Ishares") at approximately the same price per share, resulting in a loss (including trading commissions) of $3,888, or approximately $.08 per share.  The industry standard for trading commissions in brokerage accounts is approximately $.03-$.10 per share per trade.  Thus, a strong inference can

be drawn that the $3,888 loss that Confidential Co-conspirator No. 7 incurred on this same-day purchase and sale of Ishares is made up almost entirely – if not entirely – of the commissions paid to the Banks through which the purchase and sale were executed (*i.e.*, approximately $.04 per share to the Bank through which the purchase was executed and approximately $.04 per share to the Bank through which the sale was executed), and thus that the trades were entered into for the sole purpose of generating such commissions in exchange for future IPO Share allocations, such as the Snapchat IPO on March 2, 2017, or to pay the Banks back for past IPO Share allocations, rather than for legitimate trading purposes.

ii.   Similarly, on February 27, 2017, Confidential Co-conspirator No. 7 purchased and sold 20,000 shares of USO at approximately the same price per share, resulting in a loss (including trading commissions) of $2,605, or approximately $.13 per share.  The industry standard for trading commissions in brokerage accounts is approximately $.03-$.10 per share per trade.  Thus, a strong inference can be drawn that the $2,605 loss that Confidential Co-conspirator No. 7 incurred on this same-day purchase and sale of USO is made up almost entirely – if not entirely – of the commissions paid to the Banks through which the purchase and sale were executed (*i.e.*, approximately $.06 per share to the Bank through which the purchase was executed and approximately $.06 per share to the Bank

through which the sale was executed), and thus that the trades were entered into for the sole purpose of generating such commissions in exchange for future IPO Share allocations, such as the Snapchat IPO on March 2, 2017, or to pay the Banks back for past IPO Share allocations, rather than for legitimate trading purposes.

Through such deceptive and manipulative conduct, the Lustig Defendants and Affiliates knowingly and intentionally controlled and artificially affected (and continue to knowingly and intentionally control and artificially affect) the market for IPO Share allocations by the Banks in violation of C.R.S. 11-51-501(1) (a) and (c), as well as subsections (a) and (c) of Rule 10b-5.

i.   In addition to engaging in illegal wash trading, when required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, each of the Affiliated Entities, at the direction of the Lustig Defendants and its respective Affiliated Individual, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) the Affiliated Entity's net worth is higher than it actually is; (ii) the funds it uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as personal or family wealth; and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).  For example,

i.  Each of the Banks required each Affiliated Entity to complete a "Suitability" form, which requests information regarding annual income, liquid net worth, total net worth, approximate value of investable assets held away from the firm, and primary source of income.  Several of the Affiliated Individuals – including Defendants Brandon, Marsico, Harrison, Shoflick, Alterman, Lande, Hall, Pepper, and Rickel – as well as co-conspirators, such as Confidential Co-conspirator No. 2 and Confidential Co-conspirator No. 8, have admitted to Mr. Berlin that they have intentionally significantly inflated their, and their respective Affiliated Entities', net worth on these forms at the direction of Defendant Lustig. Specifically, Confidential Co-conspirator No. 2 misrepresented that his net worth was between $50-70 million, which is not accurate—in fact, had he stated his true net worth, he would not have qualified as a high net worth individual, which Lustig and Brandon knew.  (Exhibit 2.)

ii.  Moreover, at Lustig's direction, the Affiliated Entities intentionally did not disclose any of the Lustig Defendants on the Suitability forms even though the Lustig Defendants were the primary source of income for such Affiliated Entities.  For example, co-conspirators, including Confidential Co-conspirator No. 2, have admitted to Mr. Berlin that Lustig taught each Affiliated Individual how to create a false family history story to share with the Banks about the origins of his or her wealth.  Each Affiliated Individual had to submit (by mail, email, or fax) a Suitability form – and

accordingly necessarily made these misrepresentations – each time they opened an account for their respective Affiliated Entity at one of the Banks.

iii. Finally, because FINRA Rule 5130 generally prohibits a broker-dealer from selling IPO Shares to an account for which a "restricted person" has a beneficial interest, or is a beneficial owner, in order to be eligible to receive IPO Share allocations from the Banks, each Affiliated Entity was required to fill out a form with each Bank at which it opened an account representing that no restricted person has a beneficial interest in the account. However, Lustig – who meets the definition of a "restricted person" – in fact had a beneficial interest in each of the Affiliated Entities' accounts.  Specifically, a "restricted person" is defined to include "[a] person who has authority to buy or sell securities for a[n] . . . investment advisor . . . ."  Lustig is a person who has authority to buy and sell securities for JAL and United, which are themselves investment advisors to all of the Affiliated Entities, as they direct such Entities' trading. Moreover, based on the structure of the IPO Market Manipulation Scheme, Lustig is entitled to share in the profits generated in each account that each of the Affiliated Entities opens, meaning that he has a "beneficial interest" in each such account.  Lustig (for his own entities) and each Affiliated Individual (for its respective Affiliated Entity) had to submit (by mail, email, or fax) a new FINRA 5130 form – and, accordingly,

necessarily made these misrepresentations and omissions – at least twice
with each Bank at which it held accounts, once when they first opened
their accounts with that Bank, and again between April 2016 and April
2017, when the prime broker Lustig used, *i.e.*, Triad Securities Corp.
("Triad"), changed clearing banks, and each of the Affiliated Entities
accordingly had to set up a new brokerage account.  Indeed, Confidential
Co-conspirator No. 6's FINRA 5130 Form, signed March 30, 2017,
making such misrepresentations at Lustig's direction, is attached as
Exhibit 8.  Confidential Co-conspirator No. 5's FINRA 5130 Form, dated
May 6, 2016, making such misrepresentations at Lustig's direction is
attached as Exhibit 10.  Confidential Co-conspirator No. 4's 5130 Form,
dated September 20, 2016, making such misrepresentations at Lustig's
direction is attached as Exhibit 5.  And Confidential Co-conspirator No.
7's FINRA 5130 Form, dated May 21, 2013, making such
misrepresentations at Lustig's direction is attached as Exhibit 13.  Lustig,
a sophisticated securities trader and mastermind behind the IPO Market
Manipulation Scheme was (and is) fully aware that he was (and is) a
"restricted person," but nonetheless: (i) made this misrepresentation on the
FINRA 5130 forms that he submitted (by mail, email, or fax) to each Bank
at which he opened accounts for his own entities; and (ii) instructed each
of the Affiliated Individuals to make this misrepresentation on the FINRA

5130 forms submitted (by mail, email, or fax) to each Bank at which they

opened accounts for their respective Affiliated Entities.

j.     Each Affiliated Entity generated (and continues to generate) substantial

commissions for each of the Banks at which it holds accounts each year and thus

received (and continues to receive) many millions of dollars' worth of IPO Share

allocations from each of the Banks at which it holds accounts, which it purchased

and then quickly sold (and continue to purchase and quickly sell) at a substantial

profit. For example, Confidential Co-conspirator No. 2 specifically told Mr.

Berlin that he intentionally engaged in wash trades to generate commissions

sufficient to entitle him to purchase shares of the Ali Baba IPO in September

2014 and the Facebook IPO in 2012 from Goldman Sachs and other Banks.  He

also intentionally engaged in wash trades of 100,000-150,000 shares per trade in

the stock of each of USO, Bank of America, Regions Financial and XLF (an

exchange-traded fund), buying them through Goldman Sachs and selling them

through J.P. Morgan and Jefferies, around February 27-28, 2017, thereby

generating commissions sufficient to obtain 9,700 shares of the Snapchat IPO

from Goldman Sachs, J.P. Morgan, and Jefferies on or about March 2, 2017,

resulting in a profit of $75,000.  Similarly, Confidential Coconspriator No. 8

engaged in wash trading, such as the March 1, 2017 Whiting Petroleum Corp.

trades discussed above in paragraph 87(e)(ii) and thereby generated sufficient

commissions to obtain 14,950 shares of the Snapchat IPO from six different

brokerage accounts on or about March 2, 2017, resulting in a profit of

$93,109.61.  Moreover, Confidential Co-conspirator No. 4 conducted multiple wash trades (*i.e.* in Cloud Peak and Hi-Crush) in the days leading up to the Snapchat IPO, as discussed above in paragraph 87(f)(i-ii) and thereby generated sufficient commissions to obtain 10,210 shares of the Snapchat IPO from multiple brokers, resulting in a profit of approximately $76,013.11.  (*See* Exhibit 4.) Like Confidential Co-conspirator No. 4, Confidential Co-conspirator No. 6 conducted multiple wash trades (**including wash trades in Cloud Peak on the same day as Confidential Co-conspirator No. 4**) in the days leading up to the Snapchat IPO, as discussed above in paragraph 87(g)(i) and thereby generated sufficient commissions to obtain 600 shares of the Snapchat IPO from two brokers, resulting in a profit of approximately $4,476.92.  (*See* Exhibit 7.) Finally, Confidential Co-conspirator No. 7 conducted multiple wash trades in the days leading up to the Snapchat IPO, as discussed above in paragraphs 87(h)(i-ii) and thereby generated sufficient commissions to obtain 6,350 shares of the Snapchat IPO from multiple brokers, resulting in a profit of approximately $48,305.80.  (*See* Exhibit 12.)  Such coordinated trading was directed by Lustig in furtherance of the IPO Market Manipulation Scheme.  Indeed, Confidential Co-conspirator No. 1 confirmed that Lustig himself held weekly meetings or conference calls with the Affiliated Individuals and other co-conspirators to coordinate which IPO Shares to purchase, which wash trades to execute, and which Banks to use to execute such trades in any given week.

k.     The Affiliated Entities repaid (and continue to repay) funds advanced by the

Lustig Defendants, plus interest.  Additionally, in the guise of compensation for

accounting and administrative services, as much as forty percent of each

Affiliated Entity's profits from the sale of IPO Shares are paid to the Lustig

Defendants.  For example, Confidential Co-conspirator No. 1 advised Mr. Berlin

that under his entity's agreement with the Lustig Defendants, forty percent of the

profits it made from the sale of IPO Shares were to be paid to the Lustig

Defendants, purportedly in exchange for Lustig providing certain back-office

functions for that entity.  Similarly, Confidential Co-conspirator No. 2 advised

Mr. Berlin that Lustig received between 30-35%, and possibly up to 37.5% of the

profits from the sale of IPO Shares by his company.  Moreover, attached as

Exhibits 6 and 11, respectively, are example statements from Lustig's entity,

Defendant CLFS, for Confidential Co-conspirator No. 4 and Confidential Co-

conspirator No. 5, demonstrating that CLFS, and, consequently, Lustig, received

40% of those co-conspirators' profits up to $1,000,000 and 30% of their profits

over $1,000,000, while Exhibit 9 demonstrates that Lustig received 30% of

Confidential Co-conspirator No. 6's profits.  Finally, Lustig received 30% of

Confidential Co-conspirator No. 7's profits up to $1,500,000 and 25% of its

profits over $1,500,000.  (*See* Exhibit 14.)

l.     The Lustig Defendants and the Affiliates used (and continue to use) the profits

generated from the sale of the IPO Shares to continue operating the Enterprise

for the purpose of generating more commissions for the Banks and obtaining

more IPO Share allocations for the Affiliated Entities, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

m.   Each of the Lustig Defendants and the Affiliates used (and continue to use) the U.S. mail, telephone, and electronic communications in furtherance of the activities described in paragraphs a-l above, in violation of 18 USC §§ 1341 (mail fraud) and 1343 (wire fraud).  Specifically, Defendants used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by directing which wash trades should be executed through which Banks and which IPO Shares should be purchased.  For example, Confidential Co-conspirator No. 1 told Mr. Berlin that Lustig himself held weekly meetings or conference calls with certain Affiliated Individuals and other co-conspirators every Monday morning to coordinate which IPO Shares to purchase, which wash trades to execute, and which Banks to use to execute such trades in any given week.  Similarly, Confidential Co-conspirator No. 2 told Mr. Berlin that Brandon met with him in person or telephonically throughout the time Confidential Co-conspirator No. 2 managed his company from 2011-2018, directing Confidential Co-conspirator No. 2 on when and in which stocks to conduct wash trades and which IPO Shares to purchase.  These meetings initially occurred daily when Confidential Co-conspirator No. 2 began participating in the IPO Market Manipulation Scheme in 2011, and, over time, occurred on a weekly basis.  Moreover, Defendants used

the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

n.    In violation of 18 U.S.C. § 1956, each of the Lustig Defendants and the Affiliates knowingly engaged in money laundering by conducting financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such mail fraud, wire fraud, and fraud in the sale of securities, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud, wire fraud, and fraud in the sale of securities.

88.   An internal database controlled by the Lustig Defendants, to which Plaintiffs have previously had access, contains the following information:

a.    account numbers for the Affiliated Entities' accounts;

b.    information regarding the "wash sales" in which the Affiliated Entities' participated;

c.    dates of transactions;

d.    amount of stock traded and dollar amount of transactions;

e.    sources of funds used to conduct transactions;

f.    commissions paid on transactions;

g.    profits and losses from transactions;

h.     IPO Share allocations received;

i.     dates of IPO Share allocations;

j.     price of allocated IPO Shares;

k.     number of allocated IPO Shares purchased;

l.     profits made on sale of purchased IPO Shares; and

m.    division of profits from sale of purchased IPO Shares.

89.   The Lustig Defendants and their employees have the user names and passwords

necessary to access this information.  Defendants are under a legal duty to preserve this

information and requests to preserve this information have been sent to Defendant

Lustig.

90.   Similar information is also contained on the website of Triad, the prime broker used by

Lustig, at: https://secure.triadsecurities.com/login.

91.   The internal databases controlled by the Lustig Defendants and the information contained

on the Triad website https://secure.triadsecurities.com/login are incorporated by reference

as if fully set forth herein.

92.   Additionally, records identical to the documents prepared by Defendant CLFS attached

hereto as Exhibits 4, 7, and 12, which list the daily trades by each Affiliated Entity, are

within the exclusive possession of each such Affiliated Entity, its respective Affiliated

Individual, and the Lustig Defendants.  Defendant Lustig and his attorneys have gone out

of their way to threaten and intimidate other Defendants and other co-conspirators in

order to prevent them from disclosing this information to Plaintiffs, even though several

have expressed an interest in doing so.

## FIRST CLAIM FOR RELIEF
## Colorado Organized Crime Control Act (COCCA)
## C.R.S. 18-17-104(3) and 18-17-106

93.   All allegations previously stated herein are incorporated by reference.

94.   Each Defendant violated, and continues to violate, C.R.S. 18-17-104(3) because each

Defendant was (and continues to be) associated with the Enterprise and has knowingly

participated (and continues to knowingly participate) in the Enterprise through an

ongoing pattern of racketeering activity.

95.   The Enterprise is an association in fact among the Lustig Defendants, the Affiliated

Entities, and the Affiliated Individuals, the purpose of which is to generate trading

commissions for the Banks through wash trading and to obtain IPO Share allocations for

the Affiliated Entities, which IPO Share allocations are purchased and then quickly sold

for profits that are then shared among Lustig and the Affiliated Individuals.

96.   The pattern of racketeering activity consists of the Defendants' repeated and ongoing

violations of 18 USC §§ 1341, 1343, and 1956; C.R.S. 11-51-501(1)(a), (b), and (c); and

Rule 10b-5(a), (b), and (c), through the IPO Market Manipulation Scheme.  The IPO

Market Manipulation Scheme constitutes:

   a.   a device, scheme or artifice to defraud that Defendants knowingly employed in

       connection with the offer, sale, and purchase of IPO Shares allocated by the

       Bank to its clients;

   b.   a course of business knowingly engaged in by Defendants which operated as a

       fraud or deceit upon Plaintiffs and other Innocent Bank Clients in connection

51

with the offer, sale, and purchase of IPO Shares allocated by the Bank to its clients; and

    c.    manipulative and deceptive conduct knowingly engaged in by Defendants that controlled and artificially affected the market for IPO Shares allocated by the Bank to its clients, which market was relied upon by Plaintiffs and other Innocent Bank Clients who were injured by reason thereof.

97.    Moreover, in connection with implementing the IPO Market Manipulation Scheme, Lustig, JAL, and the Affiliates have: (i) violated (and continue to violate) Rule 10b-5(b) and C.R.S. 11-51-501(1)(b) by making untrue statements of material fact on account opening documents and FINRA Form 5130/5131 IPO Disclosure Forms; (ii) used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of such activities in violation of 18 U.S.C. §§ 1341 and 1343; and (iii) violated (and continue to violate) the anti-money laundering provisions set forth in 18 U.S.C. § 1956 by conducting financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (A) with the intent to promote the carrying on of such mail fraud, wire fraud, and fraud in the sale of securities, and (B) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud, wire fraud, and fraud in the sale of securities.

98.    Defendant Lustig knowingly participated, and continues to knowingly participate in conducting the Enterprise and the IPO Market Manipulation Scheme as follows:

a.   Lustig leads, orchestrates, manages, and is the mastermind behind, the IPO Market Manipulation Scheme.

b.   Lustig directed the opening of separate brokerage accounts at several of the Banks, including, at least, J.P. Morgan, Citigroup, Jefferies, Credit Suisse, Deutsche Bank, Barclays, and Morgan Stanley, for United and each of the JAL DBAs, which Lustig controlled and managed (and continues to control and manage).  Lustig also opened checking accounts for CLFS and JAL, both of which he controlled and managed (and continues to control and manage), at banks other than the Banks.

c.   Lustig directed the opening of separate brokerage accounts for each of the Affiliated Entities, which Lustig controlled and managed (and continues to control and manage) through a form of joint venture agreement with each such Affiliated Entity.

d.   Lustig provided funds in the amount of approximately $600,000 to United, the JAL DBAs, and each of the Affiliated Entities, so that they could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c). For example, Lustig provided Confidential Co-conspirator No. 1 and his company with $650,000 and funded Confidential Co-conspirator No. 2 and his entity's account with approximately $680,000, funds which were to be repaid over time to Lustig.

e.   Lustig provided (and continues to provide) training, advice, and analysis to the

Affiliated Entities regarding the purchase and sale of securities, and directed (and

continues to direct) which securities should be purchased and sold.  In so doing,

Lustig knowingly acted (and continues to knowingly act) as an unlicensed

broker-dealer and/or investment adviser in violation of C.R.S. 11-51-401 and/or

has failed to file the notice and pay the fee required in sections 11-51-403 and

11-51-404 with the Colorado securities commissioner.  For example, as

discussed above, Lustig regularly encourages and trains participants on how to

engage in wash trades, and holds weekly conference calls to direct participants

on which IPO Shares to purchase, which wash trades to execute, and which

Banks to use to execute such trades.

f.   Lustig monitored (and continues to monitor) United's, the JAL DBAs' and the

Affiliated Entities' accounts and moved (and continues to move) money between

them as needed in order to ensure that sufficient commissions were (and are)

being generated for each Bank.  No Affiliated Entity or Affiliated Individual was

(or is) permitted or able to move money into or out of the Affiliated Entities'

accounts without Lustig signing off.

g.   Lustig directed (and continues to direct) the JAL DBAs and the Affiliated

Entities to violate C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely

representing in writing on account opening documents, as well as FINRA Rule

5130/5131 IPO Disclosure Forms, that: (i) their net worth is higher than it

actually is; (ii) the funds they use to conduct trades, pay commissions, and

purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).  Confidential Co-conspirator No. 1 and Confidential Co-conspirator No. 2 indeed advised Mr. Berlin that it was "understood" between the co-conspirators in the IPO Market Manipulation Scheme and Lustig that the Affiliated Individuals and other co-conspirators were required to make these critical misrepresentations and omissions in these documents.

h.   Lustig used (and continues to use) the U.S. mail and interstate telephone and electronic communications in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Confidential Co-conspirator No. 1 told Mr. Berlin that Lustig himself held weekly meetings or conference calls with certain Affiliated Individuals and other co-conspirators every Monday morning to coordinate which IPO Shares to purchase, which wash trades to execute, and which Banks to use to execute such trades in any given week.

i.   Lustig received (and continues to receive) repayment of the funds advanced by him to the Affiliated Entities, plus interest.  Additionally, in the guise of compensation for accounting and administrative services, Lustig received (and continues to receive) as much forty percent of the Affiliated Entity's profits from the sale of IPO Shares.  For example, Lustig received forty percent of the profits

received by Confidential Co-conspirator No. 1's entity and 30-35% (and possibly up to 37.5%) of the profits received by Confidential Co-conspirator No. 2's entity from the sale of IPO Shares allocated to them pursuant to the IPO Market Manipulation Scheme.

j.    Lustig used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Banks and obtaining more IPO Share allocations for Affiliated Entities, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

k.    Lustig knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

99.    Defendant JAL knowingly participated, and continues to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.    JAL opened brokerage accounts at several of the Banks – including, at least, J.P. Morgan, Citigroup, Jefferies, Deutsche Bank, Barclays, Morgan Stanley, and

Credit Suisse – in the name of each of the JAL DBAs, and controlled and managed (and continues to control and manage) such accounts.

b.  JAL also directed the opening of separate brokerage accounts for each of the Affiliated Entities, which JAL controlled and managed (and continues to control and manage) through a form of joint venture agreement with each such Affiliated Entity.

c.  JAL provided funds in the amount of approximately $600,000 to each of the JAL DBAs and Affiliated Entities so that they could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.  JAL provided (and continues to provide) advice and analysis to the Affiliated Entities regarding the purchase and sale of securities, and directed (and continues to direct) which securities should be purchased and sold.  In so doing, JAL knowingly acted (and continues to knowingly act) as an unlicensed broker-dealer and/or investment adviser in violation of C.R.S. 11-51-401 and/or has failed to file the notice and pay the fee required in sections 11-51-403 and 11-51-404 with the Colorado securities commissioner.

e.  JAL monitored (and continues to monitor) the JAL DBAs and Affiliated Entities' accounts and moved (and continues to move) money between them as needed in order to ensure that sufficient commissions were (and are) being generated for each of the Banks.  Indeed, JAL sends quarterly billing statements

to each Affiliated Entity calculating the profit split due to the Lustig Defendants, and quarterly interest statements calculating interest due on money borrowed from the Lustig Defendants.

f.      JAL violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing on account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, that: (i) the funds the JAL DBAs use to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as personal or family wealth; and (ii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

g.      JAL directed (and continues to direct) the Affiliated Entities to violate C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing on account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, that (i) their net worth is higher than it actually is; (ii) the funds they use to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

h.      JAL used (and continues to use) the U.S. mail and interstate telephone and electronic communications in furtherance of the IPO Market Manipulation

Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, JAL: (i) used (and continues to use) wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by directing which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

i.     JAL received (and continues to receive) repayment of the funds advanced by it to the Affiliated Entities, plus interest. Additionally, in the guise of compensation for accounting and administrative services, JAL received (and continues to receive) as much as forty percent of the Affiliated Entities' profits from the sale of IPO Shares.

j.     JAL used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which the JAL DBAs have brokerage accounts and obtaining more IPO Share allocations, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

k.     JAL knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18

U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

100.   Defendant CLFS knowingly participated, and continues to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

   a.   CLFS opened checking accounts at certain banks other than the Banks.  In these accounts, CLFS held (and continues to hold) funds that were (and continue to be) used in effectuating the IPO Market Manipulation Scheme.

   b.   CLFS functioned (and continues to function) as a holding "bank" through which Lustig and JAL cause funds to be transferred to United, the JAL DBAs, and the Affiliated Entities in order to ensure that sufficient commissions are being generated for each of the Banks.

   c.   CLFS provided funds in the amount of approximately $600,000 to United, each of the JAL DBAs, and each of the Affiliated Entities so that they could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks in violation of C.R.S. 11-51-501(1)(a) and (c).

   d.   CLFS monitored (and continues to monitor) United, the JAL DBAs, and the Affiliated Entities' accounts and moved (and continues to move) money between

them as needed in order to ensure that sufficient commissions were (and are) being generated for each of the Banks.

e.     CLFS used (and continues to use) the U.S. mail and interstate telephone and electronic communications in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, CLFS used (and continues to use) wire transfers to effectuate the IPO Market Manipulation Scheme by moving money between United, the JAL DBAs, and the Affiliated Entities' accounts in order to ensure that sufficient commissions were (and are) being generated for each of the Banks

f.     CLFS received (and continues to receive) repayment of the funds advanced by it to the Affiliated Entities, plus interest. Additionally, in the guise of compensation for accounting and administrative services, CLFS received (and continues to receive) as much as forty percent of the Affiliated Entities' profits from the sale of IPO Shares.

g.     CLFS used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for the Banks and obtaining more IPO Share allocations for the Affiliated Entities, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

h.     CLFS knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i)

with the intent to promote the carrying on of such fraudulent conduct, and (ii)

knowing that the transaction is designed to conceal or disguise the nature, the

location, the source, the ownership, or the control of the proceeds of such mail

fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C.

§ 1956.

101.   Defendant United knowingly participated, and continues to knowingly participate, in the

Enterprise and the IPO Market Manipulation Scheme as follows:

   a.   United opened brokerage accounts with several of the Banks, including, at least,

        J.P. Morgan, Citigroup, Jefferies, Credit Suisse, Deutsche Bank, Barclays, and

        Morgan Stanley.  United's accounts were (and continue to be) controlled and

        managed by Lustig and/or JAL through a form of joint venture agreement.

   b.   United received approximately $600,000 from Lustig, individually or through

        JAL and/or CLFS, so that it could engage in illegal churning by consummating

        transactions lacking any economic substance, *e.g.*, "wash sales," for the sole

        purpose of generating commissions for each of the Banks at which United has

        accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and

        (c).

   c.   United used (and continues to use) the money fronted by the Lustig Defendants

        to engage in illegal churning by consummating transactions lacking any

        economic substance, *e.g.*, "wash sales," for the sole purpose of generating

        enough commissions to remain among the Banks' top tier clients and continue

receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-

501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.  United has generated (and continues to generate) enough commissions to receive

many millions of dollars' worth of IPO Share allocations, which it purchases and

then quickly sells at a substantial profit.

e.  United used (and continues to use) the U.S. mail, telephone, and electronic

communication in furtherance of the IPO Market Manipulation Scheme, in

violation of 18 U.S.C. §§ 1341 and 1343.  For example, United: (i) used (and

continues to use) wire communications in interstate or foreign commerce via

telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market

Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by

directing which wash trades should be executed through which Banks and which

IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire

communications in interstate or foreign commerce to effectuate the IPO Market

Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms

containing knowing misstatements to the Banks (via mail, email, or fax).

f.  United used (and continues to use) the profits generated from the sale of the IPO

Shares to continue operating the Enterprise for the purpose of generating more

commissions for each of the Banks at which United has accounts and obtaining

more IPO Share allocations for itself, including by recruiting additional affiliates

to participate in the IPO Market Manipulation Scheme.

g.    United knowingly conducted (and continues to knowingly conduct) financial

transactions  involving the proceeds of mail fraud and wire fraud as defined in 18

U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i)

with the intent to promote the carrying on of such fraudulent conduct, and (ii)

knowing that the transaction is designed to conceal or disguise the nature, the

location, the source, the ownership, or the control of the proceeds of such mail

fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C.

§ 1956.

102.    Defendant Global, and its manager, Brandon, knowingly participated, and continue to

knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as

follows:

a.    Brandon opened brokerage accounts for Global with several of the Banks,

including, at least, J.P. Morgan, Goldman Sachs, Citigroup, Jefferies, Credit

Suisse, Deutsche Bank, and Barclays.  Global's accounts were (and continue to

be) controlled and managed by Lustig and/or JAL through a form of joint

venture agreement.

b.    Global received approximately $600,000 from Lustig, individually or through

JAL and/or CLFS, so that it could engage in illegal churning by consummating

transactions lacking any economic substance, *e.g.*, "wash sales," for the sole

purpose of generating commissions for each of the Banks at which Global has

accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and

(c).

64

c.     Global used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).  As a close friend of Lustig's, Brandon also helps to run the IPO Market Manipulation Scheme by sharing with Lustig the tasks of training and directing other co-conspirators, including Confidential Co-conspirator No. 2, with respect to which wash trades to execute, which IPO Shares to purchase, and which Banks to use for such trading.  Brandon specifically encourages other co-conspirators to execute wash trades in Bank of America stock because it is liquid and it is consequently easier to conduct wash trades in that stock.

d.     Global generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.     When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Brandon, on behalf of Global, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) its net worth is higher than it actually is; (ii) the funds Global uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Brandon's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share

allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).  Brandon admitted in conversations with Mr. Berlin that he knew he made material misrepresentations and omissions on the 5130 Forms he filled out for each of the Banks at which he opened accounts for Global, because he represented that no "restricted person" had a beneficial interest in the accounts even though Lustig qualifies as a "restricted person" and in fact has a beneficial interest in each of the accounts. Brandon also admitted in conversations with Mr. Berlin that he provided a false net worth for Global on account opening documents provided to each of the Banks at which he opened accounts for Global.

f.    Brandon and Global used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Brandon and Global: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by directing which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.  Global repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Global's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.  Global used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Global has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.  Global knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

103.  Defendant Ultimate, and its manager, Marsico, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.  Marsico opened brokerage accounts for Ultimate with several of the Banks, including, at least, J.P. Morgan, Goldman Sachs, Citigroup, and Jefferies.

Ultimate's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.      Ultimate received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Ultimate has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.      Ultimate used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.      Ultimate generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and quickly sells at a substantial profit.

e.      When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Marsico, on behalf of Ultimate, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Ultimate's net worth is higher than it actually is; (ii) the funds Ultimate uses to conduct trades, pay commissions, and purchase IPO Shares come from

sources <u>other than the Lustig Defendants</u>, such as Marsico's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).  Indeed, Marsico admitted to Mr. Berlin in conversations that he made material misrepresentations and omissions on the Rule 5130 Forms he filled out for each of the Banks at which he opened accounts for Ultimate because he represented that no "restricted person" had a beneficial interest in the accounts even though Lustig qualifies as a "restricted person" and in fact has a beneficial interest in each of the accounts.  In fact, Marsico himself is an individual with authority to buy and sell securities for investment advisor Redan Capital Management, LLC (C.R.D. No. 284562) ("<u>Redan</u>") and therefore Marsico himself is a "restricted person" who is not entitled to receive initial public offering shares under FINRA Rule 5130.  Marsico further admitted to Mr. Berlin that, among other misrepresentations in account opening documents provided to the Banks at which he opened accounts for Ultimate, he created a fake employee named "Justin" in order to make Ultimate appear to be a larger entity than it actually was.

f.   Marsico and Ultimate used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Marsico and Ultimate: (i) used wire communications in interstate or foreign commerce via

69

telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market

Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by

receiving instructions as to which wash trades should be executed through which

Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail

and/or wire communications in interstate or foreign commerce to effectuate the

IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule

5130 forms containing knowing misstatements to the Banks (via mail, email, or

fax).

g.    Ultimate repaid (and continues to repay) funds advanced by Lustig, plus interest.

Additionally, in the guise of compensation for accounting and administrative

services, as much as forty percent of Ultimate's profits from the sale of IPO

Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.    Ultimate used (and continues to use) the profits generated from the sale of the

IPO Shares to continue operating the Enterprise for the purpose of generating

more commissions for each of the Banks at which Ultimate has accounts and

obtaining more IPO Share allocations for itself, including by recruiting

additional affiliates to participate in the IPO Market Manipulation Scheme.

i.    Ultimate knowingly conducted (and continues to knowingly conduct) financial

transactions  involving the proceeds of mail fraud and wire fraud as defined in 18

U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i)

with the intent to promote the carrying on of such fraudulent conduct, and (ii)

knowing that the transaction is designed to conceal or disguise the nature, the

location, the source, the ownership, or the control of the proceeds of such mail

fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C.

§ 1956.

104. Defendant Haven, and its manager, Brett, knowingly participated, and continue to

knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as

follows:

    a.    Brett opened brokerage accounts for Haven with several of the Banks, including,

at least, J.P. Morgan, Citigroup, and Deutsche Bank.  Haven's accounts were

(and continue to be) controlled and managed by Lustig and/or JAL through a

form of joint venture agreement.

    b.    Haven received approximately $600,000 from Lustig, individually or through

JAL and/or CLFS, so that it could engage in illegal churning by consummating

transactions lacking any economic substance, *e.g.*, "wash sales," for the sole

purpose of generating commissions for each of the Banks at which Haven has

accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and

(c).

    c.    Haven used (and continues to use) the money fronted by Lustig to engage in

illegal churning by consummating transactions lacking any economic substance,

*e.g.*, "wash sales," for the sole purpose of generating enough commissions to

remain among the Banks' top tier clients and continue receiving the valuable IPO

Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-

5(a) and (c).

d.   Haven generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.   When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Brett, on behalf of Haven, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Haven has a higher net worth than it actually does; (ii) the funds Haven uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Brett's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.   Brett and Haven used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Brett and Haven: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule

5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.    Haven repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Haven's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.    Haven used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Haven has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.    Haven knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

105.    Defendant Pinehurst, and its manager, Sandler, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.  Sandler opened brokerage accounts for Pinehurst with several of the Banks, including, at least, J.P. Morgan, Citigroup, and Deutsche Bank.  Pinehurst's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.  Pinehurst received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Pinehurst has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.  Pinehurst used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.  Pinehurst generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.  When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Sandler, on behalf of Pinehurst, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that:

74

(i) Pinehurst has a higher net worth than it actually does; (ii) the funds Pinehurst uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as Sandler's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.   Sandler and Pinehurst used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Sandler and Pinehurst: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   Pinehurst repaid (and continues to repay) funds advanced by Lustig, plus interest.  Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Pinehurst's profits from the

sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.   Pinehurst used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Pinehurst has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.   Pinehurst knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

106.   Defendant Rancho, and its manager, Harrison, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.   Harrison opened brokerage accounts for Rancho with several of the Banks, including, at least, J.P. Morgan, Goldman Sachs, Citigroup, and Deutsche Bank. Rancho's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.  Rancho received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Rancho has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.  Rancho used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.  Rancho generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.  When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Harrison, on behalf of Rancho, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Rancho's net worth is higher than it actually is; (ii) the funds Rancho uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as Harrison's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the

IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).  Harrison admitted to Mr. Berlin in conversations that he made material misrepresentations and omissions on the Rule Rule 5130 Forms he filled out for each of the Banks at which he opened accounts for Rancho because he represented that no "restricted person" had a beneficial interest in the accounts even though Lustig qualifies as a "restricted person" and in fact has a beneficial interest in each of the accounts. Harrison also admitted to Mr. Berlin that he knew omitting Lustig's name from the Rule 5130 Forms was improper.

f.   Harrison and Rancho used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Harrison and Rancho: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.    Rancho repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Rancho's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.    Rancho used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Rancho has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.    Rancho knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

107.    Defendant JZ, and its manager, Zaitz, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.    Zaitz opened brokerage accounts for JZ with several of the Banks, including, at least, J.P. Morgan, Goldman Sachs, and Citigroup.  JZ's accounts were (and

continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.  JZ received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which JZ has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.  JZ used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.  JZ generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.  When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Zaitz, on behalf of JZ, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) JZ's net worth is higher than it actually is; (ii) the funds JZ uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig</u>

Defendants, such as Zaitz's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations). In fact, at least in and around 2015, Zaitz himself was an individual with authority to buy and sell securities for investment advisor Redan and therefore Zaitz himself was a "restricted person" who was not entitled to receive initial public offering shares under FINRA Rule 5130.

f.   Zaitz and JZ used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343. For example, Zaitz and JZ: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   JZ repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative

services, as much as forty percent of JZ's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.   JZ used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which JZ has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.   JZ knowingly conducted (and continues to knowingly conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

108.   Defendant SMM, and its manager, Miller, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.   Miller opened brokerage accounts for SMM with several of the Banks, including, at least, J.P. Morgan, Goldman Sachs, and Citigroup.  SMM's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b. SMM received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which SMM has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c. SMM used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d. SMM generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e. When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Miller, on behalf of SMM, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) SMM's net worth is higher than it actually is; (ii) the funds SMM uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as Miller's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO

Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.  Miller and SMM used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Miller and SMM: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.  SMM repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of SMM's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.  SMM used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which SMM has accounts and obtaining

more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

    i.    SMM knowingly conducted (and continues to knowingly conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

109.    Defendant Arrowhead, and its manager, Shoflick, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

    a.    Shoflick opened brokerage accounts for Arrowhead with several of the Banks, including, at least, J.P. Morgan, Goldman Sachs, and Citigroup.  Arrowhead's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

    b.    Arrowhead received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which

Arrowhead has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.     Arrowhead used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.     Arrowhead generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.     When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Shoflick, on behalf of Arrowhead, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Arrowhead's net worth is higher than it actually is; (ii) the funds Arrowhead uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Shoflick's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).  Shoflick admitted to Mr. Berlin in conversation that he made material misrepresentations and omissions on the Rule Rule 5130 Forms he filled out for each of the Banks at

which he opened accounts for Arrowhead because he represented that no "restricted person" had a beneficial interest in the accounts even though Lustig qualifies as a "restricted person" and in fact has a beneficial interest in each of the accounts.  Shoflick also admitted to Mr. Berlin that he was "uncomfortable" and "worried" that his material omissions could negatively affect his legitimate real estate business with his father-in-law, Defendant Miller.

f.   Shoflick and Arrowhead used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Shoflick and Arrowhead: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   Arrowhead repaid (and continues to repay) funds advanced by Lustig, plus interest.  Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Arrowhead's profits from the

sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.   Arrowhead used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Arrowhead has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.   Arrowhead knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

110.   Defendant AHI, and its manager, Alterman, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.   Alterman opened brokerage accounts for AHI with several of the Banks, including, at least, J.P. Morgan, Goldman Sachs, and Citigroup.  AHI's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through

a form of joint venture agreement.  On multiple occasions, Alterman admitted to Mr. Berlin in conversations that he would do whatever Lustig told him to do.

b.      AHI received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which AHI has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.      AHI used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.      AHI generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.      When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Alterman, on behalf of AHI, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) AHI's net worth is higher than it actually is; (ii) the funds AHI uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than</u>

the Lustig Defendants, such as Alterman's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).  Alterman admitted to Mr. Berlin in conversations that Alterman intentionally overstated and misrepresented his net worth on each FINRA Disclosure Form he provided to the Banks at which he opened accounts for AHI.  Alterman also admitted to Mr. Berlin that he made material misrepresentations and omissions on the Rule 5130 Forms he filled out for each of the Banks at which he opened accounts for AHI because he represented that no "restricted person" had a beneficial interest in the accounts even though Lustig qualifies as a "restricted person" and in fact has a beneficial interest in each of the accounts.

f.   Alterman and AHI used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Alterman and AHI: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule

5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.     AHI repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of AHI's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.     AHI used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which AHI has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.     AHI knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

111.   Defendant Allied, and its manager, Brandon, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.  Brandon opened brokerage accounts for Allied with several of the Banks, including, at least, J.P. Morgan, Goldman Sachs, Citigroup, Jefferies, Credit Suisse, Deutsche Bank, and Barclays.  Allied's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.  Allied received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Allied has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.  Allied used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.  Allied generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.  When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Brandon, on behalf of Allied, violated C.R.S.

11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Allied's net worth is higher than it actually is; (ii) the funds Allied uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Brandon's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.   Brandon and Allied used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Brandon and Allied: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   Allied repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative

services, as much as forty percent of Allied's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.    Allied used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Allied has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.    Allied knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

112.    Defendant Rio Norte, and its manager, Lande, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.    Lande opened brokerage accounts for Rio Norte with several of the Banks, including, at least, J.P. Morgan, Goldman Sachs, Citigroup, Jefferies, Deutsche Bank, and Barclays.  Rio Norte's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

94

b.    Rio Norte received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Rio Norte has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.    Rio Norte used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) Rule 10b-5(a) and (c).

d.    Rio Norte generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.    When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Lande, on behalf of Rio Norte, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Rio Norte's net worth is higher than it actually is; (ii) the funds Rio Norte uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as Lande's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from

the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).  Indeed, Defendant Lande admitted to Mr. Berlin in conversations that he made material misrepresentations and omissions on the Rule 5130 Forms he filled out for each of the Banks at which he opened accounts for Rio Norte because he represented that no "restricted person" had a beneficial interest in the accounts even though Lustig qualifies as a "restricted person" and in fact has a beneficial interest in each of the accounts.  Defendant Lande repeatedly expressed his discomfort regarding the illegality of the IPO Market Manipulation Scheme to Mr. Berlin.

f.    Lande and Rio Norte used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Lande and Rio Norte: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   Rio Norte repaid (and continues to repay) funds advanced by Lustig, plus interest.  Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Rio Norte's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.   Rio Norte used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Rio Norte has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.   Rio Norte knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

113.   Defendant Mesa, and its manager, Eberstein, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.     Eberstein opened brokerage accounts for Mesa with several of the Banks, including, at least, J.P. Morgan and Citigroup.  Mesa's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.     Mesa received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Mesa has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.     Mesa used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.     Mesa generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.     When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Eberstein, on behalf of Mesa, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i)

Mesa's net worth is higher than it actually is; (ii) the funds Mesa uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Eberstein's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.   Eberstein and Mesa used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Eberstein and Mesa: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   Mesa repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Mesa's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

    h.    Mesa used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Mesa has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

    i.    Mesa knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

114.    Defendant JMC, and its manager, Cohen, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

    a.    Cohen opened brokerage accounts for JMC with several of the Banks.  JMC's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

    b.    JMC received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole

purpose of generating commissions for each of the Banks at which JMC had accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.    JMC used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.    JMC generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.    When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Cohen, on behalf of JMC, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) JMC's net worth is higher than it actually is; (ii) the funds JMC uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Cohen's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.   Cohen and JMC used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Cohen and JMC: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   JMC repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as thirty percent of JMC's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.   JMC used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which JMC has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

     i.     JMC knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

115.    Defendant Peak, and its manager, Rest, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

     a.     Rest opened brokerage accounts for Peak with several of the Banks, including, at least, J.P. Morgan, Goldman Sachs, and Citigroup.  Peak's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

     b.     Peak received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Peak has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.      Peak used (and continues to use) the money fronted by Lustig to engage in illegal

churning by consummating transactions lacking any economic substance, *e.g.*,

"wash sales," for the sole purpose of generating enough commissions to remain

among the Banks' top tier clients and continue receiving the valuable IPO Share

allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and

(c).

d.      Peak generated (and continues to generate) enough commissions to receive many

millions of dollars' worth of IPO Share allocations, which it purchases and then

quickly sells at a substantial profit.

e.      When required to complete account opening documents, as well as FINRA Rule

5130/5131 IPO Disclosure Forms, Rest, on behalf of Peak, violated C.R.S. 11-

51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Peak's

net worth is higher than it actually is; (ii) the funds Peak uses to conduct trades,

pay commissions, and purchase IPO Shares come from sources <u>other than the</u>

<u>Lustig Defendants</u>, such as Rest's personal or family wealth, and (iii) no

"restricted person" has a beneficial interest in the profits from the IPO Share

allocations (even though Lustig is a restricted person and has a beneficial interest

in the profits from the IPO Share allocations).

f.      Rest and Peak used (and continue to use) the U.S. mail, telephone, and electronic

communication in furtherance of the IPO Market Manipulation Scheme, in

violation of 18 U.S.C. §§ 1341 and 1343.  For example, Rest and Peak: (i) used

wire communications in interstate or foreign commerce via telephone and email

in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   Peak repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Peak's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.   Peak used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Peak has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.   Peak knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail

fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

116.   Defendant JAF, and its manager, Fraenkel, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

    a.   Fraenkel opened brokerage accounts for JAF with several of the Banks.  JAF's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

    b.   JAF received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which JAF has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

    c.   JAF used (and continues to use) the money fronted by the Lustig Defendants to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.      JAF generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.      When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Fraenkel, on behalf of JAF, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) JAF's net worth is higher than it actually is; (ii) the funds JAF uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Fraenkel's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.      Fraenkel and JAF used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Fraenkel and JAF: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule

5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.     JAF repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of JAF's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.     JAF used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which JAF has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.     JAF knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

117.   Defendant Preakness, and its manager, Hall, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.  Hall opened brokerage accounts for Preakness with several of the Banks, including, at least, J.P. Morgan, Goldman Sachs, and Citigroup.  Preakness's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.  Hall was aware of the illegality of the IPO Market Manipulation Scheme, regularly announcing, including to Mr. Berlin, that "if the regulators ever come in, we are f***ed, man."

b.  Preakness received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Preakness has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.  Preakness used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.  Preakness generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.    When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Hall, on behalf of Preakness, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Preakness's net worth is higher than it actually is; (ii) the funds Preakness uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Hall's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).  Indeed, Hall admitted to Mr. Berlin that he made material misrepresentations and omissions on the Rule 5130 Forms he filled out for each of the Banks at which he opened accounts for Preakness because he represented that no "restricted person" had a beneficial interest in the accounts even though Lustig qualifies as a "restricted person" and in fact has a beneficial interest in each of the accounts.

f.    Preakness and Hall used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Preakness and Hall: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail

and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.    Preakness repaid (and continues to repay) funds advanced by Lustig, plus interest.  Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Preakness's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.    Preakness used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Preakness has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.    Preakness knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

118.    Defendant DFO, and its manager, Davis, knowingly participated, and continue to

knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as

follows:

    a.    Davis opened brokerage accounts for DFO with several of the Banks. DFO's

accounts were (and continue to be) controlled and managed by Lustig and/or

JAL through a form of joint venture agreement.

    b.    DFO received approximately $600,000 from Lustig, individually or through JAL

and/or CLFS, so that it could engage in illegal churning by consummating

transactions lacking any economic substance, *e.g.*, "wash sales," for the sole

purpose of generating commissions for each of the Banks at which DFO has

accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and

(c).

    c.    DFO used (and continues to use) the money fronted by Lustig to engage in

illegal churning by consummating transactions lacking any economic substance,

*e.g.*, "wash sales," for the sole purpose of generating enough commissions to

remain among the Banks' top tier clients and continue receiving the valuable IPO

Share allocations, in violation of C.R.S. 11-51-501(1) (a) and (c) and Rule 10b-

5(a) and (c).

    d.    DFO generated (and continues to generate) enough commissions to receive many

millions of dollars' worth of IPO Share allocations, which it purchases and then

quickly sells at a substantial profit.

e.   When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Davis, on behalf of DFO, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) DFO's net worth is higher than it actually is; (ii) the funds DFO uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Davis' personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.   Davis and DFO used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Davis and DFO: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   DFO repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of DFO's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.   DFO used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which DFO has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.   DFO knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

119.   Defendant DTA, and its manager, Vlosich, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.   Vlosich opened brokerage accounts for DTA with several of the Banks, including, at least, Goldman Sachs and Citigroup.  DTA's accounts were (and

continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.      DTA received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Banks at which DTA has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.      DTA used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1) (a) and (c) and Rule 10b-5(a) and (c).

d.      DTA generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and quickly sells at a substantial profit.

e.      When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Vlosich, on behalf of DTA, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) DTA's net worth is higher than it actually is; (ii) the funds DTA uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Vlosich's personal or family wealth, and (iii) no

"restricted person" has a beneficial interest in the profits from the IPO Share

allocations (even though Lustig is a restricted person and has a beneficial interest

in the profits from the IPO Share allocations).

f.    Vlosich and DTA used (and continue to use) the U.S. mail, telephone, and

electronic communication in furtherance of the IPO Market Manipulation

Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Vlosich and

DTA: (i) used wire communications in interstate or foreign commerce via

telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market

Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by

receiving instructions as to which wash trades should be executed through which

Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail

and/or wire communications in interstate or foreign commerce to effectuate the

IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule

5130 forms containing knowing misstatements to the Banks (via mail, email, or

fax).

g.    DTA repaid (and continues to repay) funds advanced by Lustig, plus interest.

Additionally, in the guise of compensation for accounting and administrative

services, as much as forty percent of DTA's profits from the sale of IPO Shares

are paid to Lustig, individually and/or through JAL and/or CLFS.

h.    DTA used (and continues to use) the profits generated from the sale of the IPO

Shares to continue operating the Enterprise for the purpose of generating more

commissions for each of the Banks at which DTA has accounts and obtaining

more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

    i.    DTA knowingly conducted (and continues to knowingly conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

120.    Defendant Flamingo, and its manager, Pepper, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

    a.    Pepper opened brokerage accounts for Flamingo with several of the Banks, including, at least, Goldman Sachs and Citigroup.  Flamingo's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

    b.    Flamingo received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Flamingo had

accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.     Flamingo used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1) (a) and (c) and Rule 10b-5(a) and (c).

d.     Flamingo generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.     When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Pepper, on behalf of Flamingo, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Flamingo's net worth is higher than it actually is; (ii) the funds Flamingo uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as Pepper's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.     Pepper and Flamingo used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation

Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Pepper and Flamingo: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.      Flamingo repaid (and continues to repay) funds advanced by Lustig, plus interest.  Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Flamingo's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.      Flamingo used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Flamingo has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.      Flamingo knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18

U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

121. Defendant Irving Income, and its manager, Jeremy, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.  Jeremy opened brokerage accounts for Irving Income with several of the Banks, including, at least, J.P. Morgan, Goldman Sachs, Citigroup, Jefferies, Barclays, and Credit Suisse.  Irving Income's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.  Irving Income received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Irving Income has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.  Irving Income used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic

substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.      Irving Income generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.      When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Jeremy, on behalf of Irving Income, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Irving Income's net worth is higher than it actually is; (ii) the funds Irving Income uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Jeremy's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).  In fact, Jeremy is an individual with authority to buy and sell securities for investment advisor Redan and therefore Jeremy himself is a "restricted person" who is not entitled to receive IPO Shares pursuant to FINRA Rule 5130.

f.      Jeremy and Irving Income used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Jeremy and

Irving Income: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.    Irving Income repaid (and continues to repay) funds advanced by Lustig, plus interest.  Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Irving Income's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.    Irving Income used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Irving Income has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.    Irving Income knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as

alleged above: (i) with the intent to promote the carrying on of such fraudulent

conduct, and (ii) knowing that the transaction is designed to conceal or disguise

the nature, the location, the source, the ownership, or the control of the proceeds

of such mail fraud and wire fraud and fraud in the sale of securities, in violation

of 18 U.S.C. § 1956.

122. Defendant Irving Privates, and its manager, Jeremy, knowingly participated, and continue

to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as

follows:

a. Jeremy opened brokerage accounts for Irving Privates with several of the Banks,

including, at least, J.P. Morgan, Goldman Sachs, Citigroup, Jefferies, Barclays,

and Credit Suisse.  Irving Privates' accounts were (and continue to be) controlled

and managed by Lustig and/or JAL through a form of joint venture agreement.

b. Irving Privates received approximately $600,000 from Lustig, individually or

through JAL and/or CLFS, so that it could engage in illegal churning by

consummating transactions lacking any economic substance, *e.g.*, "wash sales,"

for the sole purpose of generating commissions for each of the Banks at which

Irving Privates has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and

Rule 10b-5(a) and (c).

c. Irving Privates used (and continues to use) the money fronted by Lustig to

engage in illegal churning by consummating transactions lacking any economic

substance, *e.g.*, "wash sales," for the sole purpose of generating enough

commissions to remain among the Banks' top tier clients and continue receiving

the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.   Irving Privates generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.   When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Jeremy, on behalf of Irving Privates, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Irving Privates' net worth is higher than it actually is; (ii) the funds Irving Privates uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Jeremy's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).  In fact, Jeremy is an individual with authority to buy and sell securities for investment advisor Redan and therefore Jeremy himself is a "restricted person" who is not entitled to receive IPO Shares pursuant to FINRA Rule 5130.

f.   Jeremy and Irving Privates used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Jeremy and Irving Privates: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO

Market Manipulation Scheme and to effectuate the IPO Market Manipulation

Scheme by receiving instructions as to which wash trades should be executed

through which Banks and which IPO Shares should be purchased; and (ii) used

the U.S. mail and/or wire communications in interstate or foreign commerce to

effectuate the IPO Market Manipulation Scheme by sending Suitability forms

and FINRA Rule 5130 forms containing knowing misstatements to the Banks

(via mail, email, or fax).

g.  Irving Privates repaid (and continues to repay) funds advanced by Lustig, plus

interest.  Additionally, in the guise of compensation for accounting and

administrative services, as much as forty percent of Irving Privates' profits from

the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or

CLFS.

h.  Irving Privates used (and continues to use) the profits generated from the sale of

the IPO Shares to continue operating the Enterprise for the purpose of generating

more commissions for each of the Banks at which Irving Privates has accounts

and obtaining more IPO Share allocations for itself, including by recruiting

additional affiliates to participate in the IPO Market Manipulation Scheme.

i.  Irving Privates knowingly conducted (and continues to knowingly conduct)

financial transactions  involving the proceeds of mail fraud and wire fraud as

defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as

alleged above: (i) with the intent to promote the carrying on of such fraudulent

conduct, and (ii) knowing that the transaction is designed to conceal or disguise

the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

123.    Defendant Irving Real Estate, and its manager, Jeremy, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

    a.    Jeremy opened brokerage accounts for Irving Real Estate with several of the Banks, including, at least, J.P. Morgan, Goldman Sachs, Citigroup, Jefferies, Barclays, and Credit Suisse.  Irving Real Estate's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

    b.    Irving Real Estate received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Irving Real Estate has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

    c.    Irving Real Estate used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving

the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

d.  Irving Real Estate generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.  When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Jeremy, on behalf of Irving Real Estate, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Irving Real Estate's net worth is higher than it actually is; (ii) the funds Irving Real Estate uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as Jeremy's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).  In fact, Jeremy is an individual with authority to buy and sell securities for investment advisor Redan and therefore Jeremy himself is a "restricted person" who is not entitled to receive IPO Shares pursuant to FINRA Rule 5130.

f.  Jeremy and Irving Real Estate used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Jeremy and Irving Real Estate: (i) used wire communications in

interstate or foreign commerce via telephone and email in violation of 18 U.S.C.

§1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO

Market Manipulation Scheme by receiving instructions as to which wash trades

should be executed through which Banks and which IPO Shares should be

purchased; and (ii) used the U.S. mail and/or wire communications in interstate

or foreign commerce to effectuate the IPO Market Manipulation Scheme by

sending Suitability forms and FINRA Rule 5130 forms containing knowing

misstatements to the Banks (via mail, email, or fax).

g.    Irving Real Estate repaid (and continues to repay) funds advanced by Lustig,

plus interest.  Additionally, in the guise of compensation for accounting and

administrative services, as much as forty percent of Irving Real Estate's profits

from the sale of IPO Shares are paid to Lustig, individually and/or through JAL

and/or CLFS.

h.    Irving Real Estate used (and continues to use) the profits generated from the sale

of the IPO Shares to continue operating the Enterprise for the purpose of

generating more commissions for each of the Banks at which Irving Real Estate

has accounts and obtaining more IPO Share allocations for itself, including by

recruiting additional affiliates to participate in the IPO Market Manipulation

Scheme.

i.    Irving Real Estate knowingly conducted (and continues to knowingly conduct)

financial transactions  involving the proceeds of mail fraud and wire fraud as

defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as

alleged above: (i) with the intent to promote the carrying on of such fraudulent

conduct, and (ii) knowing that the transaction is designed to conceal or disguise

the nature, the location, the source, the ownership, or the control of the proceeds

of such mail fraud and wire fraud and fraud in the sale of securities, in violation

of 18 U.S.C. § 1956.

124.    Defendant Lion Gate, and its manager, Rickel, knowingly participated, and continue to

knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as

follows:

a.    Rickel opened brokerage accounts for Lion Gate with several of the Banks,

including, at least, J.P. Morgan, Goldman Sachs, Citigroup, Jefferies, Credit

Suisse, Barclays, and Deutsche Bank.  Lion Gate's accounts were (and continue

to be) controlled and managed by Lustig and/or JAL through a form of joint

venture agreement.

b.    Lion Gate received approximately $600,000 from Lustig, individually or through

JAL and/or CLFS, so that it could engage in illegal churning by consummating

transactions lacking any economic substance, *e.g.*, "wash sales," for the sole

purpose of generating commissions for each of the Banks at which Lion Gate has

accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and

(c).

c.    Lion Gate used (and continues to use) the money fronted by Lustig to engage in

illegal churning by consummating transactions lacking any economic substance,

*e.g.*, "wash sales," for the sole purpose of generating enough commissions to

remain among the Banks' top tier clients and continue receiving the valuable IPO

Share allocations, in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-

5(a) and (c).

d.    Lion Gate generated (and continues to generate) enough commissions to receive

many millions of dollars' worth of IPO Share allocations, which it purchases and

then quickly sells at a substantial profit.

e.    When required to complete account opening documents, as well as FINRA Rule

5130/5131 IPO Disclosure Forms, Rickel, on behalf of Lion Gate, violated

C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that:

(i) Lion Gate's net worth is higher than it actually is; (ii) the funds Lion Gate

uses to conduct trades, pay commissions, and purchase IPO Shares come from

sources other than the Lustig Defendants, such as Rickel's personal or family

wealth, and (iii) no "restricted person" has a beneficial interest in the profits from

the IPO Share allocations (even though Lustig is a restricted person and has a

beneficial interest in the profits from the IPO Share allocations).  Indeed, Rickel

admitted to Mr. Berlin that he made material misrepresentations and omissions

on the Rule 5130 Forms he filled out for each of the Banks at which he opened

accounts for Lion Gate because he represented that no "restricted person" had a

beneficial interest in the accounts even though Lustig qualifies as a "restricted

person" and in fact has a beneficial interest in each of the accounts.  Rickel also

admitted to Mr. Berlin that he knew that doing so was illegal.

f.  Rickel and Lion Gate used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Rickel and Lion Gate: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.  Lion Gate repaid (and continues to repay) funds advanced by Lustig, plus interest.  Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Lion Gate's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.  Lion Gate used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Lion Gate has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

    i.     Lion Gate knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

125.    Defendant Mack, and its manager, Wolk, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

    a.     Wolk opened brokerage accounts for Mack with several of the Banks.  Mack's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

    b.     Mack received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Mack has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

    c.     Mack used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance,

*e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1) (a) and (c) and Rule 10b-5(a) and (c).

d.     Mack generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.     When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Wolk, on behalf of Mack, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Mack's net worth is higher than it actually is; (ii) the funds Mack uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Wolk's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.     Wolk and Mack used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Wolk and Mack: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by

receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   Mack repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Mack's profits from the sale of IPO Shares are paid to Lustig, individually and/or through JAL and/or CLFS.

h.   Mack used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Mack has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.   Mack knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail

fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

126. Defendant MSM, and its manager, Mia, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

   a.   Mia opened brokerage accounts for MSM with several of the Banks, including, at least, Goldman Sachs and Citigroup.  MSM's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

   b.   MSM received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which MSM has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

   c.   MSM used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1) (a) and (c) and Rule 10b-5(a) and (c).

d.    MSM generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.    When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Mia, on behalf of MSM, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) MSM's net worth is higher than it actually is; (ii) the funds MSM uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as Mia's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.    Mia and MSM used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Mia and MSM: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule

5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   MSM repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of MSM's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.   MSM used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which MSM has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.   MSM knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

127.   Defendant Prudent, and its manager, Goldenberg, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

a.     Goldenberg opened brokerage accounts for Prudent with several of the Banks, including, at least, Goldman Sachs and Citigroup.  Prudent's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

b.     Prudent received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Prudent has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.     Prudent used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1) (a) and (c) and Rule 10b-5(a) and (c).

d.     Prudent generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.     When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Goldenberg, on behalf of Prudent, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that:

(i) Prudent's net worth is higher than it actually is; (ii) the funds Prudent uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Goldenberg's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.   Goldenberg and Prudent used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Goldenberg and Prudent: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   Prudent repaid (and continues to repay) funds advanced by Lustig, plus interest. Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Prudent's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

    h.    Prudent used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Prudent has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

    i.    Prudent knowingly conducted (and continues to knowingly conduct) financial transactions  involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

128.    Defendant Quandary, and its manager, Mackiernan, knowingly participated, and continue to knowingly participate, in the Enterprise and the IPO Market Manipulation Scheme as follows:

    a.    Mackiernan opened brokerage accounts for Quandary with several of the Banks, including, at least, Goldman Sachs and Citigroup.  Quandary's accounts were (and continue to be) controlled and managed by Lustig and/or JAL through a form of joint venture agreement.

    b.    Quandary received approximately $600,000 from Lustig, individually or through JAL and/or CLFS, so that it could engage in illegal churning by consummating

transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for each of the Banks at which Quandary has accounts in violation of C.R.S. 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c).

c.      Quandary used (and continues to use) the money fronted by Lustig to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations, in violation of C.R.S. 11-51-501(1) (a) and (c) and Rule 10b-5(a) and (c).

d.      Quandary generated (and continues to generate) enough commissions to receive many millions of dollars' worth of IPO Share allocations, which it purchases and then quickly sells at a substantial profit.

e.      When required to complete account opening documents, as well as FINRA Rule 5130/5131 IPO Disclosure Forms, Mackiernan, on behalf of Quandary, violated C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) Quandary's net worth is higher than it actually is; (ii) the funds Quandary uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as Mackiernan's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).

f.   Mackiernan and Quandary used (and continue to use) the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.  For example, Mackiernan and Quandary: (i) used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. §1343 to discuss the IPO Market Manipulation Scheme and to effectuate the IPO Market Manipulation Scheme by receiving instructions as to which wash trades should be executed through which Banks and which IPO Shares should be purchased; and (ii) used the U.S. mail and/or wire communications in interstate or foreign commerce to effectuate the IPO Market Manipulation Scheme by sending Suitability forms and FINRA Rule 5130 forms containing knowing misstatements to the Banks (via mail, email, or fax).

g.   Quandary repaid (and continues to repay) funds advanced by Lustig, plus interest.  Additionally, in the guise of compensation for accounting and administrative services, as much as forty percent of Quandary's profits from the sale of IPO Shares is paid to Lustig, individually and/or through JAL and/or CLFS.

h.   Quandary used (and continues to use) the profits generated from the sale of the IPO Shares to continue operating the Enterprise for the purpose of generating more commissions for each of the Banks at which Quandary has accounts and obtaining more IPO Share allocations for itself, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

i.      Quandary knowingly conducted (and continues to knowingly conduct) financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such fraudulent conduct, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud and wire fraud and fraud in the sale of securities, in violation of 18 U.S.C. § 1956.

129.      Each of the aforementioned acts relates directly to the conduct of the Enterprise, and was carried out in the conduct of the Enterprise's affairs. Accordingly, the aforementioned acts constitute a pattern of racketeering activity as that term is defined in C.R.S. 18-17-103(3).

130.      The Enterprise and the IPO Market Manipulation Scheme are ongoing.

131.      Plaintiffs Birchwood and Detroit Street are entities that have been (and, in the case of Detroit Street, continue to be) injured by reason of Defendants' violations of the provisions of C.R.S. 18-17-104(3), including:

a.      Engaging in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Banks in violation of C.R.S.; 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c), which artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused

millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

b.    Violating C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) each Affiliated Entity's net worth is higher than it actually is; (ii) the funds each Affiliated Entity uses to conduct trades, pay commissions, and purchase IPO Shares come from sources other than the Lustig Defendants, such as the Affiliated Entity or Affiliated Individual's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations).   Such false representations caused the Banks to open brokerage accounts for the Affiliated Entities which then artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

c.    Using the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme as described herein, in violation of 18 U.S.C. §§ 1341 and 1343, which caused the Banks to open brokerage accounts for the Affiliated Entities which then artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and

directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

d.  Knowingly conducting financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such mail fraud, wire fraud, and fraud in the sale of securities, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud, wire fraud, and fraud in the sale of securities, which caused the Banks to open brokerage accounts for the Affiliated Entities which then artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

As a result, Plaintiffs' injuries flow directly from the IPO Market Manipulation Scheme, including the violations set forth in paragraphs a-d above.

132.  Under C.R.S. 18-17-106(7), Plaintiffs have a cause of action for threefold the actual damages they have sustained, attorneys' fees, and a claim to forfeited property or the proceeds derived therefrom.

133.  Defendants have received millions of dollars of proceeds derived from their violations of C.R.S. 18-17-104(3) which is subject to forfeiture under C.R.S. 18-17-106(10).  Under

C.R.S. 18-17-106(7)(b), Plaintiffs are injured persons who have a right or claim to the forfeited property or the proceeds derived therefrom superior to any right or claim the state has in the same property or proceeds.

## SECOND CLAIM FOR RELIEF
## Colorado Organized Crime Control Act (COCCA)
## C.R.S. 18-17-104(1) and 18-17-106

134.   All allegations previously stated herein are incorporated by reference.

135.   Each Defendant violated, and continues to violate, C.R.S. 18-17-104(1) because each Defendant has knowingly received proceeds derived directly from the pattern of racketeering activity described herein, and has used such proceeds in the ongoing operation of the Enterprise, including by recruiting additional affiliates to participate in the IPO Market Manipulation Scheme.

136.   Plaintiffs Birchwood and Detroit Street are persons who have been (and, in the case of Detroit Street, continue to be) injured by reason of the Defendants' use of the proceeds from the pattern of racketeering activity described herein to continue operating the Enterprise and carrying out the IPO Market Manipulation Scheme, which has artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were and are required to generate in order to continue to obtain IPO Share allocations.  The IPO Market Manipulation Scheme has also directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead.

137.  Under C.R.S. 18-17-106(7), Plaintiffs have a cause of action for threefold the actual damages they have sustained, attorneys' fees, and a claim to forfeited property or the proceeds derived therefrom.

138.  Defendants have received millions of dollars of proceeds derived from their violations of C.R.S. 18-17-104(1) which are subject to forfeiture under C.R.S. 18-17-106(10).  Under C.R.S. 18-17-106(7)(b), Plaintiffs are injured persons who have a right or claim to the forfeited property or the proceeds derived therefrom superior to any right or claim the state has in the same property or proceeds.

**THIRD CLAIM FOR RELIEF**
**Colorado Organized Crime Control Act (COCCA)**
**C.R.S. 18-17-104(2) and 18-17-106**

139.  All allegations previously stated herein are incorporated by reference.

140.  Each Defendant has violated C.R.S. 18-17-104(2) because each Defendant has knowingly maintained a direct interest in and control of the Enterprise through the pattern of racketeering activity described herein.

141.  Plaintiffs Birchwood and Detroit Street are persons who have been (and, in the case of Detroit Street, continue to be) injured by reason of the Defendants' maintenance of a direct interest in, and control of, the Enterprise, through the IPO Market Manipulation Scheme, which has artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were and are required to generate in order to continue to obtain IPO Share allocations.  The IPO Market Manipulation Scheme has also directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead.

142.     Under C.R.S. 18-17-106(7), Plaintiffs have a cause of action for threefold the actual damages they have sustained, attorneys' fees, and a claim to forfeited property or the proceeds derived therefrom.

143.     Defendants have received millions of dollars of proceeds derived from their violations of C.R.S. 18-17-104(2) which are subject to forfeiture under C.R.S. 18-17-106(10).  Under C.R.S. 18-17-106(7)(b), Plaintiffs are injured persons who have a right or claim to the forfeited property or the proceeds derived therefrom superior to any right or claim the state has in the same property or proceeds.

**FOURTH CLAIM FOR RELIEF**
**Colorado Organized Crime Control Act (COCCA)**
**C.R.S. 18-17-104(4) and 18-17-106**

144.     All allegations previously stated herein are incorporated by reference.

145.     Each Defendant violated, and continues to violate, C.R.S. 18-17-104(4) because each Defendant knowingly and intentionally conspired and endeavored (and continues to knowingly and intentionally conspire and endeavor) to associate with the Enterprise and to knowingly and intentionally participate in the Enterprise through the ongoing pattern of racketeering activity described herein.

146.     The overt acts committed by each Defendant in furtherance of the conspiracy are set forth in paragraphs 98-128, which paragraphs are incorporated by reference herein.

147.     Plaintiffs Birchwood and Detroit Street are persons who have been (and, in the case of Detroit Street, continue to be) injured by reason of the Defendants' commissions of overt acts in furtherance of the above-referenced conspiracy, including:

a.   Engaging in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating commissions for the Banks in violation of C.R.S.; 11-51-501(1)(a) and (c) and Rule 10b-5(a) and (c), which artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were and are required to generate in order to continue to obtain IPO Share allocations and directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

b.   Violating C.R.S. 11-51-501(1)(b) and Rule 10b-5(b) by falsely representing in writing that: (i) each Affiliated Entity's net worth is higher than it actually is; (ii) the funds each Affiliated Entity uses to conduct trades, pay commissions, and purchase IPO Shares come from sources <u>other than the Lustig Defendants</u>, such as the Affiliated Entity's personal or family wealth, and (iii) no "restricted person" has a beneficial interest in the profits from the IPO Share allocations (even though Lustig is a restricted person and has a beneficial interest in the profits from the IPO Share allocations), which caused the Banks to open brokerage accounts for the Affiliated Entities which then artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to  be allocated to the Affiliated Entities instead;

c.  Using the U.S. mail, telephone, and electronic communication in furtherance of the IPO Market Manipulation Scheme as described herein, in violation of 18 U.S.C. §§ 1341 and 1343, which caused the Banks to open brokerage accounts for the Affiliated Entities which then artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were and are required to generate in order to continue to obtain IPO Share allocations and directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to be allocated to the Affiliated Entities instead;

d.  Knowingly conducting financial transactions involving the proceeds of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and fraud in the sale of securities as alleged above: (i) with the intent to promote the carrying on of such mail fraud, wire fraud, and fraud in the sale of securities, and (ii) knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such mail fraud, wire fraud, and fraud in the sale of securities, which caused the Banks to open brokerage accounts for the Affiliated Entities which then artificially increased the price of the IPO Shares by artificially increasing the amount of commissions that Plaintiffs were required to generate in order to continue to obtain IPO Share allocations and directly caused millions of dollars' worth of IPO Shares that should have been allocated to the Plaintiffs to  be allocated to the Affiliated Entities instead;

As a result, Plaintiffs' injuries flow directly from the commission of overt acts in furtherance of the Defendants' knowingly and intentionally conspiring and endeavoring to engage in the IPO Market Manipulation Scheme, including the violations set forth in paragraphs a-d above.

148.   Under C.R.S. 18-17-106(7), Plaintiffs have a cause of action for threefold the actual damages they have sustained, attorneys' fees, and a claim to forfeited property or the proceeds derived therefrom.

149.   Defendants have received millions of dollars of proceeds derived from their violations of C.R.S. 18-17-104(4) which are subject to forfeiture under C.R.S. 18-17-106(10).  Under C.R.S. 18-17-106(7)(b), Plaintiffs are injured persons who have a right or claim to the forfeited property or the proceeds derived therefrom superior to any right or claim the state has in the same property or proceeds.

**FIFTH CLAIM FOR RELIEF**
**Colorado Securities Act**
**C.R.S. 11-51-501(1)(a) and 11-51-604(3)**

150.   All allegations previously stated herein are incorporated by reference.

151.   The IPO Market Manipulation Scheme is a device, scheme, or artifice to defraud.

152.   Defendants knowingly committed (and continue to commit) manipulative and deceptive acts in furtherance of the IPO Market Manipulation Scheme.

153.   The specific manipulative and deceptive acts committed by each Defendant in furtherance of the IPO Market Manipulation Scheme are set forth in paragraphs 98-128, which paragraphs are incorporated by reference herein.

154.   Defendants' manipulative and deceptive acts controlled and artificially affected the market for IPO Shares allocated by the Bank.

155.   Plaintiffs relied on the integrity of the IPO Share allocation market and were injured by having to pay a higher price for the IPO Shares than they would have paid but for the IPO Market Manipulation Scheme.  Plaintiffs were also injured by receiving fewer IPO Shares than they would have received but for the IPO Market Manipulation Scheme.

156.   Plaintiffs are entitled to damages in an amount to be determined at trial.

<u>**SIXTH CLAIM FOR RELIEF**</u>
<u>**Colorado Securities Act**</u>
<u>**C.R.S. 11-51-501(1)(b) and 11-51-604(3)**</u>

157.   All allegations previously stated herein are incorporated by reference.

158.   Defendants knowingly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the offer, sale, and purchase of IPO Shares.

159.   The specific misstatements and fraudulent omissions made by each Defendant in furtherance of the IPO Market Manipulation Scheme are set forth in paragraphs 98-128, which paragraphs are incorporated by reference herein.

160.   Defendants' misstatements and fraudulent omissions artificially affected the market for IPO Shares allocated by the Banks.

161.   Plaintiffs relied on the integrity of the IPO Share allocation market and were injured by having to pay a higher price for the IPO Shares than they would have paid but for the IPO

Market Manipulation Scheme.  Plaintiffs were also injured by receiving fewer IPO

Shares than they would have received but for the IPO Market Manipulation Scheme.

## SEVENTH CLAIM FOR RELIEF
### Colorado Securities Act
### C.R.S. 11-51-501(1)(c) and 11-51-604(3)

162.    All allegations previously stated herein are incorporated by reference.

163.    Defendants engaged (and continue to engage) in acts, practices, and a course of business

which operated (and continues to operate) as a fraud and deceit upon Plaintiffs.

164.    The IPO Market Manipulation Scheme operated as a fraud and deceit upon Plaintiffs (and

continues to operate as a fraud and deceit upon Detroit Street).

165.    The fraudulent and deceptive acts, practices, and course of business in which Defendants

engaged (and continue to engage) is described in paragraphs 98-128, which paragraphs

are incorporated by reference herein.

166.    Defendants' manipulative and deceptive acts controlled and artificially affected the

market for IPO Shares allocated by the Bank.

167.    Plaintiffs relied on the integrity of the IPO Share allocation market and were injured by

having to pay a higher price for the IPO Shares than they would have paid but for the IPO

Market Manipulation Scheme.  Plaintiffs were also injured by receiving fewer IPO

Shares than they would have received but for the IPO Market Manipulation Scheme.

168.    Plaintiffs are entitled to damages in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### Control Person Liability
### (Against Lustig, JAL, and the Affiliated Individuals Only)
### C.R.S. 11-51-501(1) and 11-51-604(5) (a) and (b)

169.    All allegations previously stated herein are incorporated by reference.

170. The Affiliated Entities are liable for violations of C.R.S. 11-51-501(1) pursuant to C.R.S. 11-51-604(3). Detailed allegations regarding the Affiliated Entities' liability for such violations are contained in paragraphs 98-128 and 150-168, which paragraphs are incorporated by reference herein.

171. Lustig and JAL controlled (and continue to control) the Affiliated Entities, and thus are liable for the Affiliated Entities' violations of C.R.S. 11-51-501(1) pursuant to C.R.S. 11-51-604(5).

172. Each Affiliated Individual controlled its respective Affiliated Entity and thus each Affiliated Individual is liable for its respective Affiliated Entity's violations of C.R.S. 11-51-501(1) pursuant to C.R.S. 11-51-604(5).

173. Plaintiffs were injured by Lustig, JAL, and the Affiliated Entities' violations of C.R.S. 11-51-501(1) and are entitled to damages in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF
### Aiding and Abetting Liability
### (Against CLFS Only)
### C.R.S. 11-51-501(1) and 11-51-604(5)(c)

174. All allegations previously stated herein are incorporated by reference.

175. Lustig, JAL, and the Affiliates are liable for violations of C.R.S. 11-51-501(1) pursuant to C.R.S. 11-51-604(3). Detailed allegations regarding Lustig, JAL, and the Affiliates' liability for such violations are contained in paragraphs 98-128 and 150-168, which paragraphs are incorporated by reference herein.

176. CLFS knew (and continues to know) that Lustig, JAL, and the Affiliates were (and continue to be) engaged in conduct which constitutes violations of C.R.S. 11-51-501(1), and gave (and continues to give) substantial assistance to such conduct. Accordingly,

CLFS is liable for Lustig, JAL, and the Affiliates' violations of C.R.S. 11-51-501(1)

pursuant to C.R.S. 11-51-604(5)(c).

**TENTH CLAIM FOR RELIEF**
**Securities Exchange Act**
**Section 10(b) and Rule 10b-5(a)**

177.   All allegations previously stated herein are incorporated by reference.

178.   The IPO Market Manipulation Scheme is a device, scheme, or artifice to defraud.

179.   Defendants knowingly committed (and continue to commit) manipulative and deceptive acts in furtherance of the IPO Market Manipulation Scheme.

180.   The specific manipulative and deceptive acts committed by each Defendant in furtherance of the IPO Market Manipulation Scheme are set forth in paragraphs 98-128, which paragraphs are incorporated by reference herein.

181.   Defendants' manipulative and deceptive acts controlled and artificially affected the market for IPO Shares allocated by the Bank.

182.   Plaintiffs relied on the integrity of the IPO Share allocation market and were injured by having to pay a higher price for the IPO Shares than they would have paid but for the IPO Market Manipulation Scheme.  Plaintiffs were also injured by receiving fewer IPO Shares than they would have received but for the IPO Market Manipulation Scheme.

183.   Plaintiffs are entitled to damages in an amount to be determined at trial.

**ELEVENTH CLAIM FOR RELIEF**
**Securities Exchange Act**
**Section 10(b) and Rule 10b-5(b)**

184.   All allegations previously stated herein are incorporated by reference.

185. Defendants knowingly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the offer, sale, and purchase of IPO Shares.

186. The specific misstatements and fraudulent omissions made by each Defendant in furtherance of the IPO Market Manipulation Scheme are set forth in paragraphs 98-128, which paragraphs are incorporated by reference herein.

187. Defendants' misstatements and fraudulent omissions artificially affected the market for IPO Shares allocated by the Bank.

188. Plaintiffs relied on the integrity of the IPO Share allocation market and were injured by having to pay a higher price for the IPO Shares than they would have paid but for the IPO Market Manipulation Scheme.  Plaintiffs were also injured by receiving fewer IPO Shares than they would have received but for the IPO Market Manipulation Scheme.

**TWELFTH CLAIM FOR RELIEF**
**Securities Exchange Act**
**Section 10(b) and Rule 10b-5(c)**

189. All allegations previously stated herein are incorporated by reference.

190. Defendants engaged (and continue to engage) in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs (and continues to operate as a fraud and deceit upon Plaintiff Detroit Street).

191. The IPO Market Manipulation Scheme operated as a fraud and deceit upon Plaintiffs (and continues to operate as a fraud and deceit upon Detroit Street).

192. The fraudulent and deceptive acts, practices, and course of business in which Defendants engaged (and continue to engage) is described in paragraphs 98-128, which paragraphs are incorporated by reference herein.

193. Defendants' manipulative and deceptive acts controlled and artificially affected the market for IPO Shares allocated by the Bank.

194. Plaintiffs relied on the integrity of the IPO Share allocation market and were injured by having to pay a higher price for the IPO Shares than they would have paid but for the IPO Market Manipulation Scheme.  Plaintiffs were also injured by receiving fewer IPO Shares than they would have received but for the IPO Market Manipulation Scheme.

195. Plaintiffs are entitled to damages in an amount to be determined at trial.

**THIRTEENTH CLAIM FOR RELIEF**
**Securities Exchange Act**
**Section 20(a) Control Person Liability**
**(Against Lustig, JAL and the Affiliated Individuals)**

196. All allegations previously stated herein are incorporated by reference.

197. The Affiliated Entities are liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5.  Detailed allegations regarding the Affiliated Entities' liability for such violations are contained in paragraphs 98-128 and 177-195, which paragraphs are incorporated by reference herein.

198. Lustig and JAL controlled (and continue to control) the Affiliated Entities, and thus are liable for the Affiliated Entities' violations of Section 10(b) of the Exchange Act and Rule 10b-5.

199. Each Affiliated Individual controlled its respective Affiliated Entity and thus each Affiliated Individual is liable for its respective Affiliated Entity's violations of Section 10(b) of the Exchange Act and Rule 10b-5.

200. Plaintiffs were injured by the Affiliated Entities' violations of Section 10(b) of the Exchange Act and Rule 10b-5 and are entitled to damages in an amount to be determined at trial.

## FOURTEENTH CLAIM FOR RELIEF
### Tortious Interference with Prospective Business Relations

201. All allegations previously stated herein are incorporated by reference.

202. As indicated in detail above, at the direction of Lustig (either individually or through JAL and/or CLFS) and the relevant Affiliated Individual, and using funds fronted by Lustig (either individually or through JAL and/or CLFS), each Affiliated Entity opened brokerage accounts with one or more of the Banks by supplying false information to the Banks.  After each account was opened, again at the direction of Lustig (either individually or through JAL and/or CLFS) and the relevant Affiliated Individual, each Affiliated Entity used (and continues to use) the money fronted by Lustig (either individually or through JAL and/or CLFS) to engage in illegal churning by consummating transactions lacking any economic substance, *e.g.*, "wash sales," for the sole purpose of generating enough commissions for the Banks to remain among the Banks' top tier clients and continue receiving the valuable IPO Share allocations.

203. Plaintiff Detroit Street is and, until closing its accounts with the Banks in 2013, Plaintiff Birchwood was, a legitimate customer of the Banks, and they have generated substantial commissions for the Banks through legitimate and lawful securities transactions.

204.    Plaintiffs had, under the prevailing policies established by the Banks, a reasonable

expectation of entering into valid business relationships with the Banks to purchase the

IPO Shares as top tier clients of the Banks.

205.    Defendants knew or should have known of Plaintiffs' reasonable expectancies for the

allocations of IPO Shares.

206.    Nevertheless, Defendants purposefully interfered in the process by which the IPO Shares

were allocated by fraudulently opening brokerage accounts at the Banks and then

engaging in securities transactions through the accounts that lack economic substance for

the sole purpose of generating commissions for the Banks in order to qualify for the IPO

Shares.  Through this fraudulent scheme, Defendants usurped Plaintiffs' opportunity to

obtain a much larger number of IPO Shares and prevented Plaintiffs' legitimate and

reasonable expectancies from ripening into valid business relationships with the Banks.

207.    Absent the respective frauds and collusive sham churning by Defendants, Plaintiffs

would have had an opportunity to obtain a much larger number of the IPO Shares and

would have enjoyed the financial benefits flowing from those purchases.

## FIFTEENTH CLAIM FOR RELIEF
### Civil Conspiracy

208.    All allegations previously stated herein are incorporated by reference.

209.    Defendants, in the course of their business, occupation, and/or vocation, had agreed

among themselves and conspired with each other to accomplish goals through unlawful

means.  The goals included, without limitation, to: (a) manipulate the established

procedures by which the Banks would allocate the valuable right to purchase IPO Shares,

(b) obtain the opportunity to purchase a greater number of IPO Shares than Defendants

would have otherwise been entitled to under the established policies of the Banks, and (c)

unlawfully deprive Plaintiffs of the opportunity to purchase their legitimate portion of the

IPO Shares under the established rules of the Banks.

210.   One or more overt act acts were performed to accomplish these goals.  The overt acts

committed by each Defendant in furtherance of the conspiracy are set forth in paragraphs

98-128, which paragraphs are incorporated by reference herein.

211.   As a direct and proximate result of the conspiracy alleged in this Complaint, Plaintiffs

have been injured as described above in an amount to be determined at trial.

## DAMAGES

Plaintiffs are entitled to, and hereby request, damages in an amount to be determined at

trial.  Additionally, pursuant to C.R.S. 18-17-106, Plaintiffs are entitled to, and hereby request:

a.   A money judgment award against all Defendants herein for threefold (triple) the

actual damages sustained by Plaintiffs from 2011 through present;

b.   A money judgment of forfeiture for the total amount of all gains realized by

Defendants on the sale of IPO Shares obtained by the Defendants as a result of the

IPO Market Manipulation Scheme from 2011 to the present;

c.   A judgment of forfeiture awarding to Plaintiffs all property, real or personal,

including without limitation, money, airplanes, boats, cars, houses, jewelry,

stocks, bonds, real estate, etc., obtained by Defendants using gains realized on the

sale of the IPO Shares received as a result of the IPO Market Manipulation

Scheme from 2011 to the present, or in the alternative a money judgment of

forfeiture for the cash value of these items;

d.   A money judgment of forfeiture for all proceeds from the sale of any and all

assets referred to in paragraph c. above;

e.   A judgment awarding the costs and expenses of this action;

f.   A judgment awarding reasonable attorneys' fees; and

g.   Such other and further relief ordered by the Court.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury on all issues herein.

## PRAYER

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment

against Defendants for damages as set out above, along with costs and reasonable attorneys' fees.

Dated: August 31, 2018.

ROBINS KAPLAN LLP

_s/ Lisa M. Coyle_____
Craig Weiner
Ronald J. Schutz
Lisa M. Coyle
399 Park Avenue, Suite 3600
New York, NY 10022
212/980-7400
212/980-7499
CWeiner@RobinsKaplan.com
RSchutz@RobinsKaplan.com
LCoyle@RobinsKaplan.com

Of counsel:

SANDERS LAW FIRM
Perry R. Sanders, Jr.
Rob Frank
Justin T. Bailey
David W. Hannum
31 N. Tejon Street
Suite 400
Colorado Springs, CO 80903
719/630-1556
719/630-7004
perry@scclaw.net
rob@rjflaw.com
Justin@PerrySandersLaw.com
David@PerrySandersLaw.com