**EXHIBIT 1**

## DECLARATION OF ▉

I, ▉, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following is true and correct.

1. My name is ▉. I am ▉ years old and a resident of ▉. I am the former sole shareholder of ▉ ("▉"). I have been engaged in business with James Lustig since 2006. My involvement with Mr. Lustig began when I was introduced to him by ▉, who was a client of mine.

2. In 2006, Mr. Lustig and I discussed my forming a company with which to conduct securities trades. To the best of my recollection, Mr. Lustig's lawyer, Rob Kaufmann, of the law firm Brownstein Hyatt Farber Schreck, LLP ("Brownstein Farber"), drafted the documentation to set up the agreements between Mr. Lustig and myself, including the operating agreements for ▉.

3. Once ▉ was formed, I opened securities trading accounts on behalf of ▉ with multiple prominent and recognized banks (collectively, the "Banks"). As a client of each of the Banks, ▉ would be eligible to purchase shares issued in initial public offerings that were underwritten by the Banks' underwriting affiliates ("IPO Shares"). While the specifics varied from Bank to Bank, in general the amount of IPO Shares that ▉ would receive from a particular Bank was directly tied to the amount of commissions that Bank was paid from ▉ securities account. The more securities transactions I engaged in through a particular Bank, the higher the amount of commissions that Bank could earn. Thus, a higher volume of trading activity with a particular Bank translated into ▉ receipt of larger allocations of IPO Shares from that Bank.

1

4. Mr. Lustig and/or his companies provided me and my company with approximately $650,000 with which to begin trading securities in ▮▮▮▮ accounts with the Banks. These funds would be repaid to Mr. Lustig and/or his companies over time with interest.

5. Before ▮▮▮▮ started conducting trades, Mr. Lustig conducted a "primer" of sorts with myself and two other affiliates with whom he was working whereby he explained to us how to conduct trades close in time to one another that are designed to cancel each other out and result in minimal actual exposure to market risk in our securities trading accounts for the purpose of generating commissions for the Banks. In particular, Mr. Lustig instructed that ▮▮▮▮ buy a particular quantity of a particular stock through its account at one Bank, and then sell the same quantity of the same stock through its account at a different Bank, on the same day. This way, ▮▮▮▮ would be exposed to minimal market risk from investing in that stock, but it would generate a commission for both of the Banks through which the trades were conducted. Those commissions generated through such trades were the basis for ▮▮▮▮ being eligible for IPO allocations at the Banks.

6. Every Monday morning, Mr. Lustig would have a meeting or a conference call with myself, certain of his employees, and several other of his affiliates, during which Mr. Lustig would give instructions for what IPO Shares affiliates should purchase during the coming week. Following that meeting, throughout each week, Mr. Lustig's employees would provide further instructions to myself and Mr. Lustig's other affiliates about which IPO Shares to purchase.

7. All of the trades conducted by ▮▮▮▮ between 2011 and 2017 were designed to generate broker commissions. In other words, ▮▮▮▮ engaged in trades that involved minimal exposure to market risk. The sole purpose of these trades was to generate commissions for the Banks so that the Banks would allocate IPO Shares to ▮▮▮▮

2

8. █████ purchased most of the IPO Shares offered to it by the Banks between 2011 and 2017. █████ would then quickly sell most of such IPO Shares on the open market.

9. At the time █████ was formed, it entered into an agreement with one of Mr. Lustig's companies pursuant to which Mr. Lustig and/or his companies would provide certain back-office functions for █████ and █████ would pay Mr. Lustig and/or his companies 40% of the profits that █████ made from the sale of the IPO Shares (the "Profit Sharing Agreement"). The Profit Sharing Agreement contained a confidentiality provision which was intended to keep me from disclosing the way the IPO business with Lustig worked, unless such business was somehow made public through another source. The business has been made public through at least one other published book listing Mr. Lustig specifically and describing the business. Our agreements also contained a clause preventing me from competing with Mr. Lustig's business. My best recollection is that all agreements between us were drafted by Brownstein Farber. It is therefore my opinion that Brownstein Farber must have been aware of the overall business pursuant to which █████ and other affiliates of Mr. Lustig would borrow money from Mr. Lustig or his companies to engage in IPO Share acquisitions, and share the profits generated from the sale of such IPO Shares with Mr. Lustig or his companies, in addition to repaying the amounts loaned with interest.

10. When opening securities trading accounts with the Banks, I was required to submit certain forms, including FINRA Rule 5130 and 5131 IPO Disclosure Forms, on behalf of █████. It was understood between Mr. Lustig and me that I was not to disclose on these forms that: (i) the funds █████ would use to conduct trades in the accounts were provided by Mr. Lustig and/or his companies; and (ii) Mr. Lustig and/or his companies had a beneficial interest in the profits generated from the sale of the IPO Share allocations.

3

11. Around 2014, I decided that I no longer wanted to continue my company's business with Mr. Lustig. When I told Mr. Lustig this, he became very insistent that I leave the account open even if we modified how it was managed. As a result, I continued my business with Mr. Lustig until the present day, but I engaged a third party to manage my accounts, and began receiving only a nominal amount of the profits generated by the business. Specifically, I have made approximately $10,000 from the business over the past four years. For practical purposes, I have not been personally involved in dealing with Mr. Lustig or his businesses on a regular basis for the past four years.

Dated: January 18, 2018

4