**EXHIBIT 2**

## Declaration of ▬▬▬

I, ▬▬▬, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following is true and correct.

1. My name is ▬▬▬. I am ▬ years old and a resident of ▬▬▬. I was the manager of ▬▬▬ ("▬▬▬") from January 2011 until the spring of 2018.

2. I have known James Lustig ("Mr. Lustig") for a long time. In late 2010, I was seeking job opportunities and called Mr. Lustig. Mr. Lustig agreed to meet me and offered me the opportunity to take over the accounts for ▬▬▬ from someone else.

3. I began to manage ▬▬▬ in January 2011, thereby inheriting its existing brokerage accounts open at J.P. Morgan Securities LLC ("J.P. Morgan"), Goldman Sachs & Co. ("Goldman Sachs"), and Credit Suisse Securities (USA) LLC ("Credit Suisse"). I later opened additional accounts with those and other banks on ▬▬▬ behalf, including with Jefferies LLC ("Jefferies" and, collectively with J.P. Morgan, Goldman Sachs, and Credit Suisse, the "Banks").

4. To remain in compliance with the Banks' rules for being eligible to receive allocations of shares issued in initial public offerings that were underwritten by the Banks' underwriting affiliates ("IPO Shares"), ▬▬▬ borrowed money from Mr. Lustig, amounting to approximately $680,000.

5. When I started working for ▬▬▬ in January 2011, I received training from Brandon Perry ("Mr. Perry"). He explained to me how his and Mr. Lustig's business worked and taught me how to conduct wash trades. Specifically, I was instructed to buy and sell the same amount of shares of the same stock close in time. We traded a handful of stocks, such as Bank of America, that did not move much in price so that it was easy to buy and sell the stocks

with minimal risk. The sole purpose of our trading was to generate commissions for the Banks, as a result of which ▮▮▮▮ became eligible to purchase IPO Shares. Mr. Perry taught me to increase the quantity and frequency of my wash trading in the weeks leading up to key initial public offerings ("IPOs") so as to maximize ▮▮▮▮ IPO Share allocations.

6. When I first started working for Mr. Lustig and Mr. Perry, I had daily in-person and telephonic communications with Mr. Perry, during which he would advise what stocks to trade, how and when to do wash trades, and which IPO Shares I should purchase from which Banks. Over time, I continued to have these conversations with Mr. Perry on a weekly basis.

7. During the time I was involved with ▮▮▮▮, from 2011 until 2018, all of the trades conducted by ▮▮▮▮ were wash trades, designed solely to generate commissions for the Banks so that the Banks would allocate IPO Shares to ▮▮▮▮.

8. ▮▮▮▮ purchased every IPO Share allocated to it by the Banks between 2011 and 2018. For example, it purchased shares in the Ali Baba IPO in September 2014 and the Facebook IPO in 2012 from Goldman Sachs and other Banks.

9. ▮▮▮▮ also purchased approximately 9,700 shares total of the Snapchat IPO on March 2, 2017, which it received from Goldman Sachs, J.P. Morgan, and Jefferies, resulting in a profit of approximately $75,000. As was general practice, Mr. Perry instructed me to purchase the Snapchat IPO Shares. To maximize ▮▮▮▮ IPO Share allocations for the Snapchat IPO, I increased the frequency and quantity of ▮▮▮▮ wash trading in the week leading up to the Snapchat IPO. As a result, I traded between 100,000-150,000 shares per wash trade, focusing primarily on several stocks, including United States Oil Fund, LP, Bank of America, Regions Financial, and XLF (an exchange-traded fund).

10. Mr. Lustig received a percentage of the profits from the sale of the IPO Shares allocated to ▮. That percentage was calculated by Mr. Perry and Mr. Lustig and, to the best of my recollection, it was between 30-35%, and maybe up to 37.5%.

11. In order to conduct these trades and become eligible for IPO Shares ▮ had to open accounts with the Banks, which it did before I began working for it and periodically throughout my tenure from 2011-2018. These documents required various representations, including a statement of my net worth. In early 2011 when I began working for ▮, either Mr. Lustig or Mr. Perry instructed me, despite the fact that they knew I was not a high net worth individual, to inflate my net worth so that I would meet the criteria for a high net worth individual, but they also told me to use a reasonable number so that it would not raise suspicion. As a result, I typically misrepresented that my net worth was between 50 to 70 million. This is not accurate.

12. Among the account opening documents, I was also required to submit certain forms, including FINRA Rule 5130 and 5131 IPO Disclosure Forms, on behalf of ▮. In 2011, when I first began working at ▮, either Mr. Lustig or Mr. Perry instructed me that I should only list ▮ on those forms. It was understood that I was not to disclose that: (i) the funds ▮ used to conduct trades in the accounts were provided by Mr. Lustig and/or his companies; and (ii) Mr. Lustig and/or his companies had a beneficial interest in the profits generated from the sale of the IPO Share allocations.

13. Throughout the time I was working with ▮, I received daily and weekly trading records entitled "Realized Gains and Losses" from CLFS Ltd., which reflected my wash trades. These records were sent by email, from a United Capital Management, Inc. email address.

14. In the spring of 2018, I ceased working for ███████████

Dated: August 29, 2018