**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-2992-WJM-STV
*Consolidated with Civil Action No. 18-cv-0190-WJM-STV*

DETROIT STREET PARTNERS, INC. and
BIRCHWOOD RESOURCES INC.,

      Plaintiffs,

v.

JAMES A. LUSTIG,
ALLIED FUNDING, INC.,
BENNETT PAUL "BUZZ" ALTERMAN,
ALTERMAN HARRISON INVESTMENTS, INC.,
ARROWHEAD INVESTMENTS, INC.,
CLFS EQUITIES, LLLP,
NANCY DAVIS,
DAVIS FAMILY OFFICE, INC.,
TODD J. EBERSTEIN,
GLOBAL CAP LIMITED, INC.,
WILLIAM HALL,
ANDREW HARRISON,
HAVEN CAPITAL VENTURES INC.,
JAL VENTURES CORPORATION,
KEN LANDE,
LION GATE CAPITAL, INC.,
MACK INVESTOR GROUP, INC.,
MELISSA MACKIERNAN,
MESA INVESTMENT PARTNERS, LLC,
STEWART "SKIP" MILLER,
BRANDON PERRY,
PINEHURST CAPITAL, INC.,
PREAKNESS CAPITAL MANAGEMENT INC.,
QUANDARY CAPITAL INC.,
RANCHO HOLDINGS, LLC,
KENNETH RICKEL,
RIO NORTE CAPITAL, INC.,
SMM INVESTMENTS, INC.,
WILLIAM SANDLER,
STEVE SHOFLICK,

UNITED CAPITAL MANAGEMENT, INC., and
AARON WOLK,

      Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS IN PART, DISMISSING STATE-LAW CLAIMS WITHOUT PREJUDICE, AND TERMINATING CASE

---

When a company becomes publicly traded on a stock market in the United States, it must go through an "initial public offering," or "IPO." But the very first shares a company offers for sale on a public exchange, known as "IPO shares," are not themselves publicly available. Rather, they are allocated amongst major investment banks underwriting the IPO, and the banks offer those shares at a specified price to whomever they wish (more or less). *Then* the shares may be traded on the stock exchanges, and frequently that trading activity quickly pushes their value much higher than the price at which they were purchased from the investment banks. And because IPO shares so often jump in value once they reach the public markets, well-heeled investors do whatever they must (more or less) to remain on the investment banks' short list of persons to whom IPO shares will be offered.

This lawsuit is about an allegedly unlawful scheme to curry the investment banks' favor and thus to obtain more IPO shares. Plaintiffs Detroit Street Partners, Inc. ("Detroit Street"), and Birchwood Resources, Inc. ("Birchwood") (together, "Plaintiffs"), accuse Defendants of using false pretenses to carry out a scheme by which they received many more IPO shares than they would have if they had behaved honestly.

Before the Court are two motions to dismiss, one each from the "Lustig

Defendants"[1] and the "Perry Defendants."[2]  (ECF Nos. 149, 151.)  Each motion asks

the Court to throw out the case for various and often overlapping reasons.  As explained

below, the Court grants Defendants' motions as to Plaintiffs' claims for relief arising

under federal law because Plaintiffs do not allege a federal claim that reaches

Defendants' alleged conduct.  And, with no federal claim to pursue, the Court declines

to continue exercising jurisdiction over Plaintiffs' claims arising under Colorado law.

Those claims will be dismissed without prejudice to refiling in state court.[3]

## I.  LEGAL STANDARDS

The Lustig Defendants' motion raises arguments for dismissal under Federal

Rules of Civil Procedure 12(b)(1) and 12(b)(6), and the Perry Defendants' motion raises

Rule 12(b)(6) arguments.

### A.    Rule 12(b)(1)

Rule 12(b)(1) permits a party to move to dismiss for "lack of subject-matter

jurisdiction."  "[Federal] [d]istrict courts have limited subject matter jurisdiction and may

---

[1] James A. Lustig, JAL Ventures Corporation, CLFS Equities, LLLP, and United Capital Management, Inc.

[2] Brandon Perry, Global Cap Limited, Inc., Allied Funding, Inc., Haven Capital Ventures, Inc., Pinehurst Capital, Inc., William Sandler, Andrew Harrison, Rancho Holdings, LLC, SMM Investments, Inc., Stewart Miller, Arrowhead Investments, Inc., Steven Shoflick, Alterman Harrison Investments, Inc., Bennett Paul Alterman, Rio Norte Capital, Inc., Kenneth Lande, Preakness Capital Management, Inc., Todd Eberstein, Mesa Investment Partners, LLC, William Hall, Nancy Davis, the Davis Family Office, Lion Gate Capital, Inc., Kenneth Rickel, Mack Investor Group, Inc., Aaron Wolk, Quandary Capital, Inc., and Melissa Mackiernan.  The Perry Defendants previously included JAF Holdings, Inc., DTA Capital, Inc., and Ronald Vlosich, but Plaintiffs have since voluntarily dismissed them.  (*See* ECF Nos. 160, 162.)

[3] Also still technically pending before the Court is a third motion to dismiss filed by the "Abelson Defendants" (Irving Investors Income Fund LLC, Irving Investors Privates, LLC, Irving Investors Real Estate Fund I, LLC, MSM Capital Management, Inc., and Jeremy and Mia Abelson).  (*See* ECF No. 152.)  Plaintiffs have since voluntarily dismissed these parties (*see* ECF Nos. 171, 174), which is why they no longer appear in the caption.  The Court will deny their motion to dismiss as moot.

[only] hear cases when empowered to do so by the Constitution and by act of Congress." *Randil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1225 (10th Cir. 2004) (internal quotation marks omitted). "A court lacking jurisdiction cannot render judgment but must dismiss the case at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

Rule 12(b)(1) motions generally take one of two forms: a facial attack or a factual attack. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). A facial attack "raises the question whether the complaint, on its face, asserts a non-frivolous claim 'arising under' federal law." *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 213 n.9 (1974) (quoting 28 U.S.C. § 1331). A factual attack "may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Holt*, 46 F.3d at 1003.

In this case, the Lustig Defendants bring a facial attack (ECF No. 149 at 2 n.1, 10–15),[4] so the Court cannot stray from the allegations of the complaint.

**B.    Rule 12(b)(6)**

Under Rule 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the

_____

[4] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in briefs with separately paginated prefatory material such as a table of contents.

dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II. ALLEGATIONS OF THE COMPLAINT

The Court assumes the following to be true for purposes of resolving Defendants' motions to dismiss. The following narrative comes from Plaintiffs' Amended Consolidated Complaint (ECF No. 83), to which the Court will refer to simply as "the Complaint." All "¶" citations, without more, are to the Complaint.

Plaintiffs "are securities traders that opened accounts at eight of the world's most prominent and recognized banks," such as J.P. Morgan, Deutsche Bank, Goldman Sachs, Morgan Stanley, and Barclays. (¶ 2.) The Court will refer to these various banks as "the Banks." Non-party David Berlin controls both Plaintiffs and directs their securities trading. (*Id.*) At J.P. Morgan, Berlin conducted his trades exclusively through Plaintiff Birchwood until 2013, at which time he began trading exclusively through Plaintiff Detroit Street. At the other Banks, he traded through Birchwood and Detroit Street simultaneously for some time, but has traded through Detroit Street only since 2013. (*Id.*)

Before 2008, J.P. Morgan would give preferential IPO share access to investors

with at least $10 million in their J.P. Morgan trading accounts. (¶¶ 69–70.) Birchwood met that threshold beginning in 2005, and earned $3 to $5 million dollars per year over the next few years from the sale of IPO shares offered to it by J.P. Morgan. (¶ 69.)

In 2008, "without notifying Birchwood, J.P. Morgan changed its policy such that it would allocate IPO Shares to its private banking clients based on the amount of commission revenue each account generated for J.P. Morgan through trading in securities, rather than the amount each account had on deposit." (¶ 70.) Under the new policy, "of which Birchwood was at first unaware," those with at least $10 million on account and those who generated at least $600,000 in trading commissions (regardless of the size of the account) would compete for preference when J.P. Morgan had IPO shares to allocate. (¶ 71.) Going forward, "[t]o remain top-tier clients, and thereby to receive the most IPO Share allocations, a J.P. Morgan customer would have to generate as much as $100,000 in commissions every month." (*Id.* (emphasis removed).) Moreover,

> [b]ecause of the way J.P. Morgan's rules were structured, multiple clients generating trading commissions for it would collectively be allocated a larger number of IPO Shares by J.P. Morgan than an individual client generating the same total amount of commission[s]. For example, if Companies A, B, C, D, and E each separately generated $600,000 in commissions for J.P. Morgan in one year, for a total of $3 million, the total number of IPO Shares that were allocated to them, collectively, would be larger than the number of IPO Shares allocated to Company F, which had itself generated $3 million in commissions for J.P. Morgan that same year.

(¶ 72.)

This commission-based system for earning IPO share preference was already in place at the Banks other than J.P. Morgan from the time Plaintiffs began trading at those Banks in 2006. (¶ 75.) As with the post-2008 J.P. Morgan system, the other

Banks each required "as much as $100,000 in commissions every month" to "remain top tier clients," but the "rules were structured such that multiple clients generating trading commissions for any one Bank would collectively be allocated a larger number of IPO Shares by that Bank than an individual client generating the same total amount of commission[s]." (¶¶ 75–76.)

Sometime in or around the year 2011, Defendants, led by Defendant James Lustig, devised or participated in a scheme to take advantage of the Banks' IPO share allocation policies. Specifically, Defendants set up numerous entities ("Affiliates"), which then opened trading accounts with the Banks. (¶ 9.) When opening these accounts, the Affiliates would state on required forms that they were capitalized through personal and family wealth and that no "restricted person" had a beneficial interest in trading profits. (¶ 87(b), (i).) In truth, they were actually capitalized through money loaned by the Lustig Defendants, and Lustig would qualify as a restricted person with a beneficial interest. (*Id.*) Once the accounts were opened, the Affiliates would conduct trades at the Lustig Defendants' direction solely for the purpose of generating commissions—usually by selling a quantity of a certain stock through one Bank and soon after buying the same quantity of the same stock through a different Bank. (¶ 87(c)–(h).) The Affiliates thus generated commissions at two Banks but also limited their exposure to the economic consequences of the trades. The Affiliates then received IPO share allocations, sold those shares at a profit on the open market, and remitted up to 40% of the profits to the Lustig Defendants. (¶ 87(k).)

This scheme

> enabled Lustig to profit from a far greater number of IPO
> Shares than he would have had he simply generated

commissions for the Banks in his own account with each
Bank through legitimate trading. Indeed, but for the
[scheme], the majority of the IPO Shares that Lustig has
received and/or profited from would, under the policies of the
Banks, instead have been allocated to Plaintiffs and other
innocent clients of the Banks.[5] As a result of the [scheme],
Plaintiffs have seen a steady decrease in the amount of IPO
Shares allocated to them, and thus a steady decrease in the
profits that they have earned on the sale of such IPO
Shares.

(¶ 17.)

### III. PROCEDURAL HISTORY & CLAIMS FOR RELIEF

Plaintiffs filed this lawsuit on December 13, 2017, naming various of the

Defendants, some of whom have since been dismissed. (*See* ECF No. 1.) On January

24, 2018, for reasons not important to recount here, Plaintiffs filed a separate lawsuit,

Civil Action No. 18-cv-0190, that was, in substance, an amendment to the original

complaint in this lawsuit. The Court consolidated the two lawsuits and gave Plaintiffs

leave to file an amended consolidated complaint. (ECF No. 78.)

The Amended Consolidated Complaint—what the Court refers to as "the

Complaint"—asserts fifteen claims for relief:

- knowingly conducting or participating in an enterprise through a pattern of

  racketeering activity, in violation of the Colorado Organized Crime Control

  Act ("COCCA"), Colo. Rev. Stat. § 18-17-104(3) ("Claim 1");

- using proceeds knowingly derived from a pattern of racketeering activity to

  invest in an enterprise, in violation of COCCA, § 18-17-104(1)(a)

  ("Claim 2");

---

[5] Despite this mention of "other innocent clients," Plaintiffs are not seeking class-action status.

- using a pattern of racketeering activity to knowingly acquire an interest in an enterprise, in violation of COCCA, § 18-17-104(2) ("Claim 3");

- conspiracy to violate COCCA, § 18-17-104(4) ("Claim 4");

- employing a device, scheme, or artifice to defraud in connection with securities, in violation of the Colorado Securities Act ("CSA"), Colo. Rev. Stat. § 11-51-501(1)(a) ("Claim 5");

- making fraudulent statements or material omissions in connection with securities, in violation of the CSA, § 11-51-501(1)(b) ("Claim 6");

- using acts, practices, or a course of business which operates or would operate as a fraud or deceit in connection with securities, in violation of the CSA, § 11-51-501(1)(c) ("Claim 7");

- control person liability under the CSA ("Claim 8");

- aiding and abetting liability under the CSA ("Claim 9");

- employing a device, scheme, or artifice to defraud in connection with the purchase or sale of securities, in violation of Securities Exchange Act ("Exchange Act") § 10(b) (15 U.S.C. § 78j(b)), and Securities & Exchange Commission ("SEC") Rule 10b-5(a) (17 C.F.R. § 240.10b-5(a)) ("Claim 10");

- making untrue statements or material omissions in connection with the purchase or sale of securities, in violation of Exchange Act § 10(b) and SEC Rule 10b-5(b) ("Claim 11");

- engaging in an act, practice, or course of business which operates as a fraud in connection with the purchase or sale of securities, in violation of

Exchange Act § 10(b) and SEC Rule 10b-5(c) ("Claim 12");

- control person liability under the Exchange Act § 20(a) (15 U.S.C.

  § 78t(a)) ("Claim 13");

- tortious interference with prospective business relations under Colorado

  common law ("Claim 14"); and

- civil conspiracy under Colorado common law ("Claim 15").

(¶¶ 93–211.)

## IV.  RULE 12(b)(1) ANALYSIS

The Lustig Defendants assert that Plaintiffs lack Article III standing to bring this lawsuit, referring to Article III of the United States Constitution.  (ECF No. 149 at 10–15.) Article III restricts federal courts to deciding "cases" and "controversies."  *See* U.S. Const. art. III, § 2, cl. 1.  These words have been interpreted to restrict federal courts from giving "advisory opinions," *Flast v. Cohen*, 392 U.S. 83, 96 (1968), meaning that a federal court may not resolve questions in the abstract, but instead may only resolve "disputes arising out of specific facts when the resolution of the dispute will have practical consequences to the conduct of the parties," *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011).

To safeguard this restriction, the Supreme Court has articulated a three-element test:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of . . . .  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted; certain alterations incorporated). "[T]he plaintiff bears the burden of proof" to establish that these elements exist. *Id.* at 561; *see also United States v. Bustillos*, 31 F.3d 931, 933 (10th Cir. 1994) ("The party seeking to invoke the jurisdiction of a federal court must demonstrate that the case is within the court's jurisdiction. The facts supporting jurisdiction must be affirmatively alleged, and if challenged, the burden is on the party claiming that the court has subject matter jurisdiction.").

Here, the Lustig Defendants argue that Plaintiffs fail all three standing requirements because, in essence, the alleged injury flows from the Banks' policies, but the Banks are not defendants here; and in any event Plaintiffs plead no true injury, but just the loss of an opportunity to obtain more IPO shares. (ECF No. 149 at 11–15.) The Court agrees with Plaintiffs, however, that the Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), counsels that Plaintiffs' allegations satisfy the requirements for Article III standing.

The dispute in *Bridge* involved the system by which Cook County, Illinois, auctions property tax liens. In theory, the winning bidder is the one willing to accept the lowest penalty, as a percentage of taxes owed, on the property owner (*i.e.*, the delinquent taxpayer) as a cost of clearing the lien. *Id.* at 642. But tax lien properties are usually very valuable—the delinquent taxpayers rarely clear the lien within the required amount of time, and the winner of the tax lien auction can then take the property outright upon paying those delinquent taxes, which are usually far less than the price at which the property can be resold. So winning a tax lien auction is, in most cases, like buying real estate at a fire sale price. Knowing as much, most bidders in Cook County are

"willing to accept the lowest penalty permissible—0%, that is to say, no penalty at all." *Id.*

But "[t]he lower limit of 0% creates a problem: Who wins when the bidding results in a tie?  The county's solution is to allocate parcels on a rotational basis in order to ensure that liens are apportioned fairly among 0% bidders."  *Id.* at 642–43 (internal quotation marks omitted).  That system, however, prompted some bidders to hire multiple agents to bid on their behalf, thus increasing their chances of winning any particular property.  *Id.* at 643.  And, in turn, Cook County sought to end this practice through a rule "requir[ing] each 'tax buying entity' to submit bids in its own name and prohibit[ing] it from using 'apparent agents, employees, or related entities' to submit simultaneous bids for the same parcel."  *Id.*

Some bidders broke the rule, and when rule-abiding plaintiffs discovered this, they brought the *Bridge* lawsuit against the rule-breakers, alleging various causes of action.  *Id.* at 643–44.  The United States District Court for the Northern District of Illinois found that the plaintiffs had Article III standing, but not another form of standing known as prudential standing (not relevant here).  *Id.* at 645.  The Seventh Circuit Court of Appeals agreed as to Article III standing but decided, contrary to the district court, that prudential standing also existed.  *Id.* at 646.  The Supreme Court affirmed the Seventh Circuit.

By the time the case reached the Supreme Court, it appears that no party was questioning Article III standing.  However, the Supreme Court must satisfy itself that Article III standing exists, even if not previously challenged.  *See, e.g.*, *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67–73 (1997).  In that light, it is notable that the

Supreme Court declared, without any hint of concern regarding Article III standing, that the plaintiffs' "theory of the case is straightforward. They allege that [the defendants] devised a scheme to defraud when they agreed to submit false attestations of compliance with the [county's single-bidder rule]. . . . As a result, [the plaintiffs] lost the opportunity to acquire valuable liens." *Bridge*, 553 U.S. at 647–48.

For Article III standing purposes, Plaintiffs' theory of this case is similarly straightforward: through allegedly unlawful conduct, Defendants obtained more IPO shares than they would have if they had proceeded lawfully, and Plaintiffs thus lost the opportunity to acquire valuable IPO shares. A Seventh Circuit decision from a later (post-remand) stage in the *Bridge* dispute is persuasive in this regard. The Seventh Circuit explained that the tax lien bidding process was literally a matter of who raised their hand the fastest in the auction room. *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 752–53 (7th Cir. 2011). The Seventh Circuit thus asked rhetorically, "How likely is it that [the plaintiffs] lost *no* bids to bidders who had 13 arms in the room but should have had only three?" *Id.* at 758 (emphasis in original). Similarly, in terms of Plaintiffs' Article III standing in this lawsuit, given the sophisticated machinations Plaintiffs allege comprised the scheme undertaken by the various Defendants, it is extremely unlikely that there was *no* occasion on which Defendants received IPO shares that would have gone to Plaintiffs but for Defendants' allegedly unlawful conduct. That is enough to establish injury in fact (loss of money Plaintiffs would have earned through reselling those IPO shares they would have been allocated but for Defendants' alleged scheme) caused by Defendants' conduct (*e.g.*, opening additional trading accounts through unlawful means, thus giving them more chances to obtain IPO shares

13

than they otherwise would have received) that this Court could redress (through a judgment awarding money damages to Plaintiffs). Accordingly, at least in these circumstances, the Court finds that Plaintiffs' loss-of-an-opportunity theory of injury is enough for Article III standing.

## V. RULE 12(b)(6) ANALYSIS

The next question is whether Plaintiffs state any viable claim that would allow them to recover against Defendants for Defendants' allegedly unlawful actions. For reasons that will become clear below (*see* Part VI), the Court does not need to examine all fifteen of Plaintiffs' claims for relief. The Court can instead focus on Plaintiffs' claims for relief under federal law, namely, Claims 10–14. These claims allege violations of Exchange Act § 10(b) and SEC Rule 10-b-5 (Claims 10–13), and the Lustig Defendants' "control person" liability for any such violation by the Affiliates (Claim 14).

Exchange Act § 10(b) reads in relevant part as follows:

> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate
> commerce or of the mails, or of any facility of any national
> securities exchange * * * [t]o use or employ, in connection
> with the purchase or sale of any security registered on a
> national securities exchange or any security not so
> registered . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as
> the [SEC] may prescribe as necessary or appropriate in the
> public interest or for the protection of investors.

15 U.S.C. § 78j(b). The most important of those SEC-prescribed rules and regulations is Rule 10b-5, which reads:

> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate
> commerce, or of the mails or of any facility of any national
> securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

For a private plaintiff (as distinct from the SEC) to prevail on a claim for violation of Exchange Act § 10(b) and Rule 10b-5, the plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks omitted).

The major question raised by Plaintiffs' Exchange Act § 10(b) and Rule 10b-5 claims centers on the fourth element, reliance. "The reliance element ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation." *Id.* (internal quotation marks omitted). But there is an exception. In *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court grappled with the problem of "the Rule 10b-5 plaintiff who has traded on an impersonal market," and has therefore presumed that the market

price at the time of the trade reflected all available material information.  *Id.* at 245.  The

Supreme Court endorsed the "fraud-on-the-market" presumption in such a situation:

> An investor who buys or sells stock at the price set by the
> market does so in reliance on the integrity of that price.
> Because most publicly available information is reflected in
> market price, an investor's reliance on any public material
> misrepresentations, therefore, may be presumed for
> purposes of a Rule 10b-5 action.

*Id.* at 247.  To take advantage of the fraud-on-the-market presumption,

> a plaintiff must make the following showings . . . : (1) that the
> alleged misrepresentations were publicly known, (2) that
> they were material, (3) that the stock traded in an efficient
> market, and (4) that the plaintiff traded the stock between the
> time the misrepresentations were made and when the truth
> was revealed.

*Halliburton*, 573 U.S. at 268.  "Plaintiffs who invoke the 'fraud on the market theory'

have the burden of establishing the securities were traded on an efficient market."  *In re*

*Accelr8 Tech. Corp. Sec. Litig.*, 147 F. Supp. 2d 1049, 1056 (D. Colo. 2001).

Defendants argue that Plaintiffs cannot satisfy any of the four fraud-on-the-

market elements.  (ECF No. 149 at 19–20; ECF No. 151 at 15–16.)  In response,

Plaintiffs admit that the first and third elements—publicly known misrepresentations and

an efficient market—are not satisfied:

> Here, the market for IPO share allocations was not public,
> but rather was administered by the Banks.  In this market,
> the true price of the IPO shares (including the commissions
> Bank clients had to generate to be allocated such shares)
> was determined not by publicly-disclosed information, but
> rather by the number of accounts competing for such shares
> and the amount of trading activity in which the owners of
> such accounts engaged.

(ECF No. 168 at 56 (citation omitted).)  "Plaintiffs contend," however, "that the fraud on

the market theory should apply in this case by analogy."  (*Id.* at 57.)

> The presumption of reliance that should be applied here by analogy to the fraud on the market doctrine should require that the **Banks**—which administered the market for IPO shares and controlled the number of accounts able to compete for such shares—knew of the statements and that the IPO share allocation market reflected material information available to the Banks. Both requirements are met here, as the statements were made directly to the Banks and the IPO share allocation market necessarily reflected the number of accounts competing for IPO shares, which was directly increased by Defendants' misstatements.

(*Id.* at 57–58 (citations omitted; boldface in original).) Plaintiffs' reference to "the statements [that] were made directly to the Banks" means the various Affiliates' allegedly false statements that they were opening trading accounts for themselves, with their own money, when in fact they were opening accounts to trade with the Lustig Defendants' money on the Lustig Defendants' behalf. (*See* ¶ 87(i).)

Plaintiffs' supposed analogy to the fraud-on-the-market theory is far too distant from the real fraud-on-the-market elements to be fairly called an "analogy." Plaintiffs entirely drop the "publicly" portion of the "publicly known" element. As for the "efficient market" element, Plaintiffs neither plead the existence of such a market nor attempt to demonstrate market efficiency through argument. Nor could Plaintiffs plausibly allege an efficient market, for at least three reasons.

First, "[a]n efficient market is one which rapidly reflects new information in the price of the *stock*." *Stat-Tech Liquidating Tr. v. Fenster*, 981 F. Supp. 1325, 1346 (D. Colo. 1997) (emphasis added). Perhaps this definition should say "security," rather than "stock," to encompass more than just equity shares (*e.g.*, bonds). Regardless, the market at issue here is not for stock or any other form of security, but the *opportunity*, provided by the Banks, to be allocated IPO shares when the Banks have IPO shares to allocate. (*See* ¶¶ 182, 188, 194 (characterizing the market as "the IPO Share allocation

market").)  Courts that have addressed the issue have consistently held that the market

for IPO shares (or newly issued bonds) is not efficient,[6] and Plaintiffs fail to explain how

the market for the opportunity to be allocated IPO shares could nonetheless be efficient.

Second, even if the fraud-on-the-market theory could apply to the circumstances

here, Plaintiffs' allegation about the hypothetical Companies A, B, C, D, E, and F shows

that this market is at least partly inscrutable, which is far from "rapidly reflect[ing] new

information."  *Stat-Tech*, 981 F. Supp. at 1346.  The allegation, again, is as follows:

> Because of the way the Banks' rules were structured,
> multiple clients generating trading commissions for any one
> Bank would collectively be allocated a larger number of IPO
> Shares by that Bank than an individual client generating the
> same total amount of commissions.  For example, if
> Companies A, B, C, D, and E each separately generated
> $600,000 in commissions for J.P. Morgan in one year, for a
> total of $3 million, the total number of IPO Shares that were
> allocated to them, collectively, would be larger than the
> number of IPO Shares allocated to Company F, which had
> itself generated $3 million in commissions for J.P. Morgan
> that same year.

(¶ 6.)  Although Plaintiffs make this allegation three times (¶¶ 6, 72, 76), Plaintiffs fail to

plead the *formula* that leads to this outcome, so the Court presumes that Plaintiffs do

not know it.  *Cf. O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976) ("when a

complaint omits facts that, if they existed, would clearly dominate the case, it seems fair

to assume that those facts do not exist").  And if Plaintiffs do not know how market

inputs lead to market outputs, then, almost by definition, the market is not efficient.

Third, a market surely is not efficient if its creator (here, the Banks) can change

---

[6] *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006), *decision clarified on other grounds on denial of reh'g*, 483 F.3d 70 (2d Cir. 2007); *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990); *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 69 n.5 (S.D.N.Y. 2000); *In re Bexar Cnty. Health Facility Dev. Corp. Sec. Litig.*, 130 F.R.D. 602, 607 (E.D. Pa. 1990); *Stinson v. Van Valley Dev. Corp.*, 714 F. Supp. 132, 137 (E.D. Pa. 1989).

the rules without informing market participants. Yet that is what happened here: J.P. Morgan did not notify Birchwood of the change from the $10-million-on-account preference to the $600,000-in-commissions preference, and Birchwood remained "unaware" of the change for some time afterwards. (¶¶ 70–71.)

In their response brief, Plaintiffs assert in a footnote that, "at the pleadings stage, [a] plaintiff need only allege that the subject securities traded in an efficient market to benefit from the presumption of reliance." (ECF No. 168 at 57 n.33 (citing *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 377 (S.D.N.Y. 2003), and *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 509 (S.D.N.Y. 2005)).) While the Court can agree with the Southern District of New York that "whether the fraud on the market theory applies is not a pure question of law," *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d at 377, this principle is unhelpful to Plaintiffs in the current circumstances because Plaintiffs do *not* "allege that the subject securities traded in an efficient market." (ECF No. 168 at 57 n.33.) They only allege that they "relied on the integrity of the IPO Share allocation market." (¶¶ 182, 188, 194.) "IPO Share allocation" is not a security, and, regardless, an investor's unilateral reliance on the integrity of a market is not a relevant factor when deciding whether a market is efficient. *See Stat-Tech*, 981 F. Supp. at 1346. Furthermore, Plaintiffs' allegations in their complaint and concessions in their response brief show that the lack of an efficient market may be discerned as a matter of law in these circumstances.

In short, Plaintiffs are not asking for an "analogy" to the fraud-on-the-market presumption, but for a securities fraud cause of action that simply does not exist at present. Nor do Plaintiffs point to a statute or regulation under which such a cause of

action could exist. Accordingly, Plaintiffs' Claims 10–12 fail to state a claim upon which relief can be granted. In turn, Claim 13's request for control person liability against the Lustig Defendants must fail as well. *See* 15 U.S.C.A. § 78t(a) ("Every person who, directly or indirectly, controls any person *liable* under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and *to the same extent as* such controlled person to any person to whom such controlled person is *liable* . . . ." (emphasis added)).

## VI. 28 U.S.C. § 1367(c) ANALYSIS

Aside from unusual circumstances that do not apply here, a federal district court's power to adjudicate a lawsuit must ultimately rest on either: (i) at least one claim "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331; or (ii) claims arising under state law "where the matter in controversy exceeds the sum or value of $75,000 . . . and is between * * * citizens of different States," *id.* § 1332(a)(1). The latter is not an option here because Plaintiffs and many Defendants are considered Colorado citizens, and so are not citizens of different states. (*See* ¶¶ 24–57.) Thus, this Court's original jurisdiction rests on the claims "arising under the . . . laws . . . of the United States," 28 U.S.C. § 1331, namely, Claims 10–13. Every other claim arises under Colorado law and is properly before the Court only by way of "supplemental jurisdiction." 28 U.S.C. § 1367(a).

This Court "may decline to exercise supplemental jurisdiction" over a state-law claim if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Id.* § 1367(c).  Here, the third option applies because this Court will dismiss Claims 10–13, which are the only claims over which the Court has original jurisdiction.  In such a situation, the Court should "generally decline to exercise [supplemental] jurisdiction [over the remaining claims] . . . absent compelling reasons to the contrary."  *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) (internal quotation marks omitted).

Plaintiffs argue that "such compelling reasons exist here" because (i) "federal law offers instructive guidance" on COCCA claims,[7] and so "this case presents no 'novel or complex issue of State law' counseling for [a] decision by [a] state court," and (ii) the case "does present exceptionally egregious facts."  (ECF No. 168 at 71–72.)  Taking these arguments in reverse order, Plaintiffs cite no authority that the presence of "exceptionally egregious facts" (assuming they are that) has anything to do with whether a federal district court should retain supplemental jurisdiction.  As for novel or complex issues of state law, Plaintiffs somewhat misread § 1367(c).  A novel or complex issue of state law is a reason to *dismiss* a state-law claim *even if* the lawsuit will proceed on federal claims.  *See* 28 U.S.C. § 1367(c)(1).  But the *absence* of a novel or complex issue of state law is not a "compelling reason[]," *Brooks*, 614 F.3d at 1230, to continue adjudicating state-law claims when all federal claims have been dismissed.  Even if the case were otherwise, there is an important issue of state law in play here.  The parties

---

[7] Colorado courts interpreting COCCA sometimes find guidance in cases interpreting the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961 *et seq.  See, e.g., People v. Pollard*, 3 P.3d 473, 476 (Colo. App. 2000); *Tallitsch v. Child Support Servs., Inc.*, 926 P.2d 143, 147 (Colo. App. 1996).

agree that Colorado has yet to adopt the fraud-on-the-market theory for causes of action arising under the CSA. (*See* ECF No. 151 at 18–19; ECF No. 168 at 58–59.) Whether Colorado would adopt that theory—and, even more importantly, whether it would extend the theory as far as Plaintiffs want to extend it—should be left to Colorado courts.

For all these reasons, the Court finds no compelling reason to continue adjudicating Plaintiffs' state-law claims in a federal forum. Accordingly, Claims 1–9 and 14–15 will be dismissed without prejudice to refiling in state court. *See Brooks*, 614 F.3d at 1230; *see also* 28 U.S.C. § 1367(d) (tolling statute of limitations on state-law claims for thirty days after a federal court declines supplemental jurisdiction).

## VII. CONCLUSION

For the reasons set forth above:

1. The Lustig Defendants' Motion to Dismiss (ECF No. 149) is GRANTED to the extent the Court finds that Plaintiffs' Claims 10–13 fail to state a claim upon which relief can be granted, and that the Court should decline supplemental jurisdiction over Plaintiffs' remaining claims, but is otherwise DENIED;

2. The Perry Defendants' Motion to Dismiss (ECF No. 151) is GRANTED to the extent the Court finds that Plaintiffs' Claims 10–13 fail to state a claim upon which relief can be granted, but is otherwise DENIED;

3. The Abelson Defendants' Motion to Dismiss (ECF No. 152) is DENIED AS MOOT;

4. Plaintiffs' Claims 10–13 are DISMISSED WITH PREJUDICE, and Plaintiffs' remaining claims are DISMISSED WITHOUT PREJUDICE to refiling in state

court;

5.     The Clerk shall enter judgment accordingly in this case and in Civil Action No.

       18-cv-0190-WJM-STV, and shall terminate both cases; and

6.     To the extent the Lustig Defendants and the Perry Defendants can segregate

       costs incurred defending against Claims 10–13 from costs incurred defending

       against Plaintiffs' other claims, the Lustig Defendants and the Perry Defendants

       shall have their costs upon compliance with D.C.COLO.LCivR 54.1.

       Dated this 25th day of July, 2019.

                                             BY THE COURT:

                                             _____
                                             William J. Martinez
                                             United States District Judge